UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN PENTZ, )<br><br>Plaintiff, )<br><br>v. )<br><br>ALM, )<br><br>Defendant. ) | Civil Action No. 05-10207 (JLT) |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

In the fall of 2004, American Lawyer Media, Inc. published a supplement to its regular

publications *The American Lawyer* and *Corporate Counsel* entitled "Litigation 2004: Plaintiff

Power" (the "Supplement").[1] The Supplement represented ALM's first serious effort to examine

the financial aspects of the plaintiffs' bar, as set out in the Editor's Note to the Supplement. (A

copy of the entire issue is attached as Exhibit 1 to the affidavit of Philip A. O'Connell, Jr.

submitted herewith ("O'Connell Aff't, Ex. 1"); Ex. 1 at 6)[2]  This topic was chosen by ALM

---

[1] The Complaint mistakenly identified the publisher as ALM.  At the time of publication, the correct name of the publisher was American Lawyer Media, Inc.  As of March 7, 2005, the corporate defendant's name became ALM Media, Inc.   All references herein will be to ALM Media, Inc., abbreviated as "ALM."

[2] Even though Plaintiff attached only the specific article sued on to the Complaint, and not the entire issue, the Court may consider the entire issue on a motion to dismiss. In a defamation case "based on a written instrument, as is the case here, the Court may consider such an instrument in ruling on a rule 12(b)(6) motion…even if the instrument was not attached to the complaint." *Abbott v. Harris Publications,* 1998 U.S. Dist LEXIS 18990, at *4-5 (S.D.N.Y. 1998). *See Cortec Industries, Inc. v. Sum Holding LLP*, 949 F.2d 42, 47-48 (2d Cir. 1991) (on a motion to dismiss, "when a party incorporates by reference a prospectus upon which it solely relies and is integral to the complaint, the defendant may produce the prospectus when attacking the

because the plaintiffs' bar has recently become "a subject of public debate" as "either . . . the lawyers whom injured Americans love or the lawyers whom litigation weary Americans love to hate." (O'Connell Aff't, Ex. 1 at 6)

The Supplement contained an article about Madison County, Illinois being the site of thousands of class action litigations against major corporations. (O'Connell Aff't Ex. 1 at 37) A short, 683 word sidebar to that article was a profile of the Plaintiff that forms the basis for this action, entitled "The Objector" (the "Sidebar"). (O'Connell Aff't, Ex. 1 at 38-39)  The Sidebar described the Plaintiff as one of the biggest names in a specialized field of lawyers whose practice centers on objecting to class action settlements, a description that plaintiff does not challenge, and as having successfully objected to an award of $600 million in attorney's fees to the class counsel in an action against MasterCard and Visa. Despite the overall positive tone of the Sidebar, Plaintiff apparently has based his multimillion dollar libel action on the Sidebar's rhetorical use of the colorful phrase "'holdup artist'" to describe him, as well as the article's observation that some judges do not like lawyers who object to settlements in class action suits. Finally, Plaintiff complains that the Sidebar's depiction of his success in objecting to the award of attorney's fees was "patently false."

The defamation law of this country is clear, however, that use of figurative and rhetorical hyperbole such as "'holdup artist'" cannot form the basis for a defamation claim. The law is equally clear that statements about groups or collections of people that do not single out the plaintiff are not actionable as failing to meet the "of and concerning" element of a defamation

complaint for its failure to state a claim"); *Citicorp North America, Inc v. Ogden Martin Systems of Haverhill, Inc.* 8 F.Supp.2d 72, 74 (D.Mass. 1998) (on a motion to dismiss, the "court may take into account documents whose authenticity is not questioned and on which the allegations of the complaint are expressly based"). *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, 5B FED. PRAC. & PROC. § 1357 (2005).

- 2 -

claim. Finally, statements that plaintiff has been successful in meeting his objectives in court, even if assumed to be false for the purposes of this motion only, are not defamatory as a matter of law. For these and the reasons set forth below, this action should be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

## FACTUAL BACKGROUND[3]

**The Sidebar:** The Sidebar began with a description of the plaintiffs' counsel's award in an action against Visa and MasterCard of $600 million with the class members recovering $3 billion. "It was the perfect class action ending," the Sidebar stated. The Sidebar continued, "Then the 'holdup artist' rode into the courtroom." The Sidebar identified the Plaintiff, John Pentz, as a class action objector and as having "left his mark on the case" by "cutting [class action plaintiff's counsel's fees] to $220 million." (O'Connell Aff't, Ex. 1 at 38) Continuing the Wild West rhetorical reference of "'holdup artist,'" the Sidebar then stated that Pentz became the "outlaw of class action litigation in 2000, when he opened his own firm," and that his firm focuses "almost exclusively on objecting to class action settlements."

Pentz's practice was described as showing up "at the last minute" to object to a settlement that "is sometimes years in the making." The Sidebar observed that "[j]udges tend not to like that tactic," and that

> [c]ase opinions are rife with examples of judicial scorn for Pentz's ilk. In a 2000 ruling approving a $2.1 billion settlement with Toshiba America, Inc., for instance, Judge Thad Heartfield of the Eastern District of Texas criticized "canned objections" filed by lawyers seeking "to extract a fee by lodging generic, unhelpful protests."

---

[3] For purposes of this motion to dismiss only, ALM takes as true factual allegations set forth in the Complaint.

- 3 -

*Id.* The Sidebar included Pentz's statement that "he was disturbed by class actions in which plaintiffs' lawyers took home millions and class members won just a coupon." *Id.* Pentz was quoted as observing that no court has ever said that class action objecting is illegitimate or improper. The Sidebar reported how successful Pentz has been and how "[o]ver the past four years, Pentz has objected to some huge class action settlements," which were listed by name. The Sidebar concluded with an analysis of how Pentz earns his fees, usually by receiving payment from class action counsel in exchange for dropping his objections. *Id.*

**This Action:** This action for libel followed in which Plaintiff has asked for $5 million in damages. He has also asked that the Court order ALM to print a retraction that he drafted. Any such court order would be a clear and unambiguous violation of the First Amendment.[4]

In his Complaint, Pentz appears to put forward three claims. First, he contends that a reference to him as a "'holdup artist'" is "false and defamatory." (Complaint ¶ 9)  Second, he objects to the Sidebar's characterization of him as having "cut" the fees in a suit against Visa U.S.A. Inc. and MasterCard Incorporated ("Visa Check"), in which he filed an objection to the $600 million in lawyer's fees agreed to in the settlement. (Complaint ¶16)  The judge in the case, Judge Gleeson, cut the lawyer's fees by $380 million. *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F.Supp.2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc.*, 396 F.3d 96 (2d Cir. 2005).  Finally, he alleges the statement "case opinions are rife with examples of judicial scorn for Pentz's ilk" defames him. (Complaint ¶ 9)

For the reasons set forth below, Plaintiff's claims should be dismissed in their entirety.

---

[4] *See Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974); *Machleder v. Diaz*, 801 F.2d 46, 55 (2d Cir. 1986); *Rattner v. Netburn*, 930 F.2d 204, 208 (2d Cir. 1991); *Yeo v. Town of Lexington*, 131 F.3d 241, 249-250 (1st Cir. 1997).

- 4 -

## ARGUMENT

### I.   The Complaint Fails To State A Claim For Defamation.

The Complaint does not state a claim for defamation under Massachusetts or New York

law.[5]   As this Court has stated, the elements of a libel claim are "a false and defamatory

communication of and concerning the plaintiff." *Brown* 862 F. Supp. at 627, *quoting, McAvoy v.*

*Shufrin*, 401 Mass. 593, 518 N.E.2d 513, 517 (1988).   Whether a statement is capable of a

defamatory meaning is a threshold question of law to be resolved by the Court and is therefore

the proper subject of a motion to dismiss. *E.g., Albright v. Morton,* 321 F.Supp.2d 130, 135 (D.

Mass 2004); *Abbott,* 1998 U.S. Dist LEXIS 18990, at *10; *Netzer v. Continuity Graphic*

*Associates, Inc.* 963 F.Supp. 1308, 1325 (S.D.N.Y. 1997); *Weinstein* 1996 U.S. Dist. LEXIS

3672, at *10.

Since the United States Supreme Court's landmark decision in *New York Times v.*

*Sullivan,* 376 U.S. 254 (1964), the courts have recognized the high level of First Amendment

interests at issue in defamation cases on matters of public concern such as the one before this

Court:

> Against the "background of a profound national commitment to the principle that debate
> on public issues should be uninhibited, robust, and wide-open, and that it may well
> include vehement, caustic, and sometimes unpleasantly sharp attacks," the Court noted

---

[5] As alleged in the Complaint, defendant ALM is resident in and publishes out of New York.
Plaintiff is resident in Massachusetts. (Complaint ¶¶ 1,2) Under choice of law analysis, ALM
would urge this court to apply New York law. *E.g., Brown v. Hearst Corp.,* 862 F. Supp. 622,
627 (D. Mass. 1994)(Tauro, J.), *aff'd,* 54 F.3d 21 (1st Cir. 1995)(applying Massachusetts law as
the place of publication); *Abbott,* 1998 U.S. Dist. LEXIS 18990, at *3 (applying New York law
as place of publication and residence of defendants); *Weinstein v. Friedman,* 1996 U.S. Dist.
LEXIS 3672, *20, 24 Media L. Rep. 1769 (S.D.N.Y. 1996 ) ("As the home of the defendants,
New York has a strong policy in protecting its media defendants"). Since, however,
Massachusetts and New York law do not differ on the issues relevant to this motion, the Court
need not resolve the choice of law issue to decide this motion. Cases from both jurisdictions have
been cited in support of the various arguments set forth in the motion.

that "[authoritative] interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth -- whether administered by judges, juries, or administrative officials -- and especially one that puts the burden of proving truth on the speaker." . . .. Freedoms of expression require "'breathing space.'" *Philadelphia Newspaper v. Hepps,* 475 U.S. 767, 790 (1990), *quoting, Sullivan,* 376 U.S. at 270-71.

This Court has previously recognized the importance of an unfettered press and the free flow of information through it, and that defamation claims such as this evoke important First Amendment principles. *Brown,* 86 F.Supp at 627.

It is against this backdrop of constitutional and common law safeguards that Plaintiff's claims must be evaluated. The characterization of Plaintiff in the Sidebar as a "'holdup artist,'" is literally accurate on the face of the Sidebar and, furthermore, is clearly the kind of loose and figurative rhetorical hyperbole that the courts have routinely found to be not to be actionable. And the portion of the sidebar discussing Pentz's success in his objections in the Visa/MasterCard class action litigation, even if somehow inaccurate, which it was not, was clearly not defamatory as a matter of law. The reference to judicial scorn for Pentz's ilk clearly refers to class actions in which Pentz himself did not file objections. That is obvious from the Sidebar itself, read as a whole, and therefore is not about him and does not defame him. Each of these points is addressed below.

A.    **The term "'holdup artist'" is not reasonably capable of a defamatory meaning.**

Plaintiff alleges that a reference to him as a "'holdup artist'" is "false and defamatory." (Complaint ¶ 9) Plaintiff is mistaken.

Under the applicable law, the term "'holdup artist'" as used in the context of the Sidebar and the Supplement as a whole is not reasonably susceptible of a defamatory meaning. "The

- 6 -

words must be construed in the context of the entire statement, interpreted based on the understanding of the reasonable person, and if not reasonably susceptible of a defamatory meaning, then the words are not actionable" *Rothman v. Sternberg*, 207 A.D.2d 438, 439, 615 N.Y.S.2d 748, 749-750 (2d Dept. 1994). Defamation actions cannot be sustained for "loose, figurative language." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 128 (1st Cir. 1997) (applying federal constitutional precepts to Maine defamation law). To be defamatory, a statement must be capable of actually injuring reputation. "There is common agreement that a communication that is merely unflattering, annoying, irksome, or embarrassing, or that hurts only the plaintiff's feelings is not actionable." ROBERT D. SACK, 1 SACK ON DEFAMATION, §2.4.1, at 2-11 (3d ed. 2003). In addition, "[p]resenting only a one-sided, unflattering picture of a plaintiff without more is not actionable either; editing is for editors, not for the courts." *Id.*

In this case, the phrase "'holdup artist'" has two possible meanings in the context of the Sidebar, one that is literally accurate and not defamatory, and the other that is clearly rhetorical hyperbole and not defamatory. Neither is actionable. Understood solely according to their plain English meaning, the words "holdup" and "artist" were literally accurate given plaintiff's self-professed occupation as an objector, someone who specializes in "holding up" proceedings. According to Webster's Dictionary, the first definition of "holdup" is "delay, impede." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 575 (1986). It is not disputed that Mr. Pentz files objections in class action suits – objections that invariably "delay" the suit to some degree and that, according to Pentz himself, are intended to impede plaintiffs' counsel from unduly profiting at the expense of the class.

Adding the word "artist" to the term "holdup" does not make it defamatory. According to Webster's, "artist" is defined as a "a skilled performer." WEBSTER'S at 106. The obvious

- 7 -

meaning of this is that Pentz has exceptional skill at delaying cases with his objections – an interpretation buttressed by the next sentence which describes the positive result in the Visa Check case and by the entire article, which holds up Plaintiff's success in this area of specialty.

That the other meaning of the phrase "'holdup'" is "to rob at gunpoint" does not convert this to actionable libel. That this more colloquial meaning was not to be read literally in the context of the Sidebar was made clear by the use of quotation marks around it, indicating that it was to be interpreted metaphorically, by the use of the phrase "rode into the courtroom," and by the context of the entire article discussing Pentz's objections in class action litigations, not his use of firearms or his arrival on horseback in a courtroom. Although Plaintiff may not like the phrase, it was at most a rhetorical device and as such is "not actionable because [such phrases] are commonly understood, in context, as imaginative expressions rather than statements of fact." *Levinsky*, 127 F.3d at 131, 128 (discussing word "trashy" and commenting that the "First Amendment's shielding of figurative language reflects the reality that exaggeration and non-literal commentary have become an integral part of social discourse").  The courts have routinely dismissed far more cutting phrases than the one at issue in this case. *E.g., Letter Carriers v. Austin*, 418 U.S. 264, 284-86 (1974) (use of the word "traitor" to describe a worker who crossed a picket line was not actionable); *Phantom Touring v. Affiliated Publications*, 953 F.2d 724, 728 (1st Cir. 1992) (calling a play a "rip-off, a fraud, a scandal, a snake-oil job" was protected hyperbole); *Park v. Capital Cities Communications, Inc.*, 181 A.D.2d 192, 195-196, 585 N.Y.S.2d 902 (4th Dept. 1992) (calling doctor a "rotten apple" was not susceptible to factual proof, and therefore constituted non-libelous opinion); *Weiner v. Doubleday & Co.*, 142 A.D.2d 100, 535 N.Y.S.2d 597, 15 Media L. Rep. 2441 (1st Dept. 1988) (reference to plaintiff as a "big fat ugly Jew" was nondefamatory epithet); *Komarav v. Advance Magazine Publishers*, 180

- 8 -

Misc.2d 658, 662, 691 N.Y.S.2d 298, 301 ( Sup. Ct. N.Y. Co. 1999) (reference to the plaintiff as being well known as John Gotti was "rhetorical hyperbole" and not actionable).

Statements cannot be made defamatory by a "strained or artificial construction," *Dillon v. City of New York*, 261 A.D.2d 34, 38, 704 N.Y.S.2d 1, 5 (1st Dept. 1999), especially if their precise meaning is vague, such as "'holdup artist.'" For example, the words "fellow traveler of fascism" and "radical right" were not defamatory in part because of "the tremendous imprecision of the meaning and usage of these terms." *Buckley v. Littell*, 539 F.2d 882, 893 (2d Cir. 1976). *See National Ass'n of Gov't Employees v. Central Broadcasting Co.*, 379 Mass. 220 (1979) (the term communist was "too vague to be cognizable as the subject of a defamation action").

The term "'holdup artist'" read either literally or figuratively as used in the article to describe Pentz is not defamatory and does not damage his reputation in the community.

**B.    The statement that Pentz succeeded in objecting in a class action is not defamatory.**

Pentz appears to claim that the statements in the Sidebar about his success in objecting to counsel fees in the MasterCard/Visa litigation somehow defamed him. In paragraph 15 of the Complaint Plaintiff pleads that the Sidebar's statement that Pentz cut Constantine's fees to $220 million, is "patently false." Even if this statement were false, which it is not[6], it is not defamatory, but rather presents plaintiff in a positive and effective light. In *Fitzgerald v. Town of Kingston*, 13 F.Supp.2d 119, 126 (D. Mass. 1998), a police officer was accused of stating to a

---

[6] The statement is, in fact, a fair summary of the several opinions in that case in which the fees to which Pentz objected were in fact substantially reduced, in which Pentz by his own admission was awarded fees and expenses for his "non-frivolous objections" (Complaint ¶ 13), and in which the Court said that objectors arguments including Pentz "did sharpen the debate." (Complaint ¶ 15)

- 9 -

reporter that the plaintiff taxi driver had conceded responsibility in a car accident. The court ruled that this statement even if false was not defamatory because it could be taken as a "relatively *positive* reflection of its subject and his honesty."

Plaintiff's claim seems to be that he would have preferred different favorable statements about him to be published rather than those chosen by ALM. That, of course, does not state a legal claim. *E.g.* SACK §2.4.1 at 2-11; *Cohn v. National Broadcasting Co., Inc.,* 67 A.D.2d 140, 145, 414 N.Y.S.2d 906, 909 (1st Dept. 1979) ("Apparently, the complaint is that there is lack of balanced presentation or the omission of balancing facts. However this is essentially a matter of editorial judgment and not actionable.").

### C.    The statements to which Pentz objects are not "of and concerning him."

Plaintiff cannot recover on a defamation claim for a statement that is not "of and concerning" him. *E.g., Brown,* 862 F. Supp. at 627; *Yohe,* 321 F.3d at 39; *Abramson v. Pataki,* 278 F.3d 93, 102-103 (2d Cir. 2002) (discussing the "essential element of specific reference"). A defamation claim is not sufficient if it refers to the Plaintiff solely as a member of a group or if the context of the statement makes it plain that plaintiff was not being referred to individually. *See e.g. Friends of Falun Gong v. Pacific Cultural Enterprise,* 288 F. Supp. 2d 273 (E.D.N.Y. 2003), *aff'd in unpub'd op.,* 109 Fed.Appx. 442 (2d Cir. 2004) (allegedly defamatory newspaper articles were not "of and concerning" individual plaintiff members of spiritual movement, and thus, members could not bring defamation claims against newspapers).

Plaintiff complains of the Sidebar's descriptions of "case opinions" as "rife with examples of judicial scorn for Pentz's ilk." In the Sidebar, the reference to judicial scorn for class action objectors is followed by a quote from Judge Heartfield of the Eastern District of

- 10 -

Texas about objectors: "…for instance, Judge Thad Heartfield of the Eastern District of Texas criticized 'canned objections' filed by lawyers seeking to extract a fee…"  (O'Connell Aff't Ex. 1 at 38)  To survive a motion to dismiss, Pentz must show that the words "'reasonably could be interpreted to refer'" to him based on a reading of the Sidebar as a whole.  *Dorn v. Astra,* 975 F. Supp. 388, 396 (D. Mass. 1997), *quoting, New England Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co.,* 395 Mass. 471, 483, 480 N.E.2d 1005, 1012 (1985).  He cannot do so.

The plain meaning of the sentence is a generalization about class action objectors, not anything specific to Pentz. The statement does not say, as Pentz appears to claim, that cases are rife with judicial scorn for Pentz. The use of the word "ilk," in fact conveys the opposite. Webster's defines "ilk" as "sort, kind." WEBSTER'S at 599. What the sentence clearly states is not that Pentz himself is the subject of judicial scorn, but that class action objectors in general have been. This interpretation is further supported by the specific example of such scorn cited in the very next sentence. The example does not state that it is a case in which Pentz was involved. In fact, the Sidebar lists by name five major cases in which Pentz filed objections and the case cited as the example of judicial scorn is not one of them. There is no reasonable interpretation of this sentence that could result in its being of and concerning Pentz or accuse him of any wrongdoing.

Further, nowhere in the Complaint does Pentz allege that case opinions are *not* rife with examples of judicial scorn for objectors as a group.  Nor could he.  The Sidebar quotes him, and he does not dispute this quote, as having been "annoyed by the scornful way judges and his colleagues treated objectors." (O'Connell Aff't, Ex. 1 at 38)  This broad statement about class action objectors in general cannot support a defamation claim by Plaintiff himself and for that reason, this claim should be dismissed.

- 11 -

## **CONCLUSION**

In short, there is no statement of fact in the Sidebar about the Plaintiff that can form a

valid basis for a defamation action. For the foregoing reasons, this Court should dismiss the

Complaint against American Lawyer Media, Inc., in its entirety, with prejudice.

Respectfully submitted,

ALM Media, Inc.

By its attorneys,

SONNENSCHEIN NATH & ROSENTHAL LLP

Philip A. O'Connell, Jr.   BBO #649343
155 Federal Street
17th Floor
Boston, MA 02110
(617) 574-4701
(617) 574-4744 (fax)

Of Counsel:

Devereux Chatillon, Esq.
Sonnenschein Nath & Rosenthal LLP
1221 Avenue of the Americas
New York, NY 10020
212 768-6800
212 768-6700 (fax)

Robert A. Feinberg, Esq.
ALM Media, Inc.
345 Park Ave. So.
New York, NY 10010
212 592-4944
212 592-4900 (fax)

- 12 -

17471110
17471110\V-13

Dated:  April  7 , 2005

17471110
17471110\V-13

LEXSEE 1996 US DIST LEXIS 3672

**JOSHUA WEINSTEIN, Plaintiff, -against- ROBERT FRIEDMAN, ET AL., Defendants.**

**94 Civ. 6803 (LAP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1996 U.S. Dist. LEXIS 3672; 24 Media L. Rep. 1769*

**March 26, 1996, Dated**
**March 26, 1996, FILED**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants - an author, a publishing company, and a newspaper publisher - filed a motion to dismiss plaintiff individual's action alleging defamation and invasion of privacy.

**OVERVIEW:** The individual filed an action alleging that a book and a newspaper defamed him by inaccurately portraying him as a militant activist, politically affiliated with extremist political groups, advocating violence, and having a distorted and perverse view of other persons. The action was transferred to the court from a Pennsylvania federal district court. On review, the court granted a motion to dismiss the action. The court held that, under the interest analysis test, the application of New York substantive law was more appropriate than application of Pennsylvania law. The court held that, according to the parties' respective contacts to New York and the resulting interests, New York law was the more appropriate choice of law. The court held that the allegedly offensive words contained in the publications taken as a whole were not reasonably susceptible to a defamatory meaning. The court held that the declarations were nonactionable statements of opinion. The court further held that New York did not recognize a common law cause of action invasion of privacy and therefore dismissed the individual's claim for invasion of privacy.

**OUTCOME:** The court granted the motion to dismiss filed by the author, the publishing company, and the newspaper publisher.

**LexisNexis(R) Headnotes**

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN1] Ordinarily, a federal court sitting in diversity applies the forum state's choice of law rules to decide which state's substantive law applies. However, if an action was transferred from a forum in which the action could have been maintained, then the transferee court must apply the choice of law rules of the transferor court.

*Civil Procedure > Venue > Change of Venue in Federal Courts*
[HN2] See *28 U.S.C.S. § 1404*(a).

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN3] Pennsylvania employs a flexible methodology to choice of law problems which combines the "most significant relationship" test espoused in the Second Restatement of Conflicts and the "interest-analysis" approach.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN4] Interest analysis involves a qualitative appraisal of the relevant states' policies with respect to the controversy before the court so that the court may determine the state which has the most significant interest in the dispute. The Second Restatement examines the totality of the contact which each state has with various portions of the controversy, counting and

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 2 of 20

Page 2

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

weighing those contacts in order to determine which state possesses the most significant relationship with the dispute.

### Civil Procedure > State & Federal Interrelationships > Choice of Law

[HN5] A court must consider the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in application of its rule of law.

### Civil Procedure > Preclusion & Effect of Judgments > Law of the Case Doctrine

[HN6] The law of the case doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This rule applies equally to the decisions of coordinate courts, including transfer decisions. Although it does not limit a court's power to revisit prior decisions of its own or of a coordinate court in any circumstance, courts should be reluctant to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice.

### Civil Procedure > Preclusion & Effect of Judgments > Law of the Case Doctrine

[HN7] Once domicile is established in one state, it is presumed to continue in existence, even if the party leaves that state, until the adoption of a new domicile is proven. One acquires a domicile of origin at birth, and that domicile continues until a new one a domicile of choice is acquired. A person is born with a particular domicile, and is presumed to retain it unless it can be shown that she has established a new domicile. That rule applies every time a person establishes a domicile. One may have more that one residence in different parts of the world, but a person may have only one domicile.

### Civil Procedure > State & Federal Interrelationships > Choice of Law

[HN8] New York applies an interest analysis in conflicts of law situations. Under this approach, the law of the jurisdiction having the greatest interest in the litigation will be applied and the only facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict. This approach applies on an issue-by-issue basis.

### Torts > Defamation & Invasion of Privacy > Libel
### Civil Procedure > State & Federal Interrelationships > Choice of Law

[HN9] New York courts have refined their interest analysis to develop more specialized choice of law rules in the context of defamation suits. There are enumerated nine contacts of particular importance in multistate actions for libel: (1) the state of the plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (8) the state where the libel was first seen; and (9) the law of the forum.

### Civil Procedure > State & Federal Interrelationships > Choice of Law

[HN10] Rules in choice of law, like rules of substantive law, must meet certain minimal standards of fairness, and justice in conflicts rules requires minimal contacts with another forum before subjecting the nondomiciliary to its laws.

### Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss

[HN11] When deciding a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6), a court must accept as true the factual allegations of the complaint and draw all inferences in favor of the pleader. A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. Dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.

### Torts > Defamation & Invasion of Privacy > Defamation Actions

[HN12] A common law defamation claim in New York has four elements. A plaintiff must plead: 1) a false and defamatory statement of and concerning plaintiff; 2) publication to a third-party; 3) the requisite degree of fault; and 4) special harm or per se actionability.

### Torts > Defamation & Invasion of Privacy > Defamation Actions

[HN13] Whether a statement is capable of a defamatory meaning is a threshold question of law to be resolved by the court. If a statement is not capable of a defamatory meaning, then, obviously, the motion to dismiss should be granted. If a statement is capable of a defamatory meaning, however, a court must then assess whether it also is capable of a nondefamatory meaning. If so, then the defamation claim must go to the jury to determine in what sense the words were used and understood. In New York, defamatory meaning will be found only in words which tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion,

Case 1:05-cv-10207-JLT     Document 11-2     Filed 04/07/2005     Page 3 of 20

Page 3

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*

[HN14] A writing is defamatory if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community, even though it may impute no moral turpitude to him. A court must apply this definition of defamation in light of the following factors: First, the court must consider the publication as a whole, and not pick out and isolate particular phrases. The meaning of a writing depends not on isolated or detached statements but on the whole apparent scope and intent. Second, the publication should be tested by its effects upon the average reader. The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed. Third, the court should not strain to place a particular interpretation on the published words, nor interpret such writings in their mildest and most inoffensive sense to hold them nonlibellous. Finally, the statement in question should be read against the background of its issuance with respect to the circumstances of the publication. The construction which it behooves a court of justice to put on a publication is to be derived as well from the expressions used as from the whole scope and apparent object of the writer.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*

[HN15] Only statements alleging facts can properly be the subject of a defamation action.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*

[HN16] Under both federal and New York standards, the question of whether the complained-of expression constitutes actionable fact or non-actionable opinion is one for the court to resolve. The dispositive inquiry, under either Federal or New York law, is whether a reasonable reader could have concluded that the publications were conveying facts about the plaintiff.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*

[HN17] These following are the federal factors to resolve the fact-opinion inquiry: (1) whether the statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous, (2) whether the

statement is capable of being objectively characterized as true of false, (3) a consideration of the full context of the statement, the entire article or column, for example, inasmuch as other unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content, and (4) a consideration of the broader context or setting in which the statement appears, for different types of writing have widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion.

*Torts > Defamation & Invasion of Privacy > False Light Privacy*
*Torts > Defamation & Invasion of Privacy > Public Disclosure of Private Facts*

[HN18] In the state of New York, the right to privacy is governed exclusively by § § 50 and 51 of the Civil Rights Law; there is no state common law of privacy.

*Torts > Defamation & Invasion of Privacy > False Light Privacy*

[HN19] § § 50 and 51 of the Civil Rights Law were drafted narrowly to encompass only the commercial use of an individual's name and no more.

**COUNSEL:** [*1] APPEARANCES:

Attorneys for Plaintiff: Clifford E. Haines, Esq., James W. Gicking, Esq., LITVIN, BLUMBERG, MATUSOW & YOUNG, Philadelphia, PA.

Attorneys for Defendants: Laura R. Handman, Esq., Barbara G. Cohen, Esq., Andrew A. Chirls, Esq., LANKENAU KOVNER & KURTZ, New York, New York.

**JUDGES:** LORETTA A. PRESKA, U.S.D.J.

**OPINIONBY:** LORETTA A. PRESKA

**OPINION:**

OPINION AND ORDER

LORETTA A. PRESKA, U.S.D.J.:

This is a libel action by plaintiff Joshua Weinstein ("Weinstein") against defendants Robert Friedman ("Friedman"), author of the book Zealots for Zion: Inside Israel's West Bank Settlement Movement ("Zealots"); Random House, publisher of Zealots; and VV Publishing Co., d/b/a The Village Voice, publisher of The Village Voice, a weekly newspaper that published an excerpt from Zealots in November 1993. Weinstein alleges that he was defamed in both Chapter 7 of Zealots ("Chapter

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 4 of 20

Page 4
1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

7"), entitled "Rule by the Best", and The Village Voice excerpt (the "Excerpt") which, for the most part, was a re-print of Chapter 7.

Weinstein commenced this action in Pennsylvania state court, and defendants removed it on diversity grounds to the United States District Court for the [*2] Eastern District of Pennsylvania. Thereafter, defendants moved to transfer the action to this District or, in the alternative, to dismiss. In his Memorandum and Order dated June 27, 1994 ("6/27/94 Memo."), the Honorable J. Curtis Joyner transferred the action to this District. In a Memorandum dated September 6, 1994 ("9/6/94 Memo."), Judge Joyner reaffirmed his decision from the 6/27/94 Memo. I now consider defendants' motion to dismiss, originally addressed to Judge Joyner but supplemented in this District with numerous letter briefs and oral argument.

In his first claim, Weinstein alleges that Chapter 7 and the Excerpt (collectively, the "Publications") defamed him by inaccurately portraying him as a militant activist, politically affiliated with far-right groups which advocate violence in the efforts of Jews to establish settlements in the occupied territories of Israel, and as having a distorted, perverse, and dangerous view of others. (Complaint ("Compl.") P 16.) Weinstein further alleges that defendants attributed statements to him which he did not make or which were taken out of context. (Id. P 22.) As set forth below, however, the allegedly offensive words, whether taken [*3] alone or, as New York law mandates, read as a whole and in the context of the entire work, either are not reasonably susceptible to a defamatory meaning or are nonactionable statements of opinion. Accordingly, defendants' motion to dismiss Weinstein's first claim is granted.

Weinstein's second claim is one for common law invasion of privacy. As set forth below, however, New York does not recognize such a claim, and, accordingly, defendants' motion to dismiss this claim is granted.

I. Choice of Law

In arguing the law applicable to this diversity action, Weinstein asks that I apply the conflicts rules of Pennsylvania, whereas defendants urge me to apply New York's approach. [HN1] Ordinarily, a federal court sitting in diversity applies the forum state's choice of law rules to decide which state's substantive law applies. *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941).* However, if an action was transferred from a forum in which the action could have been maintained, then the transferee court must apply the choice of law rules of the transferor court. *Van Dusen v. Barrack, 376 U.S. 612, 638-39, 11 L. Ed.*

2d 945, 84 S. Ct. 805 [*4] (1964); Davis v. Costa-Gavras, 580 F. Supp. 1082, 1086 (S.D.N.Y. 1984).

This action was transferred to this Court from the Eastern District of Pennsylvania. Weinstein, correctly noting that the defendants' motion to transfer was made pursuant to *28 U.S.C. § 1404(a)* n1 (6/27/94 Memo., at 2), argues that Pennsylvania's choice of law rules therefore apply. Defendants, however, note that they invoked *28 U.S.C. § 1406* in their supplemental brief to Judge Joyner (albeit stating that he need not reach a decision under Section 1406 since Section 1404(a) compelled the transfer) and cite the actual language of the decision, in which Judge Joyner held: "We nevertheless can make no other finding but that the Southern District of New York is not only a more convenient forum but it is the only forum in which venue properly lies." (6/27/94 Memo. at 4.) In a later decision, Judge Joyner, adhering to his earlier holding, reiterated that "venue in Pennsylvania was inappropriate." (9/6/94 Memo. at 3.) Given this unequivocal language and the reasoning set forth by Judge Joyner in those decisions, one can conclude only that venue does not lie in Pennsylvania. What follows from this conclusion, [*5] of course, is that Pennsylvania choice of law rules do not apply to this action. Nevertheless, the consequence of the choice of law question is not of major significance. As discussed below, the choice of law methodology of both New York and Pennsylvania dictates that New York substantive law applies to this action.

> n1 Section 1404(a) states: [HN2] "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." *28 U.S.C. § 1404(a).*

A. Pennsylvania Choice of Law Analysis

[HN3] Pennsylvania "employs a flexible methodology to choice-of-law problems which combines the 'most significant relationship' test espoused in the Restatement (Second) of Conflicts and the 'interest-analysis' approach." *McFadden v. Burton, 645 F. Supp. 457, 460 (E.D. Pa. 1986)* (citing *Melville v. American Home Assurance Co., 584 F.2d 1306, 1311-13 (3d Cir. 1978)*); accord *Griffith v. United Air Lines, Inc., 416 [*6] Pa. 1, 203 A.2d 796 (1964).*

> [HN4] "Interest analysis" involves a qualitative appraisal of the relevant states' policies with respect to the controversy

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 5 of 20

Page 5

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

before the court so that the court may determine the state which has the most significant interest in the dispute. The Restatement (Second) examines the totality of the contact which each state has with various portions of the controversy, counting and weighing those contacts in order to determine which state possesses the "most significant relationship" with the dispute.

*Savitt v. City of Philadelphia, 557 F. Supp. 321, 322-23 (E.D. Pa. 1983); accord McFadden, 645 F. Supp. at 460.* This methodology "takes into account both the grouping of contacts with the various concerned jurisdictions and the interests and policies that may be validly asserted by each jurisdiction." *Melville, 584 F.2d at 1311.* As the Pennsylvania Supreme Court has explained, [HN5] a court must consider "the extent to which one state rather than another has been demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in application of its rule of law." *McSwain v. McSwain, 420 Pa. 86,* [*7] *94, 215 A.2d 677, 682 (1966),* quoted by *Myers v. Commercial Union Assurance Cos., 506 Pa. 492, 496, 485 A.2d 1113, 1116 (1984).*

Pennsylvania's conflicts law has been refined further in a variety of contexts, including one similar to that in the case at hand. For example, Weinstein points to *Fitzpatrick v. Milky Way Prods., 537 F. Supp. 165 (E.D. Pa. 1982),* in which the Court applied Pennsylvania's choice of law rules in a defamation context. The plaintiffs, citizens of Pennsylvania, sued a New York publisher. The Court applied Pennsylvania's choice of law rules and determined that the substantive law of plaintiffs' domicile, Pennsylvania, should apply. *Id. at 172-73.* In reaching its conclusion, the Court found several policies and interests particularly relevant. First, the state of the plaintiff's domicile has a policy interest in "protecting the individual reputations of its citizens." *Id. at 171.* The Court reasoned that

in general, the state of a plaintiff's domicile will be the place where most, if not all, of his or her reputational contacts are found. Accordingly, in the conflict of laws context, the state of plaintiff's domicile generally has the greatest [*8] concern in vindicating plaintiff's good name and providing compensation for harm caused by defamatory publication.

*Id.; see Marcone v. Penthouse Int'l Magazine for Men, 754 F.2d 1072, 1077 (3d Cir.), cert. denied, 474 U.S. 864, 88 L. Ed. 2d 151, 106 S. Ct. 182 (1985)* ("Inasmuch as [plaintiff] is a Pennsylvania resident and any harm to his reputation that may have occurred centered in that state, the district court was correct to apply Pennsylvania law."); *Denenberg v. American Family Corp. of Columbus, Ga., 566 F. Supp. 1242, 1253 (E.D. Pa. 1983)* ("Pennsylvania has a significant interest in protecting the reputation of a domiciliary"). Second, the state in which the publisher is located has an interest in the application of its laws for at least two reasons: "(1) protection of a free and uninhibited press to encourage free discussion and debate on matters of public concern; and (2) protection of the home-state publisher's purse or financial integrity." *Fitzpatrick, 537 F. Supp. at 172.*

The Court, applying these policies and interests, found significant the facts that the plaintiffs were domiciled in Pennsylvania and that they consequently suffered injury [*9] in Pennsylvania to their personal and professional reputations and to their business interests and social contacts. *Id. at 171-72.* This "contact" with Pennsylvania and the resulting interest were deemed more significant than the corresponding contact with New York -- the defendant was a New York domiciliary -- and resulting interest -- protecting New York defendants from "any financial injury that might arise from more onerous standards of liability imposed in a foreign jurisdiction." *Id. at 172.* The Court discounted New York's general policy of fostering a free press because the plaintiffs were private figures and the matter was not one of public concern. As the Court recognized,

where the plaintiff is a private figure and the matter not one of public concern, New York's interest in encouraging free discussion is attenuated, and "the balance between free speech and private reputation" tips in favor of compensating injured plaintiffs.

*Id.* (citations omitted). Consequently, the Court found that New York's interest in the outcome of the litigation was not as significant as that of Pennsylvania.

Another defamation case in which Pennsylvania conflicts laws [*10] were applied is *Buckley v. McGraw-Hill, Inc., 782 F. Supp. 1042 (W.D. Pa. 1991),* aff'd, *968 F.2d 12 (3d Cir. 1992).* In that case, the plaintiff grew up in Pennsylvania, was a Pennsylvania domiciliary at the time of the lawsuit, and his family lived in Pennsylvania when the allegedly defamatory article was published. *Id. at 1046-47.* However, the plaintiff lived in New York when the article was published, the subject matter of the

Case 1:05-cv-10207-JLT   Document 11-2   Filed 04/07/2005   Page 6 of 20

Page 6

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

article was a New York hotel, the publisher was a New York corporation with its principal place of business in New York, the article in question was edited in New York and the parties filed a "partial pretrial stipulation" that New York law controlled. *Id. at 1047.* In this context, the Court recognized that both Pennsylvania and New York had strong interests in the case -- although it did not consider New York's interest in protecting media defendants a "compelling" factor -- but, because the plaintiff stipulated to the application of New York law and he did not reside in Pennsylvania when he filed the lawsuit or when the article was published, Pennsylvania's strong interest in protecting him as a Pennsylvania domiciliary was diminished. [*11] Id. Consequently, the Court held that New York governed.

In the instant case, Weinstein argues that the extent and nature of his contacts with Pennsylvania strongly support an application of Pennsylvania's substantive law. He asserts that he has spent the majority of his life in Pennsylvania and that he has relatives and friends who reside in Pennsylvania. (Affidavit of Joshua Weinstein ("Weinstein Aff."), at 1.) n2 He also states that he never has lived, worked, or otherwise been affiliated with New York. (Id. at 2.) I am not persuaded. Judge Joyner, in his 6/27/94 Memo., found that the evidence "clearly evinces that Joshua Weinstein is not a Pennsylvania resident" and that "there is . . . insufficient evidence . . . that he remains a Pennsylvania domiciliary." (6/27/94 Memo., at 6.) Judge Joyner found, in other words, that insufficient evidence existed to conclude that "Pennsylvania is plaintiff's 'true, fixed and permanent home and principal establishment to which he has the intention of returning whenever he is absent therefrom.'" (Id. at 7 (citations omitted).) On plaintiff's motion to reconsider, Judge Joyner adhered to his earlier decision and noted that "this Court's [*12] June 27, 1994 decision was largely based on Plaintiff's lack of domicile in Pennsylvania." (9/6/94 Memo., at 4.)

n2 Although captioned as an affidavit, this submission is neither dated nor verified.

The parties dispute the extent of deference to accord these two decisions by Judge Joyner. Generally, [HN6] the law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816, 100 L. Ed. 2d 811, 108 S. Ct. 2166 (1988).* This rule applies equally to the decisions of coordinate courts, including transfer decisions. *Id. at 816.* Although it does not limit a court's "power to revisit prior decisions of its own or of a coordinate court in any

circumstance," courts should be reluctant to do so "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice'" *Id. at 817* [*13] (citation omitted). In this action, there is no need to revisit Judge Joyner's finding that Weinstein was not a Pennsylvania domiciliary; his finding is amply supported by all the relevant evidence as set forth in his two memoranda. Nonetheless, in an excess of caution, I will recount some of the reasons that Judge Joyner relied upon in his rulings.

Judge Joyner clearly described the extent of Weinstein's contacts with Pennsylvania and recognized that he had some contacts with Pennsylvania. In addition to those contacts previously mentioned, n3 Weinstein keeps some of his clothing and books at his parents' home in Pennsylvania and all of the statements for his checking, stock and credit card accounts are sent to his parents' address. (6/27/94 Memo., at 5.) However, the stronger evidence, as Judge Joyner recognized, indicates that Weinstein is no longer a Pennsylvania domiciliary. For example, the last full year he lived in Pennsylvania was in 1983, when he was a senior in high school. Subsequently, he resided in Princeton, New Jersey, where he was an undergraduate at Princeton University from 1983 to 1987, and he spent only the summer of 1987 at his parents' residence in Pennsylvania. [*14] After attending Princeton, he resided in Irvine, California, where he studied at the University of California until March 1989. In May 1989, he moved to Israel, where he presently resides. He is not registered to vote in Pennsylvania, and does not maintain any professional or religious memberships in Pennsylvania. (Id. at 5-6.)

n3 As discussed on page 8 of this Opinion, Weinstein argues that he has spent most of his life in Pennsylvania and has relatives and friends who reside in Pennsylvania.

Judge Joyner also relied upon the insufficient evidence of Weinstein's intent to return to Pennsylvania.

Although Mr. Weinstein freely acknowledges that his future plans are unsettled and that he has "hoped" that IALA [Israel Academy of Liberal Arts] will get off the ground so that he may stay in Israel affiliated with it, he has also "considered" moving to the Eli settlement and would also "consider" taking a position with Harvard University, MIT, Williams College or some other similar

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 7 of 20

Page 7

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

institution of higher [*15] education not located in southeastern Pennsylvania. Obviously, we cannot even find from this evidence that Pennsylvania is plaintiff's "true, fixed and permanent home and principal establishment to which he has the intention of returning whenever he is absent therefrom."

(Id. at 6-7 (citations omitted).)

Finally, Judge Joyner recognized the extensive nature of Weinstein's contacts with Israel. Weinstein is an Israeli citizen as well as an American citizen. He serves in the Israeli military, travels with both Israeli and American passports, pays into Israel's national insurance plan, and has voted in local Israeli elections. (Id.) Before he was drafted into the Israeli military, he was a Ph.D. candidate at Hebrew University in Jerusalem and, after he completes his service, he hopes to return to his studies and finish his doctorate in Israel sometime in June 1996. (Id. at 6.) Further, he, along with other Princeton graduates, has founded the Israel Academy of Liberal Arts in Eli. (Id.) Accordingly, Judge Joyner held in the 6/27/94 Memo., and reaffirmed in the 9/6/94 Memo., that Weinstein was not a Pennsylvania domiciliary.

Because Weinstein has brought nothing [*16] to my attention that justifies disregarding these findings, they continue to govern, according to the law-of-the-case doctrine, in this Court. Nevertheless, I must supplement Judge Joyner's finding that Weinstein is no longer a Pennsylvania domiciliary with one that Weinstein has acquired a new domicile elsewhere. This need arises from the well-established rule that [HN7] "once domicile is established in one state, it is presumed to continue in existence, even if the party leaves that state, until the adoption of a new domicile is proven." Bevilaqua v. Bernstein, 642 F. Supp. 1072, 1073 (S.D.N.Y. 1986); accord Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48, 104 L. Ed. 2d 29, 109 S. Ct. 1597 (1989) ("One acquires a 'domicile of origin' at birth, and that domicile continues until a new one (a 'domicile of choice') is acquired."); National Artists Management Co. Inc. v. Weaving, 769 F. Supp. 1224, 1228 (S.D.N.Y. 1991) ("A person is born with a particular domicile, and is presumed to retain it unless it can be shown that she has established a new domicile. That rule applies every time a person establishes a domicile."); see Rosario v. I.N.S., 962 F.2d 220, [*17] 224 (2d Cir. 1992) ("One may have more that one residence in different parts of the world, but a person may have only one domicile."). Therefore, assuming Weinstein was a Pennsylvania domiciliary prior to 1983, when he lived there as a high school student, it is necessary to find that he has acquired

a new domicile in order to conclude that Pennsylvania is no longer his domicile.

I hold that Weinstein has acquired a new domicile in Israel. Although a

> "totality of the evidence" approach is called for, . . . "among the influential factors are the place where civil and political rights are exercised, taxes paid, real and personal property (such as furniture and automobiles) located, driver's and other licenses obtained, bank accounts maintained, location of club and church membership and places of business or employment."

National Artists, 769 F. Supp. at 1228 (quoting 1 Moore's Federal Practice P 0.74[3-3], at 707.64). As previously discussed, he holds an Israeli passport, has been a resident of Israel since May 1989, was a Ph.D. candidate at Hebrew University in Jerusalem, serves in the Israeli military, pays into Israel's national insurance plan, has voted in [*18] local Israeli elections, has assisted in the founding of the Israel Academy of Liberal Arts, and has expressed his intentions to finish his doctorate in Israel after he completes his service in the Israeli military in June 1996. Thus, his Israeli domicile has been "established by physical presence in [Israel] in connection with a certain state of mind concerning [his] intent to remain there." Holyfield, 490 U.S. at 48; accord Rosario, 962 F.2d at 224 ("Domiciliaries are those who have a fixed, permanent and principal home and to which, whenever absent, they always intend to return.")

The conclusion that Weinstein is neither a resident nor a domiciliary of Pennsylvania and is a resident and domiciliary of Israel is significant in determining the substantive law applicable to this action. The cases upon which Weinstein relies to argue that Pennsylvania has a strong interest in protecting his reputation rely on the fact that the plaintiffs in those cases were domiciliaries at the time of suit. Marcone, 754 F.2d at 1077; Medico v. Time, Inc., 643 F.2d 134, 135 n.1 (3d Cir.), cert. denied, 454 U.S. 836, 70 L. Ed. 2d 116, 102 S. Ct. 139 (1981); Denenberg, [*19] 566 F. Supp. at 1253; Fitzpatrick, 537 F. Supp. at 166. Weinstein, however, did not live or work in Pennsylvania when the events described in the Publications occurred or when the Publications were researched, written, edited, or published. Further, he did not live in Pennsylvania when he filed this lawsuit and he does not live there currently. Thus, although Weinstein argues that the alleged injury to his reputation would occur in Pennsylvania, it is more likely to be in

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 8 of 20

Page 8

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

Israel where he is a citizen and has resided and worked since 1989. Accordingly, Pennsylvania's interest in having its law applied to this action is significantly diminished. See *Buckley, 782 F. Supp. at 1047-48* ("The fact that [plaintiff] did not reside in Pennsylvania at the time the . . . article was published or at the time he filed this lawsuit also tends to diminish Pennsylvania's interest in this case."). n4

> n4 Even if the harm to Weinstein's reputation occurred in Pennsylvania, the locus of harm is not dispositive, as Weinstein has insisted. See, e.g., *Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985)* (applying New Jersey law even though the locus of the harm was New York, because the parties were from New Jersey and the interests of New Jersey outweighed those of New York); *Byard F. Brogan, Inc. v. Workmen's Comp. App. Bd., 161 Pa. Commw. 453, 459, 637 A.2d 689 (1994)* (noting that the lex loci delecti rule has long since been abandoned in Pennsylvania in favor of interest analysis).

[*20]

In addition to the absence of Weinstein as a domiciliary or resident, there is little relating to the defendants' activities that points to the application of Pennsylvania law. None of the conduct or statements to which the alleged defamation relates occurred in Pennsylvania and none of the research, writing, or editing occurred in Pennsylvania. The only contacts between the defendants and Pennsylvania, as Judge Joyner noted, were that the book physically was printed in Pennsylvania, that it had been shipped and sold in unknown quantities within Pennsylvania, that Friedman had received a $ 1,500 stipend from a Pennsylvania-based fund, that Friedman had placed several telephone calls to Pennsylvania, and that Friedman had visited Pennsylvania several times to interview people for other books and articles. (9/6/94 Memo., at 4 (referring to the "absence of any operative facts in Pennsylvania").)

The significant contacts and resulting interests do, however, suggest the application of New York law. As the home of the defendants, New York has a strong policy in protecting its media defendants. See *Davis, 580 F. Supp. at 1092* (discussing New York's interest arising from its status [*21] as "the national center of the publishing industry"); *Immuno AG v. Moor-Jankowski, 77 N.Y.2d 235, 249, 566 N.Y.S.2d 906, 913, 567 N.E.2d 1270* (articulating New York's historical interest in providing "a hospitable climate for the free exchange of ideas"), cert. denied, *500 U.S. 954, 114 L. Ed. 2d 713,*

*111 S. Ct. 2261 (1991)*. Also, because the Publications relate to matters of public concern (i.e., Israel's West Bank settlement movement), New York has a stronger interest in protecting its media defendants than it otherwise would have. See *Fitzpatrick, 537 F. Supp. at 172* ("Where the plaintiff is a private figure and the matter not one of public concern, New York's interest in encouraging free discussion is attenuated. . . .").

This interest of New York is the only significant interest discernible in this case, for, as discussed above, Weinstein is neither a Pennsylvania domiciliary nor resident and neither Weinstein nor the defendants have significant contacts with Pennsylvania. While under New York choice of law principles New York's interest in protecting its media defendants is accorded great deference and under Pennsylvania's methodology it appears not to be, it [*22] nonetheless is entitled to some weight under the Pennsylvania approach. See *Melville, 584 F.2d at 1311* (holding that Pennsylvania's choice of law approach involves weighing and evaluating the importance of contacts with respect to the policies of the interested states). Bearing this in mind, I hold that under Pennsylvania's conflicts law New York substantive law applies because, based on the respective contacts, New York has a greater interest in and possesses the most significant relationship with this dispute.

B. New York Choice of Law Analysis

Like Pennsylvania, [HN8] New York applies an interest analysis in conflicts of law situations. *Istim, Inc. v. Chemical Bank, 78 N.Y.2d 342, 347, 575 N.Y.S.2d 796, 798, 581 N.E.2d 1042 (1991); Platano v. Norm's Castle, Inc., 830 F. Supp. 796, 798 (S.D.N.Y. 1993); Zahr v. Wingate Creek Acquisition Corp., 827 F. Supp. 1061, 1064-65 n.1 (S.D.N.Y. 1993); Simons v. Marriott Corp., No. 92 Civ. 3762 (SWK), 1993 U.S. Dist. LEXIS 14365, *16, 1993 WL 410457, at *5-6 (S.D.N.Y. Oct. 13, 1993)*. Under this approach,

> the "law of the jurisdiction having the greatest interest in the litigation will be applied and . . . the [only] facts or contacts which obtain [*23] significance in defining State interests are those which relate to the purpose of the particular law in conflict."

*Istim, Inc., 78 N.Y.2d at 347, 575 N.Y.S.2d at 798* (citations omitted). Further, this approach applies on an issue-by-issue basis. See *Platano, 830 F. Supp. at 798* (stating that "in determining which law to apply to any particular issue of law or aspect of a case, [the court]

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 9 of 20

Page 9

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

looks to the state with the greatest interest in that given issue of law or aspect").

[HN9] New York courts have refined their interest analysis to develop more specialized choice of law rules in the context of defamation suits. In the leading case of *Davis v. Costa-Gavras, 580 F. Supp. 1082 (S.D.N.Y. 1984)*, the plaintiffs brought an action for libel based upon the defendants' nationwide publication of a book (in both hardcover and paperback forms) and upon the national distribution of the film adopted from the book. *Id. at 1090-92.* At the time of suit, plaintiff Davis was a New Jersey citizen serving in the armed forces in Rhode Island, plaintiff Purdy was a Pennsylvania citizen residing in Brazil, and plaintiff Dans was a citizen of New Hampshire residing in Chile. The book [*24] at issue concerned the 1993 coup d'etat in which President Salvador Allende Gossens of Chile was overthrown. All three plaintiffs were stationed in Chile in various capacities in the service of the United States at the time of the coup d'etat, and all three lived intermittently in the Washington, D.C./Northern Virginia area over the course of the roughly twenty-five years during which they served the United States. *Id. at 1088-89.*

The District Court, citing *Palmisano v. News Syndicate Co., Inc., 130 F. Supp. 17, 19 & n.2 (S.D.N.Y. 1955)*, enumerated nine contacts of particular importance in multistate actions for libel:

> (1) the state of the plaintiff's domicile; (2) the state of plaintiff's principal activity to which the alleged defamation relates; (3) the state where the plaintiff in fact suffered greatest harm; (4) the state of the publisher's domicile or incorporation; (5) the state where the defendant's main publishing office is located; (6) the state of principal circulation; (8) the state where the libel was first seen; and (9) the law of the forum.

*Davis, 580 F. Supp. at 1091.* The Court found that the first and third contacts pointed to Washington, [*25] D.C., the second pointed to Chile, and the remaining contacts pointed primarily to New York and, to a lesser extent, California. Id. The book was researched and written in New York; the publisher negotiated its contracts with the author and paperback publisher in New York; editing and promotional planning occurred in New York; almost all of the key meetings took place in New York; the film premiered in New York; New York was the "state of most substantial if not principal circulation"; and, although witnesses to the events

depicted in the book and the movie were "scattered around the world, several crucial witnesses . . . lived in New York City." *Id. at 1090-91.*

The Davis Court also was cognizant that, under New York's interest analysis, these contacts should be "evaluated according to their relative importance with respect to the particular issues." *Id. at 1092.* In Davis, as in this action, those issues revolved around the law of defamation. The Court, therefore, placed great weight on New York's interest arising from its status as "the national center of the publishing industry." *Id. at 1092.* Specifically, the Court pointed out that New York "has a significant [*26] interest in assuring that the risks and liabilities flowing from publishing and related options contracts, negotiated and largely performed here, will be uniform." Id.; cf. *Immuno AG, 77 N.Y.2d at 249, 566 N.Y.S.2d at 913* (explaining New York's historical interest in providing "a hospitable climate for the free exchange of ideas"). The Court also noted that in a libel action, which is "less plaintiff-centered than other torts", policy reasons supported "deciding issues whose major impact is on the behavior of potential defendants according to the rules of the jurisdiction where the conduct that gives rise to liability takes place." *Davis, 500 F. Supp. at 1093.* Finally, the Court explained that in a multistate libel case, where the plaintiffs were from different jurisdictions and the alleged harm to their reputations would be diffused throughout the country and overseas, the state "where defendants' significant acts and omissions gave rise to their liability is the most appropriate source of legal norms, particularly when it is also the forum state." *Id. at 1093.* Based upon these policies and the majority of the enumerated contacts, the Davis Court ruled that New York [*27] law applied. Id. at 1091-93. n5

> n5 The Davis Court also pointed to Professor Korn's theory of "conflicts justice." According to this theory, [HN10] "rules in choice of law, like rules of substantive law, must meet certain minimal standards of fairness" and "justice in conflicts rules . . . requires minimal contacts with another forum before subjecting the nondomiciliary to its laws." *Davis, 500 F. Supp. at 1092-93.* Weinstein argues that this principle supports the application of Pennsylvania law because he has had little contact with New York. However, defendants have had little contact with Pennsylvania, and, therefore, this argument favors neither New York nor Pennsylvania law.

When applied to this case, the facts and principles of Davis mandate the application of New York law. As

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 10 of 20

Page 10

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

discussed above, Weinstein's is neither a domiciliary nor a resident of Pennsylvania. The principal activities of Weinstein to which the alleged defamation relates took place in Princeton, New Jersey, and in Israel, not [*28] in Pennsylvania. Defendant Random House and defendant VV Publishing Co. are New York corporations with principal places of business in New York. The writing, editing, and publishing of the Publications occurred in New York. Although Zealots has nationwide circulation, the state of principal circulation for The Village Voice is New York. The forum is, of course, New York. One factor which arguably points to Pennsylvania law -- albeit weakly -- is the alleged harm to Weinstein's reputation. Weinstein cited persons in numerous states, including Pennsylvania and New York, and in Israel who are familiar with his reputation. Of those persons, however, only two read the material independent of Weinstein's bringing it to their attention, and they live in New York. (Supplemental Memorandum of Law in Support of Defendants' Motions to Transfer or to Dismiss the Complaint, at 12). Thus, the majority of the contacts and the resulting interests leaves no doubt that New York law applies to this action.

Although Weinstein makes two further arguments in opposition, they are no more compelling than those previously discussed. First, he argues that defendants have availed themselves of the advantages [*29] of doing business in Pennsylvania and should be held to Pennsylvania's standards of conduct. However, he offers little evidence to support this assertion, and it appears that defendants' contacts with and conduct within New York are much more extensive than any supposed contacts with and conduct within Pennsylvania. Second, Weinstein has attempted to distinguish the facts of Davis from those here. He notes that in Davis, the Court assigned Washington, D.C. merely as the "proxy for the meaningful domestic domicile lacking here due to plaintiffs' foreign service careers." *Davis, 580 F. Supp. at 1091.* Weinstein argues that his contacts with Pennsylvania are greater than those of the Davis plaintiffs with Washington and, accordingly, are entitled to greater weight. The Court in Davis, however, did not indicate that it accorded the plaintiffs' domicile less weight because their domicile was only a "proxy". In addition, while the Davis plaintiffs may not have been "true" domiciliaries of Washington, D.C., their relevant contacts with Washington were, at a minimum, equivalent to Weinstein's contacts with Pennsylvania. See *id. at 1089* (referring to the District [*30] of Columbia as "the geographic focus of their professional reputations as federal officials and public servants").

Accordingly, after balancing the respective interests of Pennsylvania and New York, New York's interests prevail. This conclusion is dictated not only by the

principles articulated in Davis, but by New York's interest in "providing a hospitable climate for the free exchange of ideas." *Immuno AG, 77 N.Y.2d at 249, 566 N.Y.S.2d at 913.* This interest stands unmatched by any countervailing interest of Pennsylvania. Therefore, the choice of law analysis of both New York and Pennsylvania requires the application of New York substantive law to this action.

## II. Standard of Review

Defendants argue that, under New York substantive law, Weinstein has failed to state a claim for relief. [HN11] When deciding a motion to dismiss under Rule 12(b)(6), a court must accept as true the factual allegations of the complaint and draw all inferences in favor of the pleader. *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).* "The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it [*31] by reference.'" *International Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)* (quoting *Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991),* cert. denied sub nom. *Cortec Indus., Inc. v. Westinghouse Credit Corp., 503 U.S. 960 (1992)).* Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957),* quoted in *Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994).*

## III. Defamation Claim

Weinstein's first claim is for defamation. [HN12] A common law defamation claim in New York has four elements. Plaintiff must plead: 1) a false and defamatory statement of and concerning plaintiff; 2) publication to a third-party; 3) the requisite degree of fault; and 4) special harm or per se actionability. *Box Tree South, Ltd. v. Bitterman, 873 F. Supp. 833, 844 (S.D.N.Y. 1995)* (quoting *Church of Scientology Int'l v. Eli Lilly & Co., 778 F. Supp. 661, 666 (S.D.N.Y. 1991)).* It is the first element that is at issue here.

### A. No Defamatory Meaning [*32]

[HN13] Whether a statement is capable of a defamatory meaning is a threshold question of law to be resolved by the court. *Aronson v. Wiersma, 65 N.Y.2d 592, 593, 493 N.Y.S.2d 1006, 1007, 483 N.E.2d 1138 (1985); James v. Gannett Co., Inc. 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834 (1976); Tracy v. Newsday, Inc., 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 3, 155 N.E.2d 853 (1959).* If a statement is not capable of a defamatory meaning, then, obviously, the motion to

dismiss should be granted. If a statement is capable of a defamatory meaning, however, a court must then assess whether it also is capable of a nondefamatory meaning. If so, then the defamation claim must go to the jury "to determine in what sense the words were used and understood." *Davis v. Ross, 754 F.2d 80, 83 (2d Cir. 1985)* (applying New York defamation law).

> In New York, defamatory meaning will be found only in words which tend to expose one to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in [*33] society.

*Fairley v. Peekskill Star Corp., 83 A.D.2d 294, 445 N.Y.S.2d 156 (1981)* (citations omitted); accord *Tracy, 5 N.Y.2d at 135-36, 182 N.Y.S.2d at 3* [HN14] ("'A writing is defamatory . . . if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community, even though it may impute no moral turpitude to him.'") (citation omitted). A court must apply this definition of defamation in light of the following factors:

> First, the court must "consider the publication as a whole", and "not pick out and isolate particular phrases." . . . The meaning of a writing "depends not on isolated or detached statements but on the whole apparent scope and intent." . . . Second, the publication should "be tested by its effects upon the average reader." . . . "The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed." . . . Third, the court should "not strain to place a particular interpretation on the published words," . . . , nor "interpret such writings 'in their mildest [*34] and most inoffensive sense to hold them nonlibellous.'" . . . Finally, the statement in question should "be 'read against the background of its issuance' with respect to 'the circumstances of the publication.'" . . . "The construction which it behooves a court of justice to put on a publication is to be derived as well from

the expressions used as from the whole scope and apparent object of the writer."

*Davis, 754 F.2d at 83* (citations omitted); accord *James, 40 N.Y.2d at 419-20, 386 N.Y.S.2d at 874-875;* see *Steinhilber v. Alphonse, 68 N.Y.2d 283, 290, 508 N.Y.S.2d 901, 904, 501 N.E.2d 550 (1986)* (relying on the "average person" standard to decide if a "given statement expresses fact or opinion" in a defamation action).

1. Monitoring Drinking Games at Princeton

In paragraph 15(g) of the Complaint, Weinstein complains that the Publications state "that while plaintiff, Joshua Weinstein[,] was a student at Princeton, he monitored drinking games 'filling out a score card on Monday mornings, listing the number of bones broken, students hospitalized and co-eds raped.'" (Compl. P 15(g).) Whereas the Complaint might be subject to more than one reading -- one [*35] that Weinstein participated in the mayhem and one that he did not -- the text of the Publications is not. It states:

> Princeton may be Ivy League, but to Yoram [Hazony's] dismay, its students partied with the best of the Big Ten. On weekends, the "eating clubs" hosted rowdy drinking games with names like "Viking Night" and "Trees and Trolls," in which short undergrads, or Trolls, would try to fight their way up a staircase past the Trees, usually inebriated jocks. The games had a gladiator-type appeal for those who enjoyed being thrown over a banister and consuming prodigious amounts of alcohol. Josh [Weinstein] and Yoram used to monitor the "games," filling out a scorecard on Monday mornings, listing the number of bones broken, students hospitalized, and co-eds raped. "It made us want to become more religious," said Josh. "All these guys did was vomit and rape."

(Zealots, at 181.) n6 The only meaning to which this text reasonably is susceptible is that Weinstein did not participate in the mayhem and, in fact, disapproved of the drinking games at Princeton to such an extent that they "made [him] want to become more religious." (Id.) Weinstein's proffered [*36] interpretation completely distorts the plain meaning of the passage. No ordinary person could find that these statements, whether read alone or in the context of the entire work, "tend[] to

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 12 of 20

Page 12

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

expose [Weinstein] to public hatred shame, abolguy, contumely, odium, contempt, ridicule, aversion ostracism, degradation or disgrace, or to induce an evil opinion of one in the minds of right-thinking persons, and to deprive one of their confidence and friendly intercourse in society." *Fairley, 83 A.D.2d at 296, 445 N.Y.S.2d at 158* (citations omitted). Thus, the statements are not defamatory.

> n6 When a particular statement is contained in both Zealots and the Excerpt, citations herein will refer only to Zealots.

2. Strategic Defense Initiative ("SDI") Research and Dungeons and Dragons

Weinstein also complains that the Publications imply "that plaintiff, Joshua Weinstein[,] had spent one summer in New Mexico working on SDI-related research projects" n7 and "that while a student at Princeton he [*37] engaged in extra curricular pleasure center[sic] around 'Dungeons and Dragons', and that 'Josh was the Dragon Master, meaning he ran the game.'" (Compl. PP 15(f), (h).)

> n7 Although falsity is assumed for the purpose of this motion, I note that Weinstein spent the summer of 1986 in Albuquerque, New Mexico employed at the Sandia National Laboratories as a research assistant in the theoretical mechanics division. (Affidavit of Laura R. Handman, Exh. E, at 14.)

On these topics, the Publications state that, "[a] former engineering student, Weinstein spent one summer in New Mexico working on SDI-related research projects" (Zealots, at 17) and that

> Josh [Weinstein's] and Yoram [Hazony's] extracurricular pleasures centered around "Dungeons and Dragons," a fantasy-oriented game in which players assume the roles of medieval warriors and pursue complex adventures that can take months - or years - to complete. Josh was the Dragon Master, meaning he ran the game. The pair eventually graduated to war-simulation [*38] games, in which opposing "generals" strategically move hundreds of small, numbered cardboard soldiers around a board in mock battles. Josh lamented that the Arab-Israeli war game bored him because Israel always

defeated the Arabs. "It was just a question of how fast you won and how many losses you took," he said.

(Zealots, at 181.) Weinstein asserts that these statements impute to him an aspect of dangerousness because,

> the portrait which Friedman paints of Joshua Weinstein as someone who would resort to the militant ideas of Kahane and other radicals in settling the territories is strengthened by the factually inaccurate statements that Joshua Weinstein worked on the strategic defense initiative and also liked to play the dragon master in Dungeons and Dragons with Yoram Hazony.

(Plaintiff's Answer to the Motion of Defendants to Transfer the Action or to Dismiss the Case ("Pl. Memo."), at 30 (footnote omitted).) Weinstein concludes that "the perverseness of the implication suggests not just a level of immaturity but also a dangerousness." (Id.)

As with the statements regarding the drinking games, the challenged language has but one reasonable interpretation, [*39] and that interpretation is non-defamatory. SDI was a major program of the Reagan Administration directed toward developing a technologically advanced system for protecting the United States from nuclear attack. To have had the ability and opportunity to work on such a project while still a student can only be a favorable reference. That Weinstein -- or the persons he associates with -- might today look unfavorably on the SDI project for political (or political correctness) reasons does not make the statement defamatory. See *Fairley, 83 A.D.2d at 296, 445 N.Y.S.2d at 158* ("Among certain segments of the population a social scientist designation might be considered unflattering. However, the peculiarities of taste found in eccentric groups cannot form a basis for a finding of libelous inferences. . . . That some people would receive a negative inference from [a particular word's] use cannot serve to make the statement actionable.").

Similarly, Weinstein's argument that the Dungeons and Dragons statements impute a level of dangerousness to him is far beyond what an average reader would take from the text. Dungeons and Dragons is a widely popular game that The Wall Street Journal [*40] has characterized as "fascinating stuff". Why Webster Hubbell, Wall St. J., July 18, 1995, at A14. Standing alone, these statements suggest that Weinstein enjoys mentally challenging activities. When read in context, particularly in juxtaposition with the violent, self-destructive antics of other Princeton students, they

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 13 of 20

Page 13

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

represent a wholly favorable comment. See *Contemporary Mission, Inc. v. New York Times Co., 665 F. Supp. 248, 259 (S.D.N.Y. 1987)* (noting, while holding that a particular statement in an article was not defamatory, that "there is other language in the article which suggests that the plaintiffs were praised for their work"), aff'd, *842 F.2d 612 (2d Cir.)*, cert. denied sub nom. *O'Reilly v. New York Times Co., 488 U.S. 856, 102 L. Ed. 2d 117, 109 S. Ct. 145 (1988).*

3. Membership in and Support for the Eli Garin

Next, Weinstein complains that the Publications imply "that plaintiff was a member of a garin, established by Yoram Hazony, whose members settled in the town of Eli on the West Bank of Israel;" "that plaintiff, Joshua Weinstein[,] was a part of the West Bank settlement movement;" and "that plaintiff, Joshua Weinstein[,] was actively [*41] involved in persuading others to join the settlement movement in Eli." (Compl. P 15(a), (c), (e).)

The Publications describe the Eli garin as "a seed group of twenty families, all friends and Ivy League graduates, who plan to set up a liberal arts college in Eli, which they envision becoming a great university town -- the Princeton of Samaria." (Zealots, at 171.) Yoram Hazony ("Hazony"), the leader of the garin (Zealots at 171), is said to have founded the Israel Academy of Liberal Arts ("IALA") in 1991, "an eight-week summer program in Jerusalem designed to teach American college students Jewish religious values and Western philosophy within a 'politically correct' Zionist environment." (Zealots, at 175.) The IALA is to be "the precursor to a full-fledged liberal arts college in Eli" (id.) and is said to describe itself in its brochure as "devoted to the idea that the mind, given a supportive environment of good friends and good conversations, can create thoughts of consequence on important issues." (Zealots, at 176). Weinstein, described by Hazony as "our Renaissance man," is "IALA's education director and the designated director of Yoram's future university." [*42] (Zealots, at 176.)

The members of the Eli garin are described in positive terms as thoughtful, philosophical, and serious people who are willing to make great sacrifices in pursuit of high ideals. The Publications quote Hazony as describing religious settlements such as Eli in Utopian terms as

"tiny, self-contained, idealistic communities where people strive to implement a Jewish vision of the good society, where people love one another freely, and I don't mean in a sexual sense, but are willing to sacrifice to help one another and be the way people are

supposed to be. My wife and I decided years ago we couldn't stand the idea of raising children anywhere else. Eli is just such a good environment. All the problems that plague living in Princeton, New Jersey, just don't exist here. There's no violent crime, there's almost no divorce, no abortions, no drug abuse - alcoholism is basically unheard of. People here have something to live for, something to pull together for, and their children turn out to be straight, powerful people."

(Zealots, at 190.) The people of Eli live in modest surroundings n8 and pursue their religious studies and worship seriously. [*43] n9 The Hazonys are described as being aware that they are "the 'model' settler family, and that everything they did was by way of example." (Zealots, at 173.) Weinstein is described positively as exuberantly engaged in the religious dialogue:

There was an occasional squabble over some finer point of Halacha [n10] among these newly awakened Orthodox Jews, but when Yoram and Josh Weinstein, also a baal teshuvah [n11] and a Princeton graduate, agreed, they whooped and hollered and gave each other the "high five," like football players after scoring a touchdown.

(Zealots, at 173.) He is said to be a "congenial host", "making fun of himself for doing a less than sterling job that day giving a lecture on Nietzsche at the Hebrew University". (Zealots, at 177.) Hazony's description of him as their "Renaissance man" is supported by the report that the books in his apartment range from Popular Halacha to Beloved by Toni Morrison. (Id.)

n8 The Hazonys' living room is described as "sparsely furnished" with "a metal table on wheels and two twin beds that doubled as couches. . . . The kitchen was small and messy. The refrigerator was very old, and the stove was a rusty top cooker with two burners." (Zealots, at 172.) The synagogue is described as "looking something like a recreation hall in a Catskill Mountains summer camp, with unfinished wood paneling and exposed ceiling beams." (Id.) Friedman similarly describes Weinstein's apartment in Jerusalem in modest terms:

Weinstein's tiny apartment could have been a grad student's

humble digs anywhere in America. The living room was furnished with an old couch, cheap wicker chairs, a world map covering one wall, a glass-topped coffee table with a copy of Newsweek, and stacks of books in Hebrew and English such as Popular Halacha, Zionist Revolution, Gateway to Self-Knowledge, Jewish Travel Guide, and Toni Morrison's Beloved. While the bedroom door had fallen off its hinges, there was an expensive, imported tap-water filtering system in the kitchenette.

(Zealots, at 176.) [*44]

n9 "Yoram [Hazony] elaborately introduced each Sabbath prayer, which everyone enjoyed immensely. The Hazonys' three-year-old daughter, Avital, . . . sang her very first Kiddush (prayer) with the attentive help of Yoram." (Zealots, at 172.)

Hazony is quoted as saying: "'We're serious about bringing something important into the world with the Land of Israel. . . .'" (Zealots, at 190.)

After the prayer and during dinner, "Yoram [Hazony] held forth with a discussion about the Bible before veering off into a conversation about what vices ancient Rome symbolized (materialism) in the Torah compared with Persia (sensuality)." (Zealots, at 173.)

n10 "Halacha" refers to Jewish law. E.g., Rabbi Abraham Cooper, Courageous Muslim Action Could End Terrorism, Houston Chron., Mar. 7, 1996.

n11 "Baal teshuva" refers to one who has returned to a traditional way of life. E.g., Rafael A. Ivarez, Marrying, Art, Love and "Praise to God", The Baltimore Sun, Dec. 28, 1994.

Regardless of whether the Publications fairly can be said to imply that Weinstein is a member [*45] of the Eli garin on the West Bank and that he attempted to persuade others to join, such statements simply are not defamatory. Both the Publications' words and their overall impression convey that the group is one of intelligent idealists seeking a better life for themselves and their children within the framework of their religion,

and that plaintiff shares those characteristics but is at the same time more scholarly and possessed of a witty self-deprecating sense of humor. n12 He is described by Hazony as an integral part of Hazony's vision of an academy of scholars on the West Bank, serving as the present director of IALA and future director of the future college (Zealots, at 176), a characterization of which Weinstein does not complain. Thus, assuming that the Publications imply that Weinstein was a member of the Eli garin and that he attempted to persuade others to join, they are capable of only a single meaning and that meaning is not defamatory. See *Pritchard v. Herald Co., 120 A.D.2d 956, 503 N.Y.S.2d 460, 462 (4th Dept. 1986)* (affirming the trial court's dismissal of a complaint where the plaintiff was described as "'controversial'" and a "'black activist'" [*46] because, "when judged by the temper of the times and the current of contemporary public opinion," such labels do "not arouse in the mind of the average person in the community an evil or unsavory opinion, nor expose plaintiff to public hatred, contempt, or aversion").

n12 Weinstein complains of the quote attributed to him at the Hazonys' home after sunset on a Saturday: "I 'love coming out here and occupying the territories' said Josh, ever the smart-ass. 'I haven't done it in a while. Somebody's got to do it or they're not being occupied, right.'" (Zealots, at 174.) Passing that it attributes to him the positive attribute of intelligent humor, it is at worst the "rhetorical hyperbole" and "vigorous epithet" protected by the First Amendment. See, e.g., *Greenbelt Coop. Publishing Ass'n v. Bresler, 398 U.S. 6, 14, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970)* (holding that the term "blackmail" was not defamatory when spoken by a citizen at a public meeting -- and later reported in a newspaper -- to describe a real estate developer's bargaining position because the term must have been perceived to be "rhetorical hyperbole, a vigorous epithet"), cited by *600 West 115th St. Corp. v. Von Gutfeld, 80 N.Y.2d 130, 143-45, 589 N.Y.S.2d 825, 830-31, 603 N.E.2d 930 (1992)* (holding the same with respect to allegations that a lease is "illegal" and "is as fraudulent as you can get and it smells of bribery and corruption"), cert. denied, *508 U.S. 910, 113 S. Ct. 2341, 124 L. Ed. 2d 252 (1993)*.

[*47]

4. Support of Kahane's Advocacy of Violence

Page 15

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

The Publications, according to Weinstein, also falsely imply

> that [he] approved and/or agreed with the teachings or philosophy of Rabbi Meir Kahane, whose viewpoint Friedman describes in Chapter 7 as a "xenophobic brand of militant Judaism in which the outside world is viewed as a bleak panorama of hatred for Jews, and where a Torah in one hand is inevitably supplemented by an AK-47 in the other . . . .";

and that

> viewed as a whole, Chapter 7 of Zealots for Zion was meant to inaccurately portray plaintiff, Joshua Weinstein[,] as a militant activist, politically affiliated with the far right wing which advocates violence in the efforts of Jews to establish settlements in the occupied territories of Israel and with a distorted view of others.

(Compl. PP 15(b), 16.)

Chapter 7 devotes many pages to discussing the effect of Kahane's career in the context of his effect on Hazony. It begins: "A staunch conservative for as long as anyone could remember, Yoram [Hazony] veered sharply to the far right in the spring of 1984 after Rabbi Meir Kahane spoke on campus -- an event Yoram would later describe as [*48] one of the most significant in his life." (Zealots, at 181.) Following a summary description of Kahane's career up to that time, Chapter 7 continues:

> Yoram [Hazony] was ripe for Kahane's message. 'In the spring of 1984,' Yoram later recalled in The Jerusalem Post, 'on a night when most of the university's undergraduates were out drinking and dancing at the annual "P-Party,' Rabbi Kahane came to Princeton. Two hundred and fifty students, most nonobservant Jews, gave up the free beer to go hear what the infamous fanatic, condemned by the Hillel but brought to campus by the debate team, had to say for himself. It was a speech many of us never forgot.

(Zealots, at 183.) Chapter 7 further states, after discussing the contents of Kahane's speech:

> Kahane "mesmerized" the students, Yoram [Hazony] recounted in The

Jerusalem Post. "Most of my friends, who had never had a conversation with an observant Jew, were astounded that an Orthodox rabbi could be an intelligent person, that he could actually defend his views against a crowd of Princeton students, when we had all thought Judaism had to be something primitive and foolish. We listened in astonishment, [*49] and finally in shame, when we began to realize he was right. We did know nothing."

> "Rabbi Kahane was the only Jewish leader who ever cared enough about our lives to actually come around and tell us what he thought we could do . . . [to] learn about Judaism, move to Israel, and stand up and fight for what you believe in . . . And his message worked. At least five students who were in the hall that night gradually became observant."

> More than that many of those students later joined the Eli Garin, a tribute to Kahane's xenophobic brand of militant Judaism in which the outside world is viewed as a bleak panorama of hatred for Jews, and where a Torah on one hand is inevitably supplemented by an AK-47 in the other.

(Zealots, at 184.)

Next, subsequent to a lengthy description of events following Kahane's death, Chapter 7 quotes Hazony's memorial to Kahane in The Jerusalem Post:

> "We found ourselves drawn to Kahane," Yoram [Hazony] wrote in a bylined column, "because, unlike any other leader we had ever met, he was willing to say what needed to be said; that an ignoramus was an ignoramus, that a phony was a phony, that there really were things in this world worth [*50] fighting for. By coming out and giving Jewish voice to the painful truths about our Jewishness, truths we had previously heard only from those openly opposed to Judaism, he returned to us the belief that Judaism could have truth on its side, that it could be something we didn't have to be embarrassed about, that we should be proud to wear a kipa and make our stand on the world stage as Jews."

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 16 of 20

Page 16

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

Although Hazony was never able to reconcile himself to Kahane's predilection for violence, he praised the rabbi for inspiring, cajoling, and shaming tens of thousands of youths into being better Jews and Zionists. Kahane "changed our lives, thrilled and entertained us, helped us grow up into strong, Jewish men and women," he wrote.

(Zealots, at 187-88 (emphasis added).) Finally, after noting that "Hazony went to Kahane's apartment in Jerusalem to sit shivah" (Zealots, at 188) and that "the Hazonys had been personally close to Kahane" (id.), Chapter 7 states: "Hazony is certainly not a thug and is quick to decry violence, unlike many supporters of the late Meir Kahane" (Zealots, at 189 (emphasis added)).

As is apparent from the above recitation (and [*51] from a review of the Publications in their entirety), Weinstein's name is nowhere associated with Kahane's. Rather, Friedman's discussion of Kahane's influence on the former Princeton students centers on Kahane's influence on Hazony. Thus, in order to satisfy the "of and concerning plaintiff" requirement of a defamation action, Weinstein appears to argue sub silentio that all of Hazony's views are attributed to him and that Hazony agreed with Kahane's views about the use of violence. The Publications, however, belie both of these arguments.

First, the Publications neither state nor imply that Weinstein shared all of Hazony's views. Indeed, the Publications make clear that, even among those gathered at the Sabbath in Eli and at the study group, there is no uniformity of views, but, rather, sincere disagreements, for example, about settlements, n13 interpretation of Jewish laws, n14 and immigration policies. n15 Second, assuming that the Publications imply that all of Hazony's views were shared by Weinstein, the Publications clearly describe that, although Hazony accepted certain of Kahane's non-violent teachings, he "was never able to reconcile himself to Kahane's predilection [*52] for violence." (Zealots, at 187-88.) Instead, Hazony is described as "quick to decry violence, unlike many of the supporters of the late Meir Kahane." (Zealots, at 189.) Thus, for example, Hazony rejected Kahane's notion that the way to solve Israel's demographic problem is to expel the Arabs, favoring instead a constructive, non-violent approach. (Zealots, at 191.) In light of these statements, no reasonable jury could find that these careful descriptions of Hazony's and, I assume for purposes of this motion, Weinstein's views on Kahane's teachings could support an inference that Weinstein approved of the violent aspects of Kahane's teachings.

n13 Haunted by her witnessing Israeli soldiers remove Arabs from a public bus, "Allison was not as gung-ho about settlement life as others." (Zealots, at 174.)

Avi was not interested in moving to Eli, "'I want something more adventurous.'" (Zealots, at 1771.)

n14 "There was an occasional squabble over some finer point of Halacha among these newly awakened Orthodox Jews, but when Yoram and Josh Weinstein, also a baal teshuvah and a Princeton graduate, agreed, they whooped and hollered and gave each other the 'high five,' like football players after scoring a touchdown." (Zealots, at 173.) [*53]

n15 "Yosha . . . worried that within a generation, the non-Jews among the Russians would de-Judaize Israel through intermarriage. Yoram disagreed, arguing that anybody who claims to be a Jew must be welcomed." (Zealots, at 173.)

Further, even if the statements were defamatory of Hazony, Weinstein may not rely on his mere association with Hazony to render the statements defamatory of and concerning him. See *Julian v. American Business Consultants, Inc.*, 2 N.Y.2d 1, 17-18, 155 N.Y.S.2d 1, 16-17, 137 N.E.2d 1 (1956) (holding that an actor could not be defamed by a book characterizing many people in the broadcast industry as communist "dupes", because the book's description of his attendance at communist front meetings did not support the application of those terms to him); *L.W.C. Agency, Inc. v. St. Paul Fire and Marine Ins. Co.*, 125 A.D.2d 371, 373, 509 N.Y.S.2d 97, 100 (2d Dept. 1986) (holding that an insurance broker's defamation complaint properly was dismissed because the letter alleging that an application for insurance contained misrepresentations would be defamatory only of [*54] the policy holder, not of the insurance broker, even though the broker also was identified in the letter); *Cohn v. National Broadcasting Co., Inc.*, 67 A.D.2d 140, 145, 414 N.Y.S.2d 906, 909 (1st Dept. 1979) ("Even assuming as true plaintiffs' assertion that the film unnecessarily distorted McCarthy's career and was unmistakably disparaging to the late Senator, this would not give rise to a claim for defamation by plaintiffs as his former aides and advisors."), aff'd, 50 N.Y.2d 885, 430 N.Y.S.2d 265, 408 N.E.2d 672, cert. denied, 449 U.S. 1022, 66 L. Ed. 2d 484, 101 S. Ct. 590 (1980).

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 17 of 20

Page 17

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

In sum, an ordinary reader of the Publications would not conclude that Hazony's views were attributed to Weinstein, or, if they were, that such views included the approval of Kahane's (or anyone else's) use of violence to establish or maintain settlements in the occupied territories. Finally, even if the Publications defamed Hazony, Weinstein's mere association with Hazony is not sufficient to render the statements defamatory of and concerning Weinstein.

5. Publications as a Whole

The Complaint also alleges that

> viewed as a whole, Chapter 7 of Zealots for Zion was meant [*55] to inaccurately portray plaintiff, Joshua Weinstein[,] as a militant activist, politically affiliated with the far right wing which advocates violence in the efforts of Jews to establish settlements in the occupied territories of Israel and with a distorted, perverse and dangerous view of others.

(Compl. P 16 or 18). As with the specific statements previously discussed, a court would have to strain to find a defamatory meaning in the Publications as a whole. See *Cohn, 50 N.Y.2d at 887, 430 N.Y.S.2d at 265* (holding that in the absence of "straining to find a defamatory interpretation where none exists," neither the individual passages nor "the cumulative effect of all such passages [can] be said to be defamatory"). They fail to support Weinstein's characterizations that he is portrayed as someone associated with violence. To the contrary, the person with whom Weinstein claims he is associated, and thereby defamed, Hazony, is unambiguously is stated to be opposed to violence and, as a result, not a pure follower of Kahane. (Zealots, at 189). The Publications as a whole, therefore, are not susceptible to a defamatory meaning.

B. Non-Actionable Statements of Opinion [*56]

Defendants also argue that certain of the statements complained of are not actionable because they "cannot 'reasonably [be] interpreted as stating actual facts' about [plaintiff]." *Milkovich v. Lorain Journal Co., 497 U.S. 1, 20, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990)* (quoting *Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 50, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988)); accord 600 West 115th St. Corp. v. Von Gutfeld, 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825, 829, 603 N.E.2d 930* [HN15] ("Only statements alleging facts can properly be the subject of a defamation action.").

[HN16] Under both federal and New York standards, the question of whether the complained-of

expression constitutes actionable fact or non-actionable opinion is one for the court to resolve. *Old Dominion Branch No. 496 v. Austin, 418 U.S. 264, 282-84, 41 L. Ed. 2d 745, 94 S. Ct. 2770 (1974); Greenbelt Coop. Publishing Ass'n. v. Bresler, 398 U.S. 6, 11-14, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (1970); Gross, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817; Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 381, 397 N.Y.S.2d 943, 950, 366 N.E.2d 1299*, cert. denied, *434 U.S. 969, 54 L. Ed. 2d 456, 98 S. Ct. 514* [*57] *(1977)*. "The dispositive inquiry, under either Federal or New York law, is 'whether a reasonable [reader] could have concluded that [the Publications were] conveying facts about the plaintiff. . . .'" *Gross, 82 N.Y.2d at 152, 603 N.Y.S.2d at 817* (citation omitted); see *Milkovich, 497 U.S. at 21* ("The dispositive question in the present case then becomes whether a reasonable factfinder could conclude that the statements in the [author's] column imply an assertion that petitioner Milkovich perjured himself in a judicial proceeding.").

Differences do exist, however, between the federal and New York standards. First, the New York State Constitution affords more protection to opinion statements than the Federal Constitution. The New York Court of Appeals, noting that New York, as "a cultural center for the Nation, has long provided a hospitable climate for the free exchange of ideas," *Immuno AG, 77 N.Y.2d at 249, 566 N.Y.S.2d at 913*, and that the New York Constitution's free speech guarantee is drafted with broad language, n16 has concluded at the "'protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum [*58] required by' the Federal Constitution." *Immuno AG, 77 N.Y.2d at 249, 566 N.Y.S.2d at 914* (quoting *O'Neill v. Oakgrove Constr. Inc., 71 N.Y.2d 521, 529 n.3, 528 N.Y.S.2d 1, 5, 523 N.E.2d 277 (1988)); accord Gross v. New York Times Co., 82 N.Y.2d 146, 152, 603 N.Y.S.2d 813, 817, 623 N.E.2d 1163 (1993)* (holding that under the State Constitution, the New York Court of Appeals "has embraced a test for determining what constitutes a nonactionable statement of opinion that is more flexible and is decidedly more protective of 'the cherished constitutional guarantee of free speech'") (citation omitted); *600 West 115th St., 80 N.Y.2d at 138, 589 N.Y.S.2d at 829* (noting "the scope of broader protection afforded by our state constitutional provision").

> N16 Instead of following the language of the First Amendment to the Federal Constitution, the New York Constitution provides that "every citizen may freely speak, write and publish . . . sentiments on all subjects." N.Y. Const., Art. I, § 8.

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 18 of 20

Page 18

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

Second, the [*59] federal and New York standards resolve the fact-opinion inquiry using slightly different approaches. The Court in *Ollman v. Evans, 242 U.S. App. D.C. 301, 750 F.2d 970 (D.C. Cir.), cert. denied, 471 U.S. 1127, 86 L. Ed. 2d 278, 105 S. Ct. 2662 (1985),* enumerated a four-factor test to apply in making this determination under the federal standard. [HN17] These factors are: (1) "whether the statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous," (2) whether the statement is "capable of being objectively characterized as true of false," (3) a consideration of "the full context of the statement -- the entire article or column, for example -- inasmuch as other unchallenged language surrounding the allegedly defamatory statement will influence the average reader's readiness to infer that a particular statement has factual content," and (4) a consideration of "the broader context or setting in which the statement appears," for "different types of writing have . . . widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion." *Ollman,* [*60] *750 F.2d at 979,* cited by *Steinhilbe, 68 N.Y.2d at 292, 508 N.Y.S.2d at 905.* Subsequently, in Milkovich, the Supreme Court addressed this same issue. Although it did not expressly adopt the Ollman factors, it applied an analysis largely similar to that in Ollman. See *Immuno AG, 77 N.Y.2d at 244, 566 N.Y.S.2d at 910-911* (interpreting Milkovich as endorsing the first two factors of the Ollman test and substituting a "type of speech" test for the last two factors). The Supreme Court first held that the statements at issue had a precise meaning. See *Milkovich, 497 U.S. at 21* (holding that "a reasonable factfinder could conclude that the statements in the . . . column imply an assertion that petitioner . . . perjured himself in a judicial proceeding"). Next, the Supreme Court held that the precise meaning was "sufficiently factual to be susceptible of being proved true or false." Id. Finally, the Supreme Court assessed whether either the "general tenor of the article" or the existence of "loose, figurative, or hyperbolic language" in the complained-of statements negated "the impression that the writer was seriously maintaining" the truth of the facts in the [*61] statement. Id.

The New York Court of Appeals employs a slightly different method of analysis, perhaps with an ear toward Justice Brennan's dissent in Milkovich. n17 In New York, the analysis must begin with "the content of the whole communication, its tone and apparent purpose." *Immuno AG, 77 N.Y.2d at 250, 566 N.Y.S.2d at 914,* cited with approval by *Brian v. Richardson, 87 N.Y.2d 46, 51, 637 N.Y.S.2d 347, 350-51, 660 N.E.2d 1126 (1995).*

Given the purpose of court review - to determine whether the reasonable reader would have believed that the challenged statements were conveying facts about the libel plaintiff - we believe that an analysis that begins by looking at the content of the whole communication, its tone and apparent purpose better balances the values at stake than an analysis that first examines the challenged statements for express and implied factual assertions, and finds them actionable unless couched in loose, figurative or hyperbolic language in charged circumstances. A media defendant surely has no license to misportray facts; false statements are actionable when they would be perceived as factual by the reasonable person. But statements must first [*62] be viewed in their context in order for courts to determine whether a reasonable person would view them as expressing or implying any facts.

*Immuno AG, 77 N.Y.2d at 255, 566 N.Y.S.2d at 917* (citations omitted) (emphasis in original).

n17 Justice Brennan recalled Justice Holmes' observation that: "'A word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.'" Id. at 26 (quoting *Towne v. Eisner, 245 U.S. 418, 425, 62 L. Ed. 372, 38 S. Ct. 158 (1918)).*

Weinstein complains of certain passages in the Publications in which statements are attributed to a "rabbi at Princeton who knew Yoram [Hazony] well." Weinstein alleges that these passages suggest that he is "not able to see the world in gray" but only in "Kahane's black and white" (Compl. P 15(i)); has a fixed belief system in which "you are either pro-Israel or an enemy of Israel, in which you are either [*63] with us or against us, in which you are either a good Jew or a bad Jew" (Compl. P15(j)); and comes from a troubled home (Compl. P 15(d)). Related to these allegations is Weinstein's conclusion that the Publications were intended to portray him inaccurately as having "a distorted, perverse and dangerous view of others". (Compl. P 16.) The pertinent portion of Chapter 7 reads as follows:

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 19 of 20

Page 19

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

"My perception is that the Princeton students who joined Yoram [Hazony] in Eli needed a fixed belief system," said the Princeton rabbi who knew them well. "One in which you are either pro-Israel or an enemy of Israel, in which you are either a good Jew or a bad Jew. Now all of that is a psychological splitting off - of not being able to see the world in gray, which, for my money, is what adult-hood is about." According to the rabbi, some of them come from troubled homes, "and Kahane's black-and-white views allow them to draw a clear picture of the universe."

(Zealots, at 184.)

Following the New York Court of Appeals' direction first to view the work as a whole and in context, I find that the "full context of the communication in which the statement appears, the broader social context [*64] and surrounding circumstances" are indeed such as to signal to an average reader that what is being read is likely to be opinion, not fact. n18 *Gross, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817.* The statements are attributed to a rabbi who is expressly stating his own "perception", or opinion. These perceptions delve into the psychological motivations and backgrounds of individuals who moved to Israel. Further, they are contained in a concededly political book looking at the nature of and motivation behind the settlement movement. I hold under the New York standard that, viewed in their context, no reasonable reader could view the statements attributed to the rabbi as expressing or implying any facts about Weinstein. n19

n18 Although it is not clear that these statements are of and concerning Weinstein, I need not address this issue because of my holding that they are non-actionable statements of opinion.

n19 Even under the less protective federal analysis, I find that, because a reasonable reader could not conclude that the statements complained of were conveying facts about Weinstein, these statements constitute protected speech. At the outset, I note that the world view attributed to the students and the characterization of their home life by the Rabbi do not have a "precise meaning which is readily understood" but, to the contrary, are utterly vague and subjective. Whether plaintiff "is able to see the world in gray" or only in "Kahane's black and white", whether plaintiff has a "fixed belief system" in which "you are either pro-Israel or an enemy of Israel, in which you are either a good Jew or a bad Jew", and whether plaintiff came from a "troubled home" are not capable of being proven true or false. In any event, the type of speech employed is loose and figurative, the kind of psychological characterization and interpretation that negates any implication that the writer is conveying fact about Weinstein. Further the general tenor of the paragraph, introduced as it is by the author's quoting the rabbi as stating his "perception[s]," negates any factual representation. Thus, under the federal analysis, the statements attributable to the rabbi are not actionable.

[*65]

Alternatively, to the extent that the statement attributed to the rabbi that "some of them come from troubled homes" could be interpreted as based on objective facts possessed by the rabbi and not known to the reader, and thus stating actual facts about Weinstein, this statement is not defamatory. Even if Weinstein came from a troubled home (however defined), that fact would not tend "to diminish the esteem, respect, goodwill, or confidence in which the plaintiff is held, or . . . tend[]to excite adverse, derogatory, or unpleasant feelings or opinions about the plaintiff." *Davis v. Costa-Gavras, 619 F. Supp. 1372, 1375 (S.D.N.Y. 1985)* (citing Prosser, Handbook of the Law of Torts § 111, at 739 (1971)); See *Aronson, 65 N.Y.2d at 594, 493 N.Y.S.2d at 1008* (holding that an employer's statement of dissatisfaction with plaintiff employee's job performance, including that the employer could not get the employee to hand in time sheets or anything else and that the employee was neglectful, was not defamatory); cf. *Gross, 82 N.Y.2d at 156, 603 N.Y.S.2d at 819-820* ("We stress once again our commitment to avoiding the 'hypertechnical parsing' of written and spoken words for [*66] the purpose of identifying 'possible "fact[s]" that might form the basis of a sustainable libel action"); *Cohn, 50 N.Y.2d at 887, 430 N.Y.S.2d at 265* ("Courts will not strain to find a defamatory interpretation where none exists").

Finally, Weinstein complains of the Excerpt headline, which reads: "Rule By the Best. Yuppie Settlers from Princeton Play Napoleon on the West Bank." (Excerpt, at 1.) Weinstein claims that the headline, "when read in the context of the entire *Village Voice* publication, portrayed plaintiff, Joshua Weinstein[,] in a defamatory, false light." (Compl. P 21.) I disagree; the average reader viewing the headline in its tone and purpose, could conclude only that, at worst, the headline is a slightly exaggerated statement of the

Case 1:05-cv-10207-JLT    Document 11-2    Filed 04/07/2005    Page 20 of 20

Page 20

1996 U.S. Dist. LEXIS 3672, *; 24 Media L. Rep. 1769

Excerpt's contents. Accordingly, the headline constitutes rhetorical hyperbole and is not actionable. See *Milkovich, 497 U.S. at 16-17; Greenbelt, 389 U.S. at 14; 600 West 115th St., 80 N.Y.2d at 143-45, 589 N.Y.S.2d at 830-31; Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1016* (1st Cir.) (holding that the headline "Little Amazons Attack Boys" constituted non-actionable rhetorical hyperbole, particularly when [*67] read in context of the article), cert. denied, *488 U.S. 821, 102 L. Ed. 2d 42, 109 S. Ct. 65 (1988).*

IV. Invasion of Privacy Claim

Weinstein also alleges a common law invasion of privacy claim. As the New York Court of Appeals repeatedly has held, however, New York does not recognize a claim for private facts or false light invasion of privacy; it recognizes only a claim for commercial misappropriation as provided under Sections 50 and 51 of the New York Civil Rights Law.

> While the courts of other jurisdictions have adopted some or all of these torts, [i.e., unreasonable publicity of private facts, unreasonable intrusion upon seclusion, and false light], [HN18] in this State the right to privacy is governed exclusively by sections 50 and 51 of the

> Civil Rights Law; we have no common law of privacy. . . .

*Howell v. New York Post Co., Inc., 81 N.Y.2d 115, 123, 596 N.Y.S.2d 350, 354, 612 N.E.2d 699 (1993)* (citations omitted); accord *Stephano v. News Group Publications, Inc., 64 N.Y.2d 174, 183, 485 N.Y.S.2d 220, 224, 474 N.E.2d 580 (1984).* Further, Sections 50 and 51 [HN19] "were drafted narrowly to encompass only the commercial use of an individual's name [*68] and no more." *Arrington v. New York Times Co., 55 N.Y.2d 433, 439, 449 N.Y.S.2d 941, 943, 434 N.E.2d 1319 (1982).* Weinstein has not pleaded a violation of Sections 50 and 51, and, accordingly, his invasion of privacy claim, Count II, is dismissed.

CONCLUSION

Defendants' motion to dismiss the complaint is granted. The Clerk of the Court shall mark this action closed.

SO ORDERED:

Dated: New York, New York
March 26, 1996

    LORETTA A. PRESKA, U.S.D.J.

LEXSEE 1998 US DIST LEXIS 18990

**VICKI L. ABBOTT, Plaintiff, -v.- HARRIS PUBLICATIONS, Inc., DOG NEWS: THE DIGEST OF AMERICAN DOGS, MATTHEW H. STANDER, SARI BREWSTER TIETJEN, THE AMERICAN KENNEL CLUB, Inc., DAVID C. MERRIAM, MARIE E. (Mary Beth) O'NEILL, ANNE D. SAVORY, DENNY MOUNCE, DOROTHY M. MacDONALD, ANN D. HEARN, AND JOHN DOES I THROUGH X, Defendants.**

97 Civ. 7648 (JSM)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 18990*

**December 4, 1998, Decided
December 4, 1998, Filed**

**DISPOSITION:** [*1] Plaintiff's motion to amend denied. Defendants' motions for judgment on the pleadings granted in part and denied in part. Third cause of action dismissed as to all defendants.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sought leave to amend her complaint pursuant to Fed R. Civ. P. 15(a); eight defendants moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on plaintiff's action alleging defamation, conspiracy, and violation of due process rights; one defendant moved to dismiss the complaint against her pursuant to Fed R. Civ. P. 12(b)(6) for failure to state a claim.

**OVERVIEW:** Plaintiff professional dog breeder sued defendants, kennel club, publisher, and associated individuals, in state court for defamation, conspiracy and due process action. Defendants, removed the case to the United States District Court for the Eastern District of Texas, Sherman Division. The case was transferred to the present court. Plaintiff's motion for permission to amend her complaint and for remand to the Texas state court was denied by the court and on appeal. The court held plaintiff's motion for leave to amend her complaint was barred by the law of the case doctrine. The court applied the law of New York to plaintiff's defamation action because New York had a closer relationship to the

parties and to the events in question. The court granted defendant's motions for judgment on the pleadings as to statements that were protected opinion or not defamatory and denied the motion as to the remaining allegations. The conspiracy claim was dismissed because New York does not recognize the tort of civil conspiracy.

**OUTCOME:** Plaintiff's motion to amend denied because the law of the case doctrine precluded revisiting the issue which had previously been decided; defendants' motions for judgment on the pleadings granted in part and denied in part; conspiracy cause of action dismissed as to all defendants.

**LexisNexis(R) Headnotes**

*Civil Procedure > Preclusion & Effect of Judgments > Law of the Case Doctrine*
[HN1] The law of the case doctrine precludes revisiting an issue once decided in a given case.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN2] Dismissal is proper under both Fed. R. Civ. P. 12(c) and Fed. R. Civ. P. 12(b)(6) only when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN3] When a case is transferred from one district court to another, the court applies the conflicts rules of the transferring jurisdiction.

*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN4] Texas has adopted a most significant relationship test for conflict of law issues. The elements of this test include, inter alia, the state which has the most significant relationship to the occurrence, the place where the conduct causing the injury occurred, and the domicile and place of business of the parties.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN5] A defamation claim in New York has four elements. The plaintiff must plead: (1) a false and defamatory statement of and concerning plaintiff; (2) publication to a third party; (3) the requisite degree of fault; and (4) special harm or per se actionability.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN6] In New York, truth is an absolute, unqualified defense to a civil defamation action. The plaintiff has the burden of showing the falsity of factual assertions.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN7] Whether a statement is capable of defamatory meaning is a threshold question of law to be resolved by the court.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN8] A defamatory statement is one which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right thinking persons, and to deprive him of their friendly intercourse in society.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN9] In determining whether a writing is defamatory, the court must consider the publication as a whole, and not pick out and isolate particular phrases. The meaning of a writing depends not on an isolated or detached statement but on the whole apparent scope and intent. The publication must be viewed from the perspective of the average reader, and the court must not strain to place a particular interpretation on the published words. Lastly, the court will read the statement against the background

of its issuance regarding the circumstances of publication.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN10] Generally, when parties have submitted materials outside the pleadings, the court must either exclude the additional documents or convert the motion to dismiss into one for summary judgment under Fed. R. Civ. P. 56.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*
[HN11] In the event a plaintiff alleges a claim based on a written instrument the court may consider such an instrument in ruling on a Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c) motion even if the instrument was not attached to the complaint.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN12] Statements of opinion which do not contain a provably false factual connotation are protected by the United States and New York constitutions. The question in a defamation action is whether a reasonable reader could have concluded that the statements were conveying facts about the plaintiff. To make this determination under New York law, the court must view the challenged statements and determine: (1) whether the language at issue has a precise and readily understood meaning; (2) if the statements are capable of being proven true or false; and (3) whether the context of the communication signals readers that the words are opinion and not fact.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN13] Defamatory statements of opinion that imply a basis of fact that are not disclosed to the reader are actionable while those that are accompanied by a recitation of supporting facts, or those that do not imply the existence of such facts, are not.

*Torts > Defamation & Invasion of Privacy > Defamation Actions*
[HN14] New York recognizes a qualified privilege for communications made to others with a common interest.

*Torts > Intentional Torts*
[HN15] New York does not recognize the tort of civil conspiracy.

COUNSEL: For plaintiff: Raymond Mundy, Spring Valley, NY.

For plaintiff: L. Randall Yazbeck, Dallas, TX.

Case 1:05-cv-10207-JLT    Document 11-3    Filed 04/07/2005    Page 3 of 10

Page 3
1998 U.S. Dist. LEXIS 18990, *

For defendants: Dale Christensen, Seward & Kissel, Nancy Felsten, Toby Butterfield, Kay Collyer & Boose, Debra Resnick, Cutner & Associates, New York, NY.

**JUDGES:** JOHN S. MARTIN, JR., U.S.D.J.

**OPINIONBY:** JOHN S. MARTIN, JR.

**OPINION:**

### MEMORANDUM OPINION AND ORDER

JOHN S. MARTIN, Jr., District Judge:

This is a defamation, conspiracy and due process action by plaintiff Vicki L. Abbott (Abbott). It is before the Court on cross motions. Abbott seeks leave to amend her complaint pursuant to *Fed R. Civ. P. 15(a)*. Defendants America Kennel Club (the "AKC"), Mary Beth O'Neill, David Merriam and Anne Savory (the "AKC Defendants") move for judgment on the pleadings pursuant to *Fed. R. Civ. P. 12(c)*. Defendants Harris Publications, Dog News: The Digest of American Dogs, Matthew Stander and Sari Brewster Tietjen (the "Harris defendants") also move for judgment on the pleadings per Rule 12(c). Defendant Dorothy MacDonald [*2] moves to dismiss the complaint against her pursuant to Rule 12(b)(6) for failure to state a claim and defendant Ann Hearn moves for judgment on the pleadings under Rule 12(c). Plaintiff's motion to amend is denied. Defendants' motions for judgment on the pleadings are granted in part and denied in part.

Facts

The facts recited below are taken exclusively from the First Amended Complaint and, for purposes of the Rule 12(c) and Rule 12(b)(6) motions are considered true. *Mills v. Polar Molecular Corp. 12 F.3d 1170, 1174 (2d Cir. 1993)*.

Plaintiff Vicki L. Abbott is a professional dog breeder who has lived most of her life in Texas. In January 1995, Abbott submitted an application to be an AKC judge. The AKC authorized Abbott to judge seven of the Toy breeds, and in April 1995 Abbott submitted an amended petition requesting authorization for six additional Toy breeds. In May, O'Neill, who was AKC's Director of Judging Applications and Mounce, who is a professional dog handler and had previously learned the contents of Abbott's judging application, spoke with each other about Abbott's application. Mounce also sent a letter to the AKC stating that Abbott's application contained factual [*3] inaccuracies. In July the AKC voted to revoke Abbott's authorization to judge any of the Toy breeds. Abbott appealed the revocation to the Judge's Review Board, which recommended to the AKC

that it reinstate Abbott's permission to judge seven Toy breeds. The AKC followed the Review Board's recommendation in January 1996 and authorized Abbott to judge seven Toy breeds.

The Harris defendants then published articles in Dog News accusing Abbott of having lied on her application. MacDonald, who was president of the Dog Judges Association of America, sent a letter to the Chairman of the AKC concerning the accusations and proposing a group of individuals to adjudicate it. In February of 1996, the AKC Board suspended Abbott's judging privileges in order to investigate whether her application contained false statements. In March or thereabouts, the AKC Board notified Abbott that her judging approval had been revoked because of "false representations on [her] application." Compl. P 56.

Plaintiff's Motion to Amend

Plaintiff moves for permission to amend her complaint and omit the allegation contained in Paragraph 60 alleging a cause of action arising under the U.S. Constitution. Fed. [*4] R. Civ. P. 15(a).

Procedural History

Plaintiff originally sued defendants in the District Court of Collin County, Texas, on December 5, 1996. On December 20, 1996, the AKC defendants, with the consent of the remaining defendants, removed the case to the U.S. District Court for the Eastern District of Texas, Sherman Division. On January 13, 1997, the AKC defendants moved to transfer the case here. On January 28, 1997, plaintiff moved for permission to amend her complaint and for remand to the Texas state court. On March 5, 1997, Judge Paul Brown of the Eastern District of Texas denied plaintiff's motion to amend and remand.

The case was transferred from Texas to New York on March 7, 1997. On March 20, 1997, plaintiff moved in the Eastern District of Texas for reconsideration of the order transferring the case. On April 4, 1997, this Court transferred the case back to Texas for consideration of the motion to reconsider. Before the Texas court received the file, however, plaintiff on April 3 petitioned the United States Court of Appeals for the Fifth Circuit for a writ of mandamus seeking withdrawal of the Eastern District Court's decision not to remand to state court and the order [*5] transferring the case to New York. Plaintiff also sought an order from the Court of Appeals remanding the case to Texas state court.

The Court of Appeals denied plaintiff's petition. In re Vicki L. Abbott, No. 97-40375 (5th Cir. April 8, 1997). On reconsideration, Judge Brown declined to change his ruling and ordered the case transferred back to New York on October 6, 1997.

Discussion

Plaintiff's wish to strike the federal claims from her complaint has already been addressed by Judge Brown in the Eastern District of Texas by his March 5, 1997 order. [HN1] The law of the case doctrine precludes revisiting an issue once decided in a given case. This rule maintains consistency in an action and promotes efficiency. *Pescatore v. Pan American World Airways, 97 F.3d 1, 7 (2d Cir. 1996).*

Both the present motion and the motion before Judge Brown deal with the same issue: whether plaintiff may avoid federal jurisdiction by amending her complaint to omit her federal constitutional claim. In her February 7, 1997 motion to Judge Brown, Abbott stated "Plaintiff has applied for leave to amend the complaint to remove the only reference to the Constitution which is contained in Paragraph 60 because [*6] plaintiff does not have, and did not intend to claim, a personal right to due process under the Constitution." See Christensen Aff. C, Plaintiff's Memo. of Law in Support of Motion to Remand Action to State Court 2.

This is, of course, the gravamen of plaintiff's present motion: "From inception, Abbott has insisted that she neither alleged, nor intended to allege, a claim arising under the Constitution." Plaintiff's Memo. of Law in Support of Motion to Amend Complaint 8.

It is obvious from the pleadings that plaintiff raises here a claim that has been considered twice by the Texas District Court and once by the Fifth Circuit Court of Appeals. This Court will not disturb Judge Brown's ruling, and plaintiff's motion to amend is therefore denied.

Motions for Judgment on the Pleadings

[HN2] Dismissal is proper under both Rules 12(c) and 12(b)(6) only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994)* (Rule 12(c)); *Automated Salvage Transport v. Wheelabrator Environ. Sys., 155 F.3d 59, 67 (2d Cir. 1998)*(Rule 12(b)(6)) citing *Conley v. Gibson,* [*7] *355 U.S. 41, 45, 78 S. Ct. 99, 101, 2 L. Ed. 2d 80 (1957).*

Plaintiff claims Texas law applies to her state law claims, while Defendants seek to apply the law of New York.

[HN3] When a case is transferred from one district court to another, the Court applies the conflicts rules of the transferring jurisdiction. *Shah v. Pan American World Services, 148 F.3d 84, 94 (2d Cir. 1998)* citing *Van Dusen v. Barrack, 376 U.S. 612, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964).* Applying Texas law to the question

of whether New York or Texas defamation law applies, [HN4] Texas has adopted a most significant relationship test as set forth in the *Restatement (Second) of Conflict of Laws, § § 6* and 145. *Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 420 (Tex. 1984); Gutierrez v. Collins, 583 S.W.2d 312, 318 (Tex. 1979); Brown v. Hearst Corp., 862 F. Supp. 622, 627 (D. Mass. 1994).*

The elements in the Restatement analysis adopted by Texas include, inter alia, the state which has the most significant relationship to the occurrence, the place where the conduct causing the injury occurred and the domicile and place of business of the parties. *Gutierrez, 583 S.W.2d at 319.*

In this defamation action, [*8] New York has a closer relationship to the parties and to the events in question. The AKC is incorporated in New York and chartered by the New York Legislature. Dog World magazine is published here. In addition, a majority of the personal defendants live in the New York metropolitan area, and most of the conduct complained of occurred in New York. This is particularly true of Defendants' alleged violation of the due process clause of the New York Constitution. Compl. P 60. All decisions regarding Abbott's application were made in New York, and records of and witnesses to the application process are more likely to be located in New York than in Texas.

These factors outweigh the reasons to apply Texas law, namely that the plaintiff lives in Texas and that the allegedly defamatory statements in Dog World magazine were read by Texas residents. Because this case has a more significant relationship to New York than to Texas, New York law applies.

The New York Law of Defamation

[HN5] A defamation claim in New York has four elements. Plaintiff must plead: 1) a false and defamatory statement of and concerning plaintiff; 2) publication to a third party; 3) the requisite degree of fault; [*9] and 4) special harm or per se actionability. *Weinstein v. Friedman, 1996 U.S. Dist. LEXIS 3672, 1996 WL 137313 (S.D.N.Y. March 26, 1996)* citing *Church of Scientology Int'l v. Eli Lilly & Co., 778 F. Supp. 661, 666 (S.D.N.Y. 1991); Box Tree South Ltd. v. Bitterman, 873 F. Supp. 833, 844 (S.D.N.Y. 1995).*

This opinion primarily addresses the first element, falsity and defamation. [HN6] In New York, "truth is an absolute, unqualified defense to a civil defamation action." *Guccione v. Hustler Magazine, 800 F.2d 298, 301 (2d Cir. 1986); Commonwealth Motor Parts v. Bank of Nova Scotia, 44 A.D.2d 375, 355 N.Y.S.2d 138, 141 (N.Y. App. Div. 1974); Chung v. Better Health Plan, 1997 U.S. Dist. LEXIS 9627, 1997 WL 379706 (S.D.N.Y. 1997).* Plaintiff has the burden of showing the falsity of

factual assertions. *Immuno AG v. J. Moor-Jankowski, 77 N.Y.2d 235, 250, 566 N.Y.S.2d 906, 914, 567 N.E.2d 1270 (N.Y. 1991)* citing *Philadelphia Newspapers v. Hepps, 475 U.S. 767, 776, 106 S. Ct. 1558, 1563, 89 L. Ed. 2d 783 (1986).*

[HN7] Whether a statement is capable of defamatory meaning is a threshold question of law to be resolved by the court. *Weinstein, 1996 WL 137313 *10; Aronson v. Wiersma, 65 N.Y.2d 592, 593, 493 N.Y.S.2d 1006, [*10] 1007, 483 N.E.2d 1138 (N.Y. 1985); James v. Gannett Co., 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 874, 353 N.E.2d 834 (N.Y. 1976); Tracy v. Newsday, 5 N.Y.2d 134, 136, 182 N.Y.S.2d 1, 3, 155 N.E.2d 853 (N.Y. 1959).*

[HN8] A defamatory statement is one which tends to "expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right thinking persons, and to deprive him of their friendly intercourse in society." *Foster v. Churchill, 87 N.Y.2d 744, 751, 642 N.Y.S.2d 583, 587, 665 N.E.2d 153 (N.Y. 1996)* citing *Rinaldi v. Holt, Rinehart & Winston, 42 N.Y.2d 369, 379, 397 N.Y.S.2d 943, 949, 366 N.E.2d 1299 (N.Y. 1977).* See also *Golub v. Enquirer/Star Group, 89 N.Y.2d 1074, 1076, 659 N.Y.S.2d 836, 837, 681 N.E.2d 1282 (N.Y. 1997)* (A writing is defamatory "if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community") accord *Tracy, 5 N.Y.2d at 135, 182 N.Y.S.2d at 3; Mencher v. Chesley, 297 N.Y. 94, 100, 75 N.E.2d 257 (N.Y. 1947).*

[HN9] In determining whether a writing is defamatory, the Court must "consider the [*11] publication as a whole," and "not pick out and isolate particular phrases." *Immuno AG, 77 N.Y.2d at 250, 566 N.Y.S.2d at 914.* The meaning of a writing "depends not on an isolated or detached statement but on the whole apparent scope and intent." *Davis v. Ross, 754 F.2d 80, 83 (2d Cir. 1985).* The publication must be viewed from the perspective of the average reader, and the Court must not strain to place a particular interpretation on the published words. Lastly, the Court will read the statement "against the background of its issuance" regarding the circumstances of publication. *Id.*

In determining whether the excerpts included in Abbott's complaint are defamatory, the Court may look at the entire document to assess the context of the complained-of words. This is a departure from general practice under Rules 12(c) and 12(b)(6), where the Court normally limits itself to the four corners of the complaint. *Northrop v. Hoffman of Simsbury, 134 F.3d 41, 44 n.2 (2d Cir. 1997); Kramer v. Time Warner, 937 F.2d 767, 773 (2d Cir. 1991);* Wright & Miller, *Federal Practice and Procedure: Civil 2d § 1357.* [HN10]

Generally, when parties have submitted materials outside the pleadings, [*12] the Court must either exclude the additional documents or convert the motion into one for summary judgment under Rule 56. *Kramer, 937 F.2d at 773.*

[HN11] In the event a plaintiff alleges a claim based on a written instrument, as is the case here, the Court may consider such an instrument in ruling on a Rule 12(b)(6) or Rule 12(c) motion even if the instrument was not attached to the complaint. *Rodriguez v. American Friends of Hebrew Univ., 1998 U.S. Dist. LEXIS 3701, 1998 WL 146227 (S.D.N.Y. March 25, 1998)* (Koeltl, J.) (In deciding a motion, court may consider documents referenced in the complaint and documents in plaintiff's possession which were relied upon in bringing suit); *Hogan v. DC Comics, 983 F. Supp. 82 (N.D.N.Y 1997)* (McAvoy, Chief J., on reconsideration); *National Football League v. Dallas Cowboys, 922 F. Supp. 849, 853 (S.D.N.Y. 1996); Sazerac Co. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994);* see also *Brass v. Am. Film Techn., 987 F.2d 142, 150 (2d Cir. 1993); Cortec Indus. v. Sum Holding, 949 F.2d 42, 47 (2d Cir. 1991); I. Meyer Pincus & Assoc. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991).* In this case, the Court will consider the entire publications from [*13] which the allegedly defamatory statements were culled. n1

n1 Affidavit of Toby M.J. Butterfield (Butterfield Aff.)

Affidavit of Debra I. Resnick (Resnick Aff.)

We now turn to the statements at issue contained in Paragraph 62 of the First Amended Complaint.

**Statement i** ("The Way It Is," written by Defendant Tietjen).

There is every reason to believe that a person has been less than honest on an application to judge.

A number of them (persons listed in Abbott's application" [sic] told the investigator that certain statements in the application were false.

On a personal note, as one of the individuals falsely listed on the application, I find it intolerable that this column is even necessary.

Statement i meets the pleading requirements for defamation because it accuses Abbott of lying on her

judging application. Accusations of duplicity and mendacity are likely to expose the accused to disgrace and contempt among participants in a sport that values honesty and integrity. *Foster,* [*14] *87 N.Y.2d at 751, 642 N.Y.S.2d at 587.*

The title and tone of "The Way It Is" may be fairly considered to be an opinion piece and not real news. [HN12] Statements of opinion which do not "contain a provably false factual connotation" are protected by the U.S. and New York constitutions. *Milkovich v. Lorain Journal Co., 497 U.S. 1, 17-21; 110 S. Ct. 2695, 2704-2707, 111 L. Ed. 2d 1 (1990); Immuno AG, 77 N.Y.2d at 256, 566 N.Y.S.2d at 906.* The question under federal and New York law is "whether a reasonable reader could have concluded that the articles were conveying facts about the plaintiff." *600 W. 115th St. Corp. v. Von Gutfeld, 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825, 829, 603 N.E.2d 930 (N.Y. 1992)* (citations omitted). To make this determination under New York law, the Court must view the challenged statements and determine: (1) whether the language at issue has a precise and readily understood meaning; (2) if the statements are capable of being proven true or false; and (3) whether the context of the communication signals readers that the words are opinion and not fact. *Gross v. New York Times Co., 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 817, 623 N.E.2d 1163 (N.Y. 1993)* [*15] (internal citations and quotations omitted). [HN13] Defamatory statements of opinion that imply a basis of fact that are not disclosed to the reader are actionable while those that are accompanied by a recitation of supporting facts, or those that do not imply the existence of such facts, are not. *Gross, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817; Potomac Valve & Fitting Co. v. Crawford Fitting, 829 F.2d 1280, 1290 (4th Cir. 1987).*

In the case of Statement i, the Court finds that the statement "There is every reason to believe that a person has been less than honest on an application to judge" is supported by the fact that "AKC's investigator contacted a number of the people listed on the application. A number of them told the investigator that certain statements in the application were false." Teitjen goes on to say that her name was "falsely listed on the application."

Tietjen's belief that Abbott was dishonest is protected opinion. However, Abbott may prevail in her claim that the underlying "fact" that unnamed individuals told the AKC investigator that her application contained falsehoods was defamatory. This statement may be proven true or false, as can the fact that Teitjen's own [*16] name was wrongly listed on the application. Thus, the only actionable issue concerning Statement i is whether Tietjen's report of statements made to the AKC investigator are true and whether her name was falsely

listed on the application. See *Restatement [Second] of Torts § 566,* comment c. n2 The motion for judgment on the pleadings regarding Statement i is denied.

> n2 A somewhat analogous set of facts was addressed by the Court in Milkovich: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement 'Jones is a liar.'" *Milkovich v. Lorain Journal Co., 497 U.S. 1, 18-19, 110 S. Ct. 2695, 2705-706, 111 L. Ed. 2d 1, (1990).*

[*17]

**Statement ii** ("The Way It Is," written by Defendant Tietjen).

> . . . (A)s evidenced by a recent vote of AKC Board of Directors to reward falsification by granting judging privileges, the honesty of an applicant was not important to seven members of the Board.

> The other directors attending that meeting voted to grant breeds to judge to an individual who wantonly and deliberately falsified the judging applications. . . . Falsification is the name of the game. Deliberate misrepresentations are acceptable. Lies are permissible

Statement ii is similar to and gives rise to the same issues as Statement i. The defamatory (and for purposes of this 12(c) motion false) allegations of wanton and deliberate falsification are supported by the results of the AKC investigation that Teitjen reported.

Unlike Statement i, both statements are presented as facts to support defendant Teitjen's opinion that the AKC was being poorly administered. Although Teitjen's allegations of "wanton" conduct may be considered hyperbole, she makes a clear factual claim that Abbott deliberately falsified her applications and that an AKC investigation confirmed this claim. The motion for

1998 U.S. Dist. LEXIS 18990, *

judgment [*18] on the pleadings regarding Statement ii is denied.

**Statement iii.** ("The Way It Is," written by Defendant Tietjen).

> Sources have reported that by a six to five vote, the Board of Directors... elected to send the Abbott judging applications to an independent investigative committee.. . The purpose of the committee is to investigate whether or not the applicant made false statements prejudicial to the best interest of AKC.

Statement iii agrees with the facts alleged in the complaint. Compl. P 44. The statement is true, and the motion for judgment on the pleadings regarding Statement iii is granted.

**Statement iv.** ("The Way It Is," written by Defendant Tietjen).

> Those who thought there was nothing wrong with the Abbott application, or considered it to consist of little more than white lies, minor exaggerations, or forgotten memory probably feel the penalty was too harsh. Those who were directly involved in the matter by being "used" by Mrs. Abbott and then subsequently maligned by her and her cohorts feel nothing short of a public hanging was sufficient justice.

Statement iv is the author's opinion, yet it relies on the assertions that Abbott [*19] "'used'" and "maligned" people. Whether or not Abbott "'used'" people is too amorphous a charge to be proven true or false. The allegation that Abbott maligned people, defined as "uttering injuriously misleading or false reports," may be established. Webster's Third New International Dictionary 1367 (1986). The statement thus contains "a provably false factual connotation" that may reasonably expose Abbott to contempt, ridicule or disgrace. *Milkovich, 497 U.S. at 17-21, 110 S. Ct. at 2704-2707; Foster, 87 N.Y.2d at 751, 642 N.Y.S.2d at 587.* The motion for judgment on the pleadings regarding Statement iv is denied.

**Statement v** (Editorial "The Board Must Bow Out" appearing in Dog News.)

> This combined with the mess made out of the Abbott situation really erodes any

> confidence in the approval of judges one may have had for the Board to do so.

Statement v cannot sustain a cause of action for defamation for several reasons. First, it is not defamatory of Abbott. Although the editorial is critical, the criticism is directed toward the AKC Board and its procedures. It is unclear what "mess" the editorial refers to, as it was published in January 1996, the [*20] month that the AKC reinstated Abbott as a judge. Compl. P 48. Statement v could just as easily be about the "mess" of Abbott's suspension as it could be about the "mess" of her reinstatement.

Second, the statement is protected opinion, as evidenced by its publication on a page titled "Editorial" and the use of persuasive and tendentious language. See *Millus v. Newsday, 89 N.Y.2d 840, 842, 652 N.Y.S.2d 726, 727, 675 N.E.2d 461 (N.Y. 1996).* Lastly, the statement is true, as the pleadings lead to the unavoidable conclusion that the controversy surrounding Abbott's applications created a "situation," and that some people were unhappy about the outcome. The motion for judgment on the pleadings regarding Statement v is granted.

**Statement vi** (Editorial "Everyone Does Not Lie" appearing in Dog News.)

> It is ironic that two British judges who were suspended for five years ... for falsifying information on their judging applications arrived in California the same week AKC's Board decided to award seven breeds to a person in America who allegedly committed similar transgressions. ... no Elaine, No Patti not everyone lies on their judging application.

Statement vi [*21] cannot support a cause of action for defamation because it is true as acknowledged by the Complaint. Compl. PP 43-50. Specifically, Abbott was granted permission to judge and she was alleged to have falsified her application. Falsity is an essential element of defamation in New York, and the motion for judgment on the pleadings regarding Statement vi is granted.

**Statement vii** ("The Gossip Column" appearing in Dog News)

> The episode that took place last week with the Board of Directors granting judging approval of seven breeds to Vicki Abbott has taken on the moniker VIC-FIX.

Assuming this to be a false statement, it could not reasonably expose Abbott to "contempt, ridicule,

aversion or disgrace." *Foster, 87 N.Y.2d at 751, 642 N.Y.S.2d at 587.* The statement is insufficient because it implies that the AKC Board, not Abbott, was corrupt in approving Abbott's application. Read in context, Statement vii is not defamatory, and the motion for judgment on the pleadings regarding Statement vii is granted.

**Statement viii** ("Kodner's Korner" appearing in Dog News)

> The AKC has made it abundantly clear that anyone can become a judge even if they [*22] are just a little bit dishonest. Can you be just a little bit pregnant?

This statement is defamatory because it accuses Abbott of being a liar. The tone of the piece suggests what the title implies: that it is author Kodner's personal opinion. Statement viii is not protected opinion because it contains a "provably false factual connotation," i.e. that Abbott is dishonest. *Milkovich, 497 U.S. at 17-21, 110 S. Ct. at 2704-2707.* Turning to the New York Gross tests, the statement may be readily understood to accuse Abbott of lying and may be proven false. Although Kodner's criticism of the AKC is clearly opinion, it is based on the factual assertion that Abbott was dishonest in the application process. The article does not provide the facts underlying this assertion nor does it imply that no such facts exist. *Gross, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817.* The statement is thus actionable, and the motion for judgment on the pleadings regarding Statement viii is denied.

**Statement ix** ("Kodner's Korner" appearing in Dog News)

> I do not want to see the issuance of judging approvals become a form of political patronage.

This statement is not defamatory [*23] of Abbott in any way, shape or form. The motion for judgment on the pleadings regarding Statement ix is granted.

**Statement x** ("Cold, Cold St. Paul" written by defendant Stander appearing in Dog News)

> It is truly amazing the way my 'bad' guys on the Board have reacted to the Abbott case. Jim Smith's statement that her investigation was nothing more than a 'witch hunt' is as astounding to me. No one knows or likes Vicki better than I do and if there is a chance the motivation behind the initial investigation was less

than pure (and I am not even certain of this being the case) the fact remains that the investigation did prove ample transgressions by her. ... I was listed by Vicki, I am told, (not by her) as having spoken to her about English Toy Spaniels ... but to the best of my recollection I never spoke to her about the breed.

Statement x is also written in the style of an editorial or opinion piece. However, it is not protected opinion under Milkovich because it includes the verifiable assertions that "the investigation did prove ample transgressions by [Abbott]," including "unexplained exaggerations, misfed information and possibly down right lies." [*24] Stander also wrote that someone told him that Abbott reported having a conversation with him about English Toy Spaniels that he did not remember. Statement x is actionable as a defamatory statement because it states that Abbott was misleading in her judging applications. This statement could reasonably lead to contempt and ridicule among dog handlers and judges. The language clearly states that Abbott exaggerated and "misfed information" on her application and that an investigation proved these facts. Statement x also asserts that Abbott claimed to have had a conversation with Stander that she did not. These facts can be proven false and are presented as fact within an opinion piece. *Gross, 82 N.Y.2d at 153, 603 N.Y.S.2d at 817.* As such, Statement x is actionable and the motion for judgment on the pleadings is denied.

**Statement xi** (Letter, Stander to Robert Berndt, president of AKC)

> Whether or not she (Abbott) actually lied on her application is unknown to me personally, but many people to whom I have spoken tell me she blatantly and illegally used their names as references when in fact they claim never to have spoken to her at all about the breeds or situations [*25] in question.

The question raised by Statement xi is not whether it is defamatory but whether it is privileged. [HN14] New York recognizes a qualified privilege for communications made to others with a common interest. *Liberman v. Gelstein, 80 N.Y.2d 429, 436, 590 N.Y.S.2d 857, 861, 605 N.E.2d 344 (N.Y. 1992); Friedman v. Ergin, 110 A.D.2d 620, 487 N.Y.S.2d 109 (N.Y. App. Div. 1985); Wright v. Johnson, 184 A.D.2d 234, 584 N.Y.S.2d 305 (N.Y. App. Div. 1992).*

It is not possible to dispose of a claim of qualified privilege pursuant to Rules 12(b)(6) or 12(c). Although Stander's letter appears to be privileged because it

concerns dog show judging, a matter of concern to him, this privilege may be overcome by a showing of malice. *Friedman, 110 A.D.2d 620, 1985 N.Y. App. Div. LEXIS 48516, \*3, 487 N.Y.S.2d 109.* Abbott alleges that the above statements were made with actual malice toward her. Compl. P 64. While this conclusory allegation would be insufficient upon a summary judgment motion, it is enough to sustain the cause of action beyond this Rule 12(c) motion.

Statement xi is defamatory because it alleges Abbott lied. The statement is thus actionable, and the motion for judgment on the pleadings regarding statement xi is [*26] denied.

**Statement xii** ("The Week That Was" written by defendant Stander published in Dog News)

> Other aspects of the document worth noting were misstatements of fact and misleading inferences about the Vicki Abbott investigation.

Statement xii does not defame Abbott. The sentence criticizes a document that Abbott did not write, and any failure of the document to correctly characterize Abbott's judging application or the surrounding controversy is simply not actionable. The motion for judgment on the pleadings regarding Statement xii is granted.

**Statement xiii** ("The Week That Was" written by defendant Stander published in Dog News)

> Now then, the Vicky Abbott matter is settled for the time being. She was found guilty of certainly exaggerating on one of her applications and put on hold to apply as a judge again for seven years.

Statement xiii is not defamatory as it merely repeats facts acknowledged to be true in the Complaint. Compl. P 56. The motion for judgment on the pleadings regarding Statement xiii is granted.

**Statement xiv** (Editorial: "Who if Anyone at Staff Should Pay the Piper?" published in Dog News)

> Okay [*27] let's accept the fact that Mrs. Abbott was wrong and should have been penalized.

This statement is not defamatory for several reasons. First, it is the writer's opinion because it is written in a manner which indicates it is opinion and the phrases "wrong" and "should have been penalized" cannot be established as true or not. It was also published on a page titled "Editorial." See *Millus, 89 N.Y.2d at 842, 652*

*N.Y.S.2d at 727.* Second, the statement assumes hypothetical facts but does not assert their truth. Even if the statement is considered to report facts regarding Abbott, it is true that Abbott was found to be "wrong" by the AKC. Compl. P 56.

Statement xiv is not defamatory and the motion for judgment on the pleadings regarding Statement xiv is granted.

**Statement xv** (AKC Board Minutes (a) and MacDonald letter (b)) n3

> (a) There was a confidential discussion on the two investigative reports related the judging application of Mrs. Vicki Abbott. During this session the following actions were taken: The Board voted to accept the reports of the Investigative Trial Board and the Outside Investigations Agency. The Board voted to revoke the judging approval of [*28] Mrs. Abbott and to advise her that AKC will not entertain another judging application from her for a period of seven years.
>
> (b) The integrity of all judges and the ethics of our entire sport may have been put in jeopardy. Integrity has always been of supreme importance to all of us and is indeed the very backbone of the dog game. Recent and present problems with an applicant's possible misrepresentations are of grave concern.

Statement xv(a) is true as acknowledged in the Complaint. Compl. P 56. It is thus not defamatory.

> n3 Two separate statements are included under the heading "xv." The Court will refer to the Board Minutes as xv(a) and the MacDonald letter as xv(b).

Statement xv(b) is also not defamatory because referring to "possible misrepresentations" Abbott made on her application does not expose her to "contempt, ridicule, aversion or disgrace." *Foster, 87 N.Y.2d at 751, 642 N.Y.S.2d at 587.* The motion for judgment on the pleadings as to Statement xv is granted.

**Statement xvi** [*29] (Hearn Memorandum)

> I am secretary for two judges organizations - a local and a national one.

1998 U.S. Dist. LEXIS 18990, *

I can tell you unequivocally these two groups are highly angered over the recent AKC approval of a judging application with blatant questionable authenticity. So much so that the Dog Judges Association of America requested interview time with the AKC Board to present the feelings of judges everywhere.

Statement xvi is not defamatory because it cannot be proved false. The allegation that Abbott's application was of "blatant questionable authenticity" is true. Enough people questioned the authenticity of the application to give rise to a belabored review process and investigation. Compl. PP 42-56. The motion for judgment on the pleadings regarding statement xvi is granted.

It is unclear whether plaintiff seeks relief for the statement contained in Paragraph 57 by David Merriam: "it's my understanding that the basis of the Board's action had to do with intentional misinformation included on the (Abbott's) judging application." This statement is true as it reports facts acknowledged in the complaint. It is not defamatory.

Finally, the defamation claims against Mary Beth O'Neill and [*30] Anne Savory are dismissed because the complaint lacks any allegation that they made defamatory statements.

The Third Cause of Action

The third cause of action alleges that the defendants participated in a conspiracy to defame Abbott. [HN15] New York does not recognize the tort of civil conspiracy. *In re Hougibant, 914 F. Supp. 964, 989 (S.D.N.Y. 1995); Rivera v Greenberg, 243 A.D.2d 697, 663 N.Y.S.2d 628, 629, (N.Y. App. Div. 1997).*

The third cause of action is dismissed as to all defendants.

SO ORDERED.

Dated: New York, New York

December 4, 1998

JOHN S. MARTIN, JR., U.S.D.J.