# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | |
|---|---|
| IN RE CHARTER COMMUNICATIONS, INC. SECURITIES LITIGATION | MDL DOCKET NO. 1506 (CAS) ALL CASES |
| STONERIDGE INVESTMENT PARTNERS LLC, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CHARTER COMMUNICATIONS, INC., PAUL ALLEN, JERALD L. KENT, CARL E. VOGEL, KENT KALKWARF, DAVID G. BARFORD, PAUL E. MARTIN, DAVID L. McCALL, BILL SHREFFLER, CHRIS FENGER, JAMES H. SMITH, III, SCIENTIFIC-ATLANTA, INC., MOTOROLA, INC. and ARTHUR ANDERSEN, LLP,<br><br>Defendants. | Consolidated Case No. 4:02-CV-1186 CAS<br><br>DATE: May 23, 2005<br>TIME: 10:00 A.M.<br>COURTROOM:<br>Hon. Charles A. Shaw |

## LEAD PLAINTIFF'S RESPONSE TO OBJECTIONS

LAW OFFICES OF WOLFF AND D'AGROSA
8019 Forsyth Street
Clayton, Missouri 63105
Telephone:    (314) 725-8019
Facsimile:    (314) 725-8443

*Liaison Counsel for Lead Plaintiff
and the Class*

POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665

One North LaSalle Street, Suite 2225
Chicago, Illinois 60602
Telephone:    (312) 377-1181
Facsimile:    (312) 377-1184
*Counsel for Lead Plaintiff StoneRidge
Investment Partners LLC and the Class*

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ........................................... 1

II   THE OBJECTIONS TO THE SETTLEMENT/
     PLAN OF ALLOCATION ARE UNWARRANTED ......................... 6

     A.   The Evans, McCully and Rinna Objections ........................... 6

     B.   The O'Conner "Objection" ......................................... 8

III. THE FEE REQUESTED IS FAIR AND REASONABLE ..................... 9

     A.   The 25% Award in *Xcel* ........................................... 9

     B.   Institutional Lead Plaintiffs Have Regularly
          Supported Awards of 20% or More ............................... 13

     C.   Sub-20% Fee Awards Are Not the Rule ........................... 15

     D.   Lead Counsel Assumed Significant
          Risks of Little or No Recovery....... ........................... 18

     E.   The Objectors' Focus on the Lodestar/
          Multiplier Is Misplaced ......................................... 24

     F.   The Objectors' Challenge to Time Incurred In
          Connection With Due Diligence Discovery Is
          Equally Unwarranted ........................................... 26

     G.   NYS Teachers' Other Objections to the Lodestar
          Are Misplaced ................................................. 28

     H.   The "Professional" Objections Should Be Rejected .................... 30

     I.   Ms. Lockshine's Objections to the Notice, Time
          of Payment of Fees and Amount of Payment to
          Lead Plaintiff Is Without Justification ........................... 30

CONCLUSION ........................................................... 32

## TABLE OF AUTHORITIES

## CASES

*In re AMF Bowling Secs. Litig.*, 334 F. Supp. 2d 462 (S.D.N.Y.
2004) ....................................................... 12, 13 n16

*In re Activision Sec. Litig.*, 723 F. Supp. 1373 (N.D. Cal. 1989) ..................... 19

*In re Alloy, Inc. Sec. Litig.*, 03 Civ 1597, 2004 U.S.
Dist. LEXIS 24129, 2004 WL 2750089
S.D.N.Y. Dec. 2, 2004) ............................................. 12-13 &n16

*\*In re Assisted Living Concepts Sec. Litig.*, No. 99-CV-167,
Order (D. Or. filed May 23, 2002) ...................................... 13

*In re Bankamerica Secs. Litig.*, 228 F. Supp. 2d 1061 (E.D. Mo.
2002) ...................................................................... 15

*†Benacquisto v. American Express Fin. Corp.*, No. 00-1980
DSD/JMM, 2001 U.S. Dist. LEXIS 23914
(D. Minn. May 15, 2001) ............................................. 29 n 4d

*Blum v. Stenson*, 465 U.S. 886 (1984) ........................................... 16

*Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.*,
778 F.2d 890 (1st Cir. 1985) ............................................... 23

*In re Bristol-Myers Squibb Secs. Litig.*, 361 F. Supp. 2d 229
(S.D.N.Y. 2005) ................................................. 15,16, 25-26 & n34

*In re Cavanaugh*, 306 F.3d 726 (9th Cir. 2002) ............................... 28 n35

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ..................... 15, 27 n35

*In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235 (D.N.J.
2000), *aff'd in part, vacated in part*, 264 F.3d 201 (3d Cir.
2001), *on remand*, 243 F. Supp. 2d 166 (D.N.J. 2003) ..................... 15

*   Annexed to Compendium of Unreported Authority in Support of Final Approval of Settlement and Award of Attorneys' Fees and Expenses (Case Comp.) Filed Apr. 15, 2005.

**   Annexed to Supplemental Compendium of Affidavits, Publications, and Other Materials (Supp. Comp.) Filed Apr. 15, 2005.

†   Annexed to Compendium of Unreported Cases to Lead Plaintiff's Response to Objectors (Case Comp. 2d) contepraneously filed.

ii

*In re Comdisco Secs. Litig.*, 150 F. Supp. 2d 943
(N.D. Ill. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27 n35

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
MDL 1361, 2003 U.S. Dist. LEXIS 25788, 2003 WL
22417252 (D. Me. Oct. 7, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re DJ Orthopedics Inc. Secs Litig.*, No. 01-CV-2238-K, 2004
US Dist LEXIS 11457, 2004 WL 1445101 (S.D. Cal. June
21, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Di Giacomo v. Plains All Am. Pipeline*, Nos. H-99-4137,
H-99-4212, 2001 U.S. Dist. LEXIS 25532, 2001 WL
34633373 (S.D. Tex. Dec. 18, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 10 n.11, 19, 23

\*\**In re Dollar Gen. Corp. Sec. Litig.*, No. 01-388, Order
(M.D. Tenn. filed May 24, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543
(D.N.J. 1992), aff'd, 7 F.3d 357 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*In re Dun & Bradstreet Credit Servs. Cust. Litig.*, 130 F.R.D. 366
(S.D. Ohio 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Dura Pharmas., Inc v. Broudo*, 125 S. Ct. 1627 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

†*In re Finova Group Inc. Secs. Litig.*, No. 00-619,
Order (D. Ariz. filed July 30, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

\**In re First Energy Corp. Sec. Litig.*, No. 03-CV-1684, Order
(N.D. Ohio filed Dec. 30, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

†*In re Gateway, Inc. Sec. Litig.*, No. 00 CV 2435, 23
Order (S.D. Cal. filed Sept. 9, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Glendora Community Redevelopment Agency v. Demeter*, 155 Cal.
App. 3d 465 (Cal. Ct. App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965 (7th Cir.
1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28 n19

*In re HPL Techs. Inc.*, No. C-02-3510 VRW, 2005 U.S. Dist.
LEXIS 7244, 2005 WL 941586 (N.D. Cal. Apr. 22, 2005) . . . . . . . . . . . . . . . 27 n35

*In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d 1056 (D.S.D. 2004) . . . . . . . . . . . . . . . . 6 n.7, 10

---

\*       Annexed to Compendium of Unreported Authority in Support of Final Approval of Settlement and Award of Attorneys' Fees and Expenses (Case Comp.) Filed Apr. 15, 2005.

\*\*      Annexed to Supplemental Compendium of Affidavits, Publications, and Other Materials (Supp. Comp.) Filed Apr. 15, 2005.

†       Annexed to Compendium of Unreported Cases to Lead Plaintiff's Response to Objectors (Case Comp. 2d) contepraneously filed.

iii

*In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166 (E.D. Pa. 2000) . . . . . . . . . . . . . . . . . 13, 17

*In re InfoSpace, Inc. Sec. Litig.*, 330 F. Supp. 2d 1203
(W.D. Wash. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

†*In re JDN Realty Corp. Secs. Litig.*, No. 1:00-CV-0396, Order
(N.D. Ga. filed Nov. 15, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Jenson v. Continental Fin. Corp.*, 591 F.2d 477 (8th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . 8

*Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241 (8th Cir.
1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20-21

*Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

†*In re Leasing Solutions, Inc. Secs. Litig.*, No. C-98-4366,
22 Class Action Rep. 405 (2001) (Order (N.D. Cal.
filed Feb. 28, 2000)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

†*In re Lotus Development Corp. Secs. Litig.*, No. 94-11279,
Final Order and Judgment
(D. Mass. filed July 10, 1998)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426 (D.N.J.
2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re M.D.C. Holdings Sec. Litig.*, No. 89-0090, 1990 U.S. Dist.
LEXIS 15488, 1990 WL 454747 (S.D. Cal. Aug. 30,
1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mashburn v. National Healthcare, Inc.*, 684 F. Supp. 679 (M.D.
Ala. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

†*In re Mercury Finance Co.*, No. 97 C 3035, Orders (N.D. Ill.
filed July 27, 2000, and filed July 9, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

†*Morris v. Lifescan, Inc.*, 54 Fed. Appx. 663 (9th Cir. 2003) (Not
selected for pub. in the Fed. Rptr.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 n40

*Morse v. McWhorter*, No. 3-97-0370, 25 Class Action Rep. 220-21 (2004)
(Order (E.D. Tenn. filed Mar. 12, 2004)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

†*In re Navigant Consulting, Inc. Sec. Litig.*, No. 99 C 07617,
Order (N.D. Ill. filed Mar. 26, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

---

* Annexed to Compendium of Unreported Authority in Support of Final Approval of Settlement and Award of Attorneys' Fees and Expenses (Case Comp.) Filed Apr. 15, 2005.

** Annexed to Supplemental Compendium of Affidavits, Publications, and Other Materials (Supp. Comp.) Filed Apr. 15, 2005.

† Annexed to Compendium of Unreported Cases to Lead Plaintiff's Response to Objectors (Case Comp. 2d) conteporaneously filed.

*Nichols v. Smithkline Beecham Corp.*, No. 00-6222, 2005 U.S.
Dist. LEXIS 7061, 2005 WL 950616 (E.D. Pa. Apr. 22,
2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 n.14

*O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266 (E.D. Pa.
2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*\*In re Oxford Health Plans, Inc. Sec. Litig.*, MDL No. 1222,
Order and Final Judgment (S.D.N.Y. filed June 12, 2003) . . . . . . . . . . . . . . . . . 13

*In re Paypal Litig.*, No. 02-1227-JF PVT, 2004 U.S. Dist.
LEXIS 22470, 2004 WL 2445244 (N.D. Cal. Oct. 13,
2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 & n40

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 12, 31

*Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39,
1984 U.S. Dist. LEXIS 23595, 1994 WL 21981
(N.D. Ill. Sept. 14, 2984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Prudential-Bache Energy Income Pshps. Sec. Litig.*,
No. 888 Sec, E, 1994 U.S. Dist. LEXIS 6621,
1994 WL 202394 (E.D. La. May 18, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Ravisent Tech., Inc. Secs. Litig.*, No. 00 CV 1014, 2005
U.S. Dist. LEXIS 4718, 2005 WL 697461 (E.D. Pa. Apr.
18, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 n.14

*In re Rent-Way Secs. Litig*, 305 F. Supp. 2d 491 (W.D. Pa. 2003) . . . . . . . . . . . . . . . 29, 31

*Reynolds v. Beneficial Nat'l Bank*, 260 F. Supp. 2d 680 (N.D. Ill.
2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . 11, 22

*In re Rite Aid Corp. Sec. Litig.*, MDL Dkt. No. 1360,
Master File No. 99-1349, 2005 U.S. Dist. LEXIS 4718,
2005 WL 697461 (E.D.Pa. Mar. 24, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603 (E.D. Pa.
2003), *vacated and remanded*, 396 F.3d 294 (3d Cir.
2005), *aff'd on remand*, MDL Dkt. No. 1360, Master File
No. 99-1349, 2005 U.S. Dist. LEXIS 4718, 2005 WL
697461 (E.D. Pa. Mar. 24, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 n40, 30

---

* Annexed to Compendium of Unreported Authority in Support of Final Approval of Settlement and Award of Attorneys' Fees and Expenses (Case Comp.) Filed Apr. 15, 2005.

** Annexed to Supplemental Compendium of Affidavits, Publications, and Other Materials (Supp. Comp.) Filed Apr. 15, 2005.

† Annexed to Compendium of Unreported Cases to Lead Plaintiff's Response to Objectors (Case Comp. 2d) contepraneously filed.

*In re Rural Cellular Corp. Secs. Litig.*, No. 02-Civ-4893, 2004
    U.S Dist. LEXIS 10577, 2004 WL 1278725 (D. Minn.
    June 6, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18 n19

[†]*Sands Point Ptnrs., L.P. v. Pediatrix Med. Group*, No. 99 CV 6181,
    2002 U.S. Dist. LEXIS 25721 (S.D. Fla. May 3, 2002) . . . . . . . . . . . . . . . . . . . . . 14

[†]*In re Scholastic Corp. Secs. Litig.*,
    No. 97 CV 2447, 24 Class Action Rep. 624 (2003)
    (Order (S.D.N.Y. filed Apr. 3, 2003)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Shaw v. Toshiba America Info. Sys., Inc.*, 91 F. Supp. 2d 942
    (E.D. Tex. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*[*]In re Smartforce PLC Sec. Litig.*, No. 02-CV-544, Final
    Judgment (D.N.H. filed Sept. 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Spark v. MBNA Corp.*, 289 F. Supp. 2d 510 (D. Del. Oct 30,
    2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29-30

*[*]In re Sykes Enterprises, Inc. Sec. Litig.*, No. 00-CV-212-T-26F,
    Order and Final Judgment (M.D. Fla. filed Mar. 7, 2003) . . . . . . . . . . . . . . . . . . . 14

*In re Synthroid Marketing Litig.*, 325 F.3d 974 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . 16 n18

*Teacher's Retirement v. A.C.L.N. Ltd.*, No. 01-11814,
    2004 U.S. Dist. LEXIS 8608, 2004 WL 1087261
    (S.D.N.Y.May 14, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Teamsters Local Union No. 604 v. Inter-Rail Transp., Inc.*, No. 02
    CV 1109, 2004 U.S. Dist. LEXIS 6363, 2004 WL 768658
    (D. Ill. Mar. 19, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Tenuto v. Transworld Sys., Inc.*, No. 99-4228, 2002 U.S. Dist.
    LEXIS 1764, 2002 WL 188569 (E.D. Pa. Jan. 31, 2002) . . . . . . . . . . . . . . . . 29 n40

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir.1993) . . . . . . . . . . . . . . . . . . 12 n.14

*In re US Bancorp Litig.*, 291 F.3d 1035 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 11-12

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir.
    2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

---

[*]    Annexed to Compendium of Unreported Authority in Support of Final Approval of Settlement and Award of Attorneys' Fees and Expenses (Case Comp.) Filed Apr. 15, 2005.

[**]   Annexed to Supplemental Compendium of Affidavits, Publications, and Other Materials (Supp. Comp.) Filed Apr. 15, 2005.

[†]    Annexed to Compendium of Unreported Cases to Lead Plaintiff's Response to Objectors (Case Comp. 2d) contepraneously filed.

vi

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del.
2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29 n 40

\**In re Wireless Tel. Fed Cost Recovery Fees Litig.*, MDL 1559,
Master Case No. 4:03-md-01559, 2004 U.S. Dist. LEXIS
23342 (W.D. Mo. Apr. 20, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re Xcel Energy, Inc.*, No 02-2677, 2005 U.S. Dist. LEXIS
6432, 2005 WL 840370 (D. Minn. Apr. 8, 2005) . . . . . . . . . . . . . . . . . . . . 1, estseq.

## BRIEFS, RECORDS, MOTIONS and MEMORANDA

†Declaration of John C. Coffee, Jr., *In re Lucent Techs., Inc.*,
327 F. Supp. 2d 426 (D.N.J. 2004) (No. 00-CV-621-(JAP),
Doc. No. 179 filed Dec. 9, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## MISCELLANEOUS

Alba Conte and Herbert B. Newberg, *4 Newberg on Class
Actions 4th Ed.* § 14:6 (West 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 n33

†Brian Brueggemann, *AT&T may give charities phone cards;
Part of settlement in class-action suit,* BELLEVILLE
NEWS-DEMOCRAT, Apr. 7, 2003, sec. A, p. 20 . . . . . . . . . . . . . . . . . . . . . . . 29 n 40

†Tony Cooke, *Inside Track*, WALL ST. J., July 17, 2002,
sec. B; p. 11; col. 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

\*\*Elaine Buckberg, Todd Foster, Ronald Miller, and
Stephanie Plancich, *Recent Trends in Class Action
Litigation: Bear Market Cases Bring Big Settlements*
(NERA Feb. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12 n15

†David B. Caruso, *Judge sign off on KPMG settlement after
settling legal fees*, ASSOCIATED PRESS, June 3, 2003 . . . . . . . . . . . . . . . . . . . . 29 n40

†Lisa Lerer, *John Pentz; Class Action Fariness Group,
Sudbury Massachusetts*, THE AMER. LAWYER, Oct. 1, 2004 . . . . . . . . . . . . . 5, 28-29

Stuart J. Logan, Jack Moshman and Beverly C. Moore, Jr.,
*Attorney Fee Awards in Common Fund Class Actions*,
24 Class Action Rep. 169 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

---

\*     Annexed to Compendium of Unreported Authority in Support of Final Approval of Settlement and Award of Attorneys' Fees and Expenses (Case Comp.) Filed Apr. 15, 2005.

\*\*     Annexed to Supplemental Compendium of Affidavits, Publications, and Other Materials (Supp. Comp.) Filed Apr. 15, 2005.

†     Annexed to Compendium of Unreported Cases to Lead Plaintiff's Response to Objectors (Case Comp. 2d) contepraneously filed.

## FEDERAL STATUTES

15 U.S.C.

§ 78u-4(a)(7) (A) ............................................... 30 & n.41

§ 78u-4(a)(2) (B) ............................................... 31 & n.41

---

* Annexed to Compendium of Unreported Authority in Support of Final Approval of Settlement and Award of Attorneys' Fees and Expenses (Case Comp.) Filed Apr. 15, 2005.

** Annexed to Supplemental Compendium of Affidavits, Publications, and Other Materials (Supp. Comp.) Filed Apr. 15, 2005.

† Annexed to Compendium of Unreported Cases to Lead Plaintiff's Response to Objectors (Case Comp. 2d) contepraneously filed.

## I.
## PRELIMINARY STATEMENT

Over 500,000 notices have been mailed to potential Class members regarding the proposed $146,250,000 Settlement of this action.[1] Nine objections to the Settlement or fee request have been filed, representing 0.000018% of the Class.[2] Only 35 individuals have sought exclusion. The "opt-outs" purchased approximately 60,000 shares of Charter Communications, Inc ("Charter" or the "Company") during the period November 8, 1999 through August 16, 2002 (the "Class Period"). This represents less than 0.00013% of the 454 million shares of Charter traded during the Class Period .

The paucity of opt-outs and objections further validates the fairness of the Settlement, Plan of Allocation and fee request. "Courts often consider the number of objectors in determining whether the settlement is fair to the entire class." *In re Wireless Tel. Fed Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005)(characterizing objection rate of 0.00068% as "minuscule" while noting that settlements in this Circuit have been approved with objection rates as high as 4%) ; *see also In re Xcel Energy, Inc.*, No 02-2677, 2005 U.S. Dist. LEXIS 6432, at *31, 2005 WL 840370 at *9 (D. Minn. Apr. 8, 2005).

In evaluating these objections, the Court should also consider the constituency of the Class, and the absence of any objections from other large institutional investors who purchased Charter stock during the Class Period. These include Dreyfus Funds, Fidelity Funds, Merrill Lynch Funds

---

[1] *See* Affidavit of Micheal Rosenbaum dated May 11, 2005, attached as Ex. 12 to the Supplemental Declaration of Marc I. Gross dated May 12, 2005 (Supp. Decl.).

[2] All of the objections are attached as Exhibits to the Supp. Decl. (Exs. 1-10). The "objection" by Kathleen R. O'Conner (Supp. Decl. Ex. 11) is procedural defective, as discussed below at 8, and is not included in this tally.

and TIAA-CREF Investment Management LLC. These are highly sophisticated investors, with internal legal departments more than capable of evaluating the reasonableness of the recovery and fees requested.

The small number of objections to the Settlement (only three of the nine) is hardly surprising. Through skillful and efficient advocacy, Lead Counsel achieved a historic result — the second largest settlement of a securities class action in the Eighth Circuit. The Settlement compensates Class members for a significant portion of their damages — 93% of Lead Plaintiff's estimate for those likely to file claims.

Lead Plaintiff achieved this stellar result in a complex action, where the risk of obtaining a significantly smaller recovery, if any, was substantial. The Indictment of several Charter officers, and restatement of financial results, were only partially beneficial. Significantly, despite the restatement, the SEC did not fine the Company for any accounting matters, consistent with the Company's defense that the restatement was triggered by the discovery of errors attributable to mismanagement and poor internal controls - not deliberate fraud. Moreover, the Indictment focused on customer count inflation for several months during 2001, a relatively small portion of the Class Period.

Moreover, both of these matters provided minimal aid to Lead Plaintiff in establishing the critical element of "loss causation", *i.e.*, that Charter's stock price fell because of revelations related to these matters. Indeed, when the Company wrote off all those inflated customers, Charter's stock price rose. Finally, there were significant risks regarding collection of any significant judgment, since Charter had no earnings and enormous debt. By negotiating for part of the Settlement in securities, Lead Plaintiff materially increased the amount of the recovery without crippling the financially strapped Company.

2

Examination of the three objections to the Settlement compels their rejection.[3] Each objector is an investor who purchased Charter shares at the beginning of the Class Period in 1999. Each complains that the Plan of Allocation affords them only modest compensation. As such, the objectors do not really challenge the adequacy of the recovery, but rather its allocation. In any event, these objectors fail to recognize that: (a) as a matter of law, Class members could not recover for the entire decline of Charter's stock throughout the Class Period, but only that portion which was "causally related" to the fraud; (b) the claims for this early period were by far the weakest, and, indeed, may have recovered nothing at trial; and (c) a significant portion of the Lead Plaintiff's transactions took place during this early period as well, and it has endorsed the proposed Settlement and Plan of Allocation.

The small number of objections to Lead Counsel's fee request (six in all) is not surprising either. The request for 20% of the recovery (to be paid in cash and securities in the same proportion as the Class) falls at the lower end of the range generally awarded in these cases. Three of these objections were filed by state employee pension funds, which waited until after the case was settled (to their apparent satisfaction) before stepping forward, only to complain that the case was not efficiently litigated.[4] If such high profile investors were serious about benefitting Class members, they could have done so earlier in the case by offering their resources, as did the Lead Plaintiff, StoneRidge Investment Partners LLC ("StoneRidge") which manages over $700 million in assets.

---

[3] John R. Evans, Michael McCulley and Carl Rinna.

[4] New York State Teachers' Retirement System ("NYS Teachers"), State of Idaho and The Commonwealth of Pennsylvania Public School Employees' Teachers' Retirement System ("Pension Funds").

3

Significantly, The Hon. David Doty (District of Minnesota), denied similar objections by these same three pension funds in granting a 25% fee from an $84 million settlement in *Xcel*, 2005 U.S. Dist. LEXIS 6432, at *10, 2005 WL 840370 at *2. The lodestar multiplier in that case was 4.7. As detailed below, many other institutional investors have endorsed fee awards of 20% or more in comparable cases.

On May 5, 2005, NYS Teachers belatedly mailed additional papers attacking the quality and efficiency of the time invested in the case. According to this Court's Order of Preliminary Approval dated February 15, 2005, and the Notice to the Class ("Notice") ¶ 69, all papers objecting to the Settlement or fee request were due on April 29, 2005. NYS Teachers provided no explanation why it could not have submitted these additional papers by the objection deadline, especially since, on April 15, 2005, Lead Counsel overnighted to it all the papers in support of Settlement and fee request. As such, the additional submission should be stricken as untimely.

Moreover, NYS Teachers misstates the fee requested. Contrary to its computation, the amount requested is not $35.2 million (Supp. Decl., Ex. 6, p. 1). This appears to be based on assumption that Lead Counsel was seeking 25% of the fee. At 20% (as indicated in the Notice), the amount requested is $29.25 million, of which approximately 55% will be in Charter stock and warrants.

In any event, NYS Teachers' attack on the efficiency of the litigation effort is typical Monday night quarter- backing. As detailed in the Supplemental Declaration submitted herewith, the due diligence discovery program was conducted on an expedited basis, and was concluded 12 weeks after execution of the August 5, 2004 Memorandum of Understanding (the "MOU"). It was staffed entirely by associates, except for critical interviews of defendants and other key Charter employees.

4

The discovery program served not only to confirm Lead Counsel's assumptions regarding the evidence regarding the claims being settled (which was an express pre-condition to the Settlement), but also aided the continued prosecution of claims against the then non-settling defendants.

By focusing on the time invested in the case by the attorneys, NYS Teachers also ignores what should be the true focus of any fee determination - the recovery achieved for the Class. As discussed below, objector's position is contrary to case law in this Circuit. *See e.g.*, *Xcel*; *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245 (8th Cir. 1996).

There are also three objections to the fee request from individual shareholders,[5] at least two of whom are represented by "serial" objectors. John J. Pentz, Esq. has been described as a "holdup artist," who runs an objection mill. *Lisa Lerer, John Pentz; Class Action Fairness Group, Sudbury Massachusetts*, THE AMER. LAWYER, Oct. 1, 2004 ("*Lerer/Pentz Article*") (Supp. Decl. Ex. 17). As for Nicholas M. Fausto, Esq. this is the third time in the last three years in which he has objected to a fee request filed by the Pomerantz firm.

It is respectfully requested that this Court not be distracted by these opportunistic objectors, but rather focus on the extraordinary recovery achieved in less than 2 ½ years, despite Charter's precarious financial state and the ultimate uncertainties of proving that any significant decline in its stock price was caused by revelations related to the alleged fraud.

Finally, settling defendant James Smith's submissions to the Court should be ignored. They relate to separate litigation between Mr. Smith and Charter over his legal fees. In any event, Mr. Smith's submissions support the Settlement. While he pled guilty to "managing disconnects" (whereby late paying customers of Charter were not terminated but given more time to pay), Mr.

---

[5] Ann Mitchell, Susan Lockshine, and Rory Valas.

5

Smith continues to assert that he believed this was a valid business practice, and was sentenced only

to a year's probation for his misconduct.[6]

# II.
# THE OBJECTIONS TO THE SETTLEMENT/
# PLAN OF ALLOCATION ARE FLAWED

## A.    The Evans, McCulley and Rinna Objections

John R. Evans, Michael W. McCulley and Carl Rinna essentially question the Plan of

Allocation's treatment of claims arising from purchases made in 1999. As such, their objection

should not distract the Court from approving the Settlement. Their objections should be otherwise

rejected for several reasons:

- The Settlement resulted from six months of hard fought negotiations mediated by a former federal court judge. Declaration of Marc I. Gross dated April 15, 2005 ("Gross Decl.") ¶¶ 78-87.[7]

- Charter's stock price dropped only $0.70 per share following revelations at the end of the Class Period. Thus, any damages for any portion of the Class Period would likely have been significantly limited had the case gone to trial. (Gross Decl. ¶¶ 63, 114, 198, ).

- Damages for the 1999 portion of the Class Period were highly problematic. There was very little evidence of any fraudulent misconduct prior to 2000. The accounting

---

[6] Lead Counsel also requests reimbursement of $671,734.64 in expenses, to which there has been no objection. There is also one cursory objection to the $26,625 compensatory award requested for Lead Plaintiff. The objection focuses on the amount in the Notice, not in the actual request, which was obviously ignored.

[7] *See In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d 1056, 1064 (D.S.D. 2004) ("Both sides to the litigation were represented by experienced class action counsel and the Stipulation of Settlement was vigorously negotiated at arms-length over several months with the assistance of a mediator. There is no evidence of bad faith or collusion during the negotiation process.") (citation omitted).

6

restatement covered only 2000-02. The Indictment likewise identified acts only in 2000 and 2001. (Gross Decl. ¶¶ 26, 128).

- Lead Plaintiff StoneRidge purchased significant amounts of Charter shares in 1999 (and subsequently).[8] To the extent that the Plan of Allocation recognized only limited losses for such 1999 purchases, the Plan impacts not only these objectors, but Lead Plaintiff as well. Thus, its fairness is unassailable. (Gross Decl. ¶ 195).

Contrary to these objectors' assertions, the fact that Charter's stock price dropped from over

$20 in 1999 to less than $4 by the end of the Class Period does not mean that Class members were

entitled to recover for the entire decline. The federal securities laws limit damages to those losses

that can be causally linked to the fraud, not simply the loss of investment value. *Dura Pharma., Inc.*

*v. Broudo*, 125 S. Ct. 1627, 1633 (2005). In *Dura,* the plaintiffs asserted that merely showing that

defendants had issued false statements which inflated the price of a stock at the time of purchase was

sufficient to satisfy "loss causation." The Supreme Court held otherwise, noting:

> If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changes in investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

125 S. Ct. 1631-32 (emphasis in original). As detailed in the Gross Decl. ¶¶ 183-98, this case had

significant loss causation hurdles, most notably, that Charter's stock price *rose* when it issued a

"corrective disclosure" on February 11, 2002, *i.e.,* that it was writing off over 120,000 accounts (all

of which had been the subject of the "managed disconnect" practice). When the Company

announced it was being investigated by a Grand Jury, its stock price fell, but only by $0.20 per share.

---

[8] *See* Supp. Decl. Ex. 18.

7

It had fallen $0.50 a share a month before when the stock was downgraded by Merrill Lynch. Nonetheless, by impressing upon defendants that their exposure was even larger because of an earlier decline in the price of Charter stock on November 1, 2001 (which followed the announcement of lower customer growth rates), Lead Plaintiff was able to recover $144,000,000 from a company with no earnings. *See* Gross Decl. ¶¶ 187, 194, 197.

## B.    The O'Conner "Objection"

Kathleen R. O'Conner's objection to the Settlement is procedurally defective. *See* Supp. Decl. Ex. 11. She opted out of the Class, and therefore is not bound by its terms. She may pursue her claims individually. *See Jenson v. Continental Fin. Corp.*, 591 F.2d 477, 482 n.7 (8th Circuit 1979) ("Opt-outs . . . are not members of the class and hence are not entitled to the protection of Rule 23(e)" (citations omitted)).  Thus, the Court need not consider her objection.

Even if the Court chooses to do so, a cursory examination makes clear that the objection is unfounded and self-contradictory.  As she notes, during "late 2001 through early 2003," while Charter officers were touting the stock to employees, "senior executives also continued to exercise their options to *purchase* more shares."  Supp. Decl. Ex. 11 at 2 (emphasis supplied).[9]  Defendants

---

[9]  On July 17, 2002, the day before the critical Merrill Lynch report, *The Wall Street Journal* reported: "No insider has reported to the SEC the sale of any Charter shares this year." After noting the buying by insiders, the paper quoted an expert researcher on insider trading: "It's strange that Charter seems to stand out as the one [cable] company where the insiders are stepping up and purchasing shares . . . The fact that there are so many [buyers] is definitely an encouraging sign." Tony Cooke, *Inside Track*, WALL ST. J., July 17, 2002, at sec. B; p. 11; col. 5 Supp. Decl., Ex. 16.

8

would undoubtedly have cited such purchases as evidence of their good faith belief that Charter stock was not illegally inflated — otherwise, why would they have bought the stock?[10]

## III.
## THE FEE REQUESTED IS FAIR AND REASONABLE

### A.    The 25% Award in *Xcel*

The reasonableness of the 20% fee requested in this case is confirmed by the recent decision in *Xcel* (by another district court in this Circuit), where the court awarded 25% of an $84,000,000 recovery. The similarities to this case are remarkable. After litigating for two and a half years, lead counsel in *Xcel* obtained a mega settlement. The settlement was reached before depositions but after document discovery, motions to dismiss and two days of mediation. *Xcel*, 2005 U.S. Dist. LEXIS 6432, at *10, 2005 WL 840370 at *2. The requested fee represented a 4.7 multiple of the lodestar.

In rejecting the objections to the fee request (including by the three Pension Funds here), the court noted:

> All counsel — both those representing plaintiffs and defen-
> dants — conducted this litigation in an exemplary manner and
> fulfilled their obligations under Rule 1. This is the type of complex

---

[10] Ms. O'Conner also notes that Charter's controlling shareholder, defendant Paul Allen, was "buying back common stock and investing more money in Charter" in 2002. Supp. Decl. Ex. 11 at 2. Such conduct makes clear that Mr. Allen did not profit from this scheme. Indeed, in the absence of any evidence demonstrating his active involvement in the day to day management of the Company, or any knowledge of the fraud, Lead Plaintiff faced an uphill battle to hold Mr. Allen liable as a "control person."

There is no question that Mr. Allen is a "deep pocket." However, as his counsel frequently asserted, as owner of over 50% of Charter's outstanding stock, Mr. Allen was arguably the largest "victim" of the fraud here, having lost several billion dollars from his own investment in Charter. Indeed, the continued viability of the Company, and the value of the securities portion of the Settlement, is in large part a function of Mr. Allen's continued role as *de facto* financier of the Company. As such, he is arguably making an indirect, but substantial, contribution to the Settlement.

9

> litigation that easily could have dragged on for several more years. Instead, it had a relatively short stay of two and a half years on this court's docket because counsel litigated the case efficiently and inexpensively. The lodestar of plaintiffs' counsel could easily have been much higher had not counsel cooperated with one another through the litigation and settlement process. Instead, all counsel presented a modest lodestar because they moved the case along efficiently to a just result in a remarkably short time.

*Id.* LEXIS, at *17, WL at *5. *See also IBP, Inc.*, 328 F. Supp. 2d at 1065 (awarding 28% in fees where case settled before discovery and while the motion to dismiss was pending, with court making clear that it had no intention to "penalize Plaintiff's counsel for proceeding efficiently and effectively").[11]

Equally significant, the court in *Xcel* noted the multitude of fee awards which granted 25% or more of the recovery, effectively endorsing that benchmark. "First, courts in this circuit and this district have frequently awarded attorney fees between twenty-five and thirty-six percent of a common fund in other class actions." *Id.* LEXIS, at *36, WL at *11.[12] The court further observed

_____

[11] *See, e.g.*, *Di Giacomo v. Plains All Am. Pipeline*, Nos. H-99-4137, H-99-4212, 2001 U.S. Dist. LEXIS 25532, at *32, 2001 WL 34633373 at *11 (S.D. Tex. Dec. 18, 2001) (30% awarded, with court reasoning: "An undue emphasis on the number of hours spent on a contingency case would penalize counsel for obtaining an early settlement and could distort the value of the attorneys' services." (citation omitted)).

[12] In support, the *Xcel* Court cited:

*U.S. Bancorp*, 291 F.3d [1035] at 1038 [8th Cir. 2002] (awarding 36% of $3.5 million settlement fund); *In re Select Comfort Corp. Sec. Litig.*, No. 99-884 (D. Minn. Feb.28, 2003) (awarding 33.3% of the $5,750,000 settlement); *In re Monosodium Glutamate Antitrust Litig.*, 2003 WL 297276, at *3 (D. Minn. Feb. 6, 2003) (awarding 30% in attorney fees from a $81.4 million settlement); *Cooper v. Miller Johnson Steichen Kinnard, Inc.*, No. 02-CV-1236 (D. Minn. July 22, 2003) (awarding 25% of a $5.65 million settlement); *In re E.W. Blanch Holdings, Inc. Sec. Litig.*, No. 01-258 (D. Minn. June 16, 2003) (awarding 33.3% of a $20 million settlement); *KK Motors v. Brunswick Corp.*, No. 98-2307 (D. Minn. March 6, 2000) (awarding 33.3% of $30 million settlement fund); *In re Airline Ticket Commission*

10

that its "award comports with attorney fee awards in other securities actions from other federal courts around the country." *Id.* LEXIS, at *38, WL at *11.[13] The court favorably cited a study by Professor John C. Coffee, Jr. of Columbia University, which found, among other things, that "25-30% recoveries were 'fairly standard' in 'mega fund' class actions involving settlements between $100 and $200 million." *Id.* LEXIS, *38-*39, WL at *12, citing *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 298-303 (3d Cir. 2005). *See also In re US Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002)

---

*Antitrust Litig.,* 953 F.Supp. 280, 285-86 (D. Minn.1997) (awarding 33.3% of $86 million fund); *In re SciMed Life Sec. Litig.,* No. 3-91-0575 (D. Minn. July 17, 1995) (awarding 33.3% of $5 million fund plus costs); *In re Control Data Sec. Litig.,* No. 3-85-1341 (D. Minn. Sept. 23, 1994) (awarding 36.96% of $8 million fund); *In re Employee Benefit Plans Sec. Litig.,* 1993 WL 330595 (D.Minn. June 2, 1993) (awarding 33.3% of the $4.2 million cash payment and 33.3% of the $6.5 million debentures to be issued); *Harris v. Republic Airlines, Inc.,* 1991 WL 238992, at *2 (D. Minn. Nov.12, 1991) (awarding "a sum slightly in excess of 30% of the common fund").

*Id.* LEXIS, at *36-*38, WL at *11.

[13] The *Xcel* Court relied on:

*In re Rite Aid Corp. Sec. Litig.,* --- F. Supp. 2d ----, 2005 WL 697461, at *1-*2 (E.D. Pa. Mar. 24, 2005) (*Rite Aid II* ) (awarding as attorney fees 25% of a $126,641,315 settlement, resulting in a multiplier of 6.96), *on remand from* 396 F.3d 294 (3d Cir.2005) (*Rite Aid I* ); *In re Sunbeam [Sec. Litig.*], 176 F. Supp. 2d [323] at 1335 [S.D. Fla. 2002] (awarding 25% of $110 million settlement and noting the size of the settlement did not warrant an upward or downward departure from the "benchmark" of 25%); *Ikon Office Solutions*, at 194 F.R.D. [166] at 194-95 [E.D. Pa. 2000] (awarding 30% of an $111 million settlement).

*Id.* LEXIS, at *38, WL at *11.

11

(36% fee award); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999) (24% award).[14]

## B.   Institutional Lead Plaintiffs Have Regularly Supported Awards of 20% or More

NYS Teachers asserts that the increased presence of institutional investors in securities class

actions has resulted in a decline in fees requested, as well as awarded. While this is true in a select

few mega-settlements, it is certainly not the trend. The fact remains that 33% remains the fee most

frequently requested. *See*, Elaine Buckberg, Todd Foster, Ronald Miller, and Stephanie Plancich,

*Recent Trends in Class Action Litigation: Bear Market Cases Bring Big Settlements*, pp. 9-10

(NERA Feb. 2005).[15]

As noted above, several courts have rejected the Pension Funds' objections to fee awards of

25%; *Xcel,* (despite similar objection by these pension funds, court awarded 25% award of $84

million settlement); *In re AMF Bowling Secs. Litig.*, 334 F. Supp. 2d 462, 470 (S.D.N.Y. 2004)

(despite objection by NYS Teachers that there was "'growing trend of sub-25% requests,'" *id.* at

467, the court awarded 25% of $20 million settlement). Indeed, NYS Teachers and Idaho negotiated

a fees of 24% for lead counsel (reduced from the 27% requested) in a securities fraud case which

quickly settled for $6.75 million after informal discovery and without a motion to dismiss, and,

---

[14] *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir.1993) (25% benchmark approved); *Nichols v. Smithkline Beecham Corp.*, No. 00-6222, 2005 U.S. Dist. LEXIS 7061, at *69-*70, 2005 WL 950616 at *21 (E.D. Pa. Apr. 22, 2005) (30% fee award); *In re Ravisent Tech., Inc. Secs. Litig.*, No. 00 CV 1014, 2005 U.S. Dist. LEXIS 4718, at *35-*36, 2005 WL 697461 at *10 (E.D. Pa. Apr. 18, 2005) (33 1/3% award). *See also,* Supp. Decl. Ex. 19 (a list of mega antitrust recoveries where the fee award exceeded 20%).

[15] This study was attached as Ex. 4 to the Supp. Comp. filed on April 15, 2005. It shows in 40% of the cases, the fees requested were 33%.

12

where, as here, the defendant's financial health was "dubious." *See In re Alloy, Inc. Sec. Litig.*, 03

Civ 1597, 2004 U.S. Dist. LEXIS 24129, at \*9, 2004 WL 2750089 at \*3 (S.D.N.Y. Dec. 2, 2004).[16]

Thus, although the superior results in this case would justify a *request* for 25%, Lead Counsel

is seeking only 20%. Moreover, *awards* of 20% or more are routine in comparable cases, even

where the lead plaintiff is an institutional investor:

| **Institutional Lead Plaintiff/ Case** | **Fee Award/ Settlement** |
|---|---|
| Colorado Public Emples Ret. Assn., PBHG Fds.<br>*In re Oxford Health Plans, Inc. Sec. Litig.*,<br>MDL No. 1222, Order and Final Judgment (S.D.N.Y. filed June 12, 2003) | 28% of \$300 million Settlement |
| Philadelphia Bd of Pens. & Ret.<br>*In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166 (E.D.Pa 2000) | 30% of \$111 million Settlement |
| Central Laborers Pen. Fd., City of Sterling Hts. via<br>Gen. Emples. Ret. Sys., City of Sterling Hts.<br>*In re First Energy Corp. Sec. Litig.*, No. 03-CV-1684,<br>Order (N.D. Ohio filed Dec. 30, 2004) | 23% of \$84.5 million Settlement |
| Minnesota St. Bd. of Inv.<br>*In re Mercury Finance Co.*. No. 97 C 3035, Orders (N.D. Ill. filed July 27, 2000, and filed July 9, 2001) | 33.33% of \$56.4 million Settlement |
| ZSA Asset Allocation Fd., Bernie Mermelstein-IRA,<br>Stephen S. Shuster-PSP<br>*Morse v. McWhorter*, No. 3-97-0370, 25<br>Class Action Rep. 220-21 (2004)<br>(Order (E.D. Tenn. filed Mar. 12, 2004)) | 34.02% of \$49.5 million Settlement |
| Miami Police Relief & Pen. Fds.<br>*In re Assisted Living Concepts Sec. Litig.*, No. 99-CV-167,<br>Order (D. Or. filed May 23, 2002) | 30% of \$43.5 million Settlement |
| Louisiana Muni. Police Emples. Ret. Sys.,<br>Louisiana Sch. Emples. Ret. Sys.<br>*In re Finova Group Inc. Secs. Litig.*,<br>No. 00-619, Order (D. Ariz. filed July 30, 2002) | 20% of \$40.28 million Settlement |

---

[16] The multipliers in *AMF* and *Alloy* were less than 2. However, that should be irrelevant to the fee determination, which courts recognize focuses principally on the recovery achieved.

13

| | |
|---|---|
| Clarion-CRA Secs. <br> *In re JDN Realty Corp. Secs. Litig.*, No. 1:00-CV-0396, <br> Order No. 107 (N.D. Ga. filed Nov. 15, 2001) | 20% of $39.5 million Settlement |
| Louisiana Sheriffs Pen. & Relief Fd., <br> Teachers Ret. Sys. of Louisiana <br> *In re Smartforce PLC Sec. Litig.*, No. 02-CV-544, <br> Final Judgment (D.N.H. filed Sept. 29, 2004) | 20% of $30,500,000 Settlement |
| Florida St. Bd. of Admin., Louisiana St. Emples. Ret. Sys. <br> *In re Sykes Enterprises, Inc. Sec. Litig.*, <br> No. 00-CV-212-T-26F, Order and Final Judgment (M.D. Fla. <br> filed Mar. 7, 2003) | 24% of $30 million Settlement |
| Detroit Policeman & Fireman Ret. Sys. <br> *In re Navigant Consulting, Inc. Sec. Litig.*, <br> No. 99 C 07617, Order (N.D. Ill. filed Mar. 26, 2001) | 20% of $23.1 million Settlement |
| Florida St. Bd. of Admin., New Orleans Emples Ret. Sys., <br> Louisiana St. Emples. Ret. Sys. <br> *Sands Point Ptnrs., L.P. v. Pediatrix Med. Group*, <br> No. 99 CV 6181, 2002 U.S. Dist. LEXIS 25721 <br> (S.D. Fla. May 3, 2002) | 30% of $12 million Settlement |
| Fla. St. Bd. of Admin., Teachers Ret. Sys. of Louisiana <br> *In re Dollar Gen. Corp. Sec. Litig.*, No. 01-388, Order <br> (M.D. Tenn. filed May 24, 2002) | 20.879% of $10.5 million Settlement |
| Perry Capital, Teachers Ret. Sys. of Louisiana <br> *In re Gateway, Inc. Sec. Litig.*, No. 00 CV 2435, <br> Order (S.D. Cal. filed Sept. 9, 2002) | 25% of $10 million Settlement |
| Philadelphia Bd of Pens. & Ret. <br> *In re Scholastic Corp. Sec. Litig.*, No. 97 CV 2447, 24 Class <br> Action Rep. 624 (2003) (Order (S.D.N.Y. filed Apr. 2, 2003)) | 30% of $7.5 million Settlement |
| Jefferson Heritage Ptnrs., Ltd. <br> *In re Lotus Development Corp. Secs. Litig.*, <br> No. 94-11279, Final Order and Judgment <br> (D. Mass. filed July 10, 1998) | 30% of $7.5 million Settlement |
| Louisiana Sch. Emples. Ret. Sys. <br> *In re DJ Orthopedics Inc. Secs Litig.*, No. 01-CV-2238-K, 2004 <br> US Dist LEXIS 11457, 2004 WL 1445101 (S.D. Cal. June 21, <br> 2004) | 25% of $5.5 million Settlement |
| Sound Shore Opportunity Hldg. Fd., Ltd. <br> *In re Leasing Solutions, Inc. Secs. Litig.*, No. C-98-4366, <br> 22 Class Action Rep. 405 (2001) (Order (N.D. Cal. Filed <br> Feb. 28, 2000)) | 25% of $5 million Settlement |

14

| Teachers Ret. Sys. of Louisiana<br>*Teacher's Retirement v. A.C.L.N. Ltd.*, No. 01-11814,<br>No. 01-11814, 2004 U.S. Dist. LEXIS 8608,<br>2004 WL 1087261 (S.D.N.Y. May 14, 2004) | 20% of the \$5.5 million Settlement |
|---|---|

## C.     Sub-20% Fee Awards Are Not the Rule

NYS Teachers cites several decisions (for the most part from outside this Circuit) where the fees awarded were less than 20%. Significantly, these include some of the same decisions cited to, and rejected by, the court in *Xcel*. In one such case, *In re Bankamerica Secs. Litig.*, 228 F. Supp. 2d 1061 (E.D. Mo. 2002), The Hon. John F. Nangle awarded fees of 18% on a \$460 million settlement. The \$82.8 million fee was granted even though the risk of limited or no recovery in *Bankamerica* was far smaller than here. Defendant BankAmerica had very deep "pockets," particularly compared to debt ridden Charter. Moreover, the proxy fraud claims arising out of BankAmerica's merger did not require proof of scienter, an element for Rule 10b-5 fraud claims asserted here. *Xcel*, 2005 U.S. Dist. LEXIS 6432, at \*33, 2005 WL 840370 at \*10.

*In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 285 (D.N.J. 2000), *aff'd in part, vacated in part*, 264 F.3d 201 (3d Cir. 2001), *after remand*, 243 F. Supp. 2d 166 (D.N.J. 2003), is also inapposite. That "was a simple case in terms of liability," 264 F.3d 197. Moreover, Cendant's financial situation was much more sound than Charter's.

*In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229 (S.D.N.Y. 2005), is equally distinguishable. There, the company was compelled to pay the SEC \$150,000,000 to settle fraud claims. That SEC settlement coincided with settlement of the class action for twice that amount. Clearly, the class action settlement in *Bristol-Myers* (which occurred while the dismissal of the complaint was being appealed) was driven by the company's desire to settle with the SEC. In stark

15

contrast, in this case, the SEC settled with Charter for *no money whatsoever,* just injunctive relief. Thus, there can be no suggestion that the SEC settlement drove the recovery achieved by Lead Plaintiff here.[17]

While institutional investors have negotiated lower fee rates during the course of litigation in a few cases (where potential recoveries were far larger than in this case), it is unfair to speculate with hindsight what such a rate could have been in this case, much less assume that it would be significantly below the *prevailing* "market rates" for attorneys in contingent lawsuits. *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986).[18]  The 20% fee request is substantially below the 33⅓% contingency fees typically negotiated by plaintiffs in non-class litigations:

> In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery.

*Blum v. Stenson*, 465 U.S. 886, 902 n.* (1984) (Brennan, J., Marshall, J., concurring); *see also Teamsters Local Union No. 604 v. Inter-Rail Transp., Inc.*, No. 02 CV 1109, 2004 U.S. Dist. LEXIS 6363, at *3-*4, 2064 WL 768658 at *1 (S.D. Ill. Mar. 19, 2004) (Court awarded requested fee of 19%, while acknowledging: "'The utilization of the market percentage method, as one district court has observed, results in awards of attorneys' fees "equal to approximately *one-third or more* of the

---

[17]  In this case, negotiations regarding the Settlement were ongoing for six months before an agreement was reached. Gross Decl. ¶¶ 78-88. The fact that Charter's settlement with the SEC was announced just a week before the Settlement was disclosed in this case suggests that, if anything, the non-compensatory SEC settlement was driven by the class action settlement, not vice-versa.

[18]  *See also In re Synthroid Marketing Litig.*, 325 F.3d 974, 978-80 (7th Cir. 2003) (awarding 22%, while reversing the lower fees granted by the district court; The Court of Appeals endorsed a tiered approach: 30% of the first $10 million, 25% of the next $10 million, 22% of the recovery from $20 million to $46 million, and 15% of higher amounts).

recovery.'") (citation omitted, emphasis supplied); *Ikon Office*, 194 F.R.D. at 194 (awarding 30%, and acknowledging that in private contingency tort matters, plaintiffs' counsel routinely negotiate agreements between 30%-40%); *In re Prudential-Bache Energy Income Pshps. Sec. Litig.*, No. 888 Sec. E, 1994 U.S. Dist. LEXIS 6621, at *4, 1994 WL 202394 at *2 (E.D. La. May 18, 1994) (awarding 25%, while noting: "Were this not a class action, attorney's fees would range between 30% and 40%, the percentage commonly contracted for in contingency cases."); *Phemister v. Harcourt Brace Jovanovich, Inc.*, No. 77 C 39, 1984 U.S. Dist. LEXIS 23595, at *40-*41, 1984 WL 21981 at *15 (N.D. Ill. Sept. 14, 1984) ("The percentages agreed on [in non-class action damage lawsuits] vary, with one-third being particularly common.").

Objector Lockshine's cites the study by Stuart J. Logan, Jack Moshman and Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 169 (2003) ("Logan Study"), which found that fee awards for settlement greater than $100 million averaged 15.1%. However, that study was recently debunked because it "relies on outdated data and [is] an overly broad study that covers every type of class action." *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 444 (D.N.J. 2004). As Professor Coffee explained in his affidavit in *Lucent*, when old cases reflecting a strictly lodestar analysis are eliminated and fee awards in more recent mega settlements considered, the weighted average basis of awards in cases settling for $100 million or above is over 20%. Declaration of John C. Coffee, Jr. submitted in *Lucent,* at 11-17 (No. 00-cv-621-(JAP), Doc. No. 179 filed Dec. 9, 2004) (Supp. Decl. Ex 13) ("Coffee Decl.").

Finally, Lead Plaintiff here *is* a sophisticated institutional investor, which actively participated in the prosecution and mediation of this case, and has shown a firm commitment to advocating the best interests of the Class. For sound reasons, it has consented to the fee request.

17

## D.    Lead Counsel Assumed Significant Risks of Little or No Recovery

Several objectors insist that, although they took no part in this litigation, the case was a no

brainer and that the outcome was a foregone conclusion. The objectors blithely reference the

government's actions, as well as Merrill Lynch's July 18, 2002 downgrade of Charter.

These objectors have obviously not reviewed the 50 page detailed Gross Declaration filed

on April 15, 2005 which discusses the risks in this case, and the hurdles Lead Plaintiff had to

overcome. Had they done so, they would have seen that;

- The subscriber overcount scheme set forth in the Indictment covered only a short portion of the Class Period, from July, 2001 through the end of the year. Plaintiffs' own investigation pushed the commencement back to February, 2001. Gross Decl. ¶¶ 120-28.

- The Indictment was silent regarding any accounting claims other than two kickback transaction that affected the results of one quarter in 2000. Gross Decl. ¶ 113.

- While Charter restated two years of its financial results, such restatements alone are insufficient to prove scienter.[19]  Indeed, the explanation given to the SEC for the restatement by Charter's new accountants, KPMG LLP, indicated that the issue was lack of documentation, not improper accounting, thus suggesting that the inflated financials arose from mismanagement and internal control problems following Charter's acquisitions, rather than deliberate fraud. Gross Decl. ¶¶ 137, 150, 159.

- Moreover, Charter asserted that the SEC had previously endorsed its treatment of certain items that were subsequently reversed. This would be consistent with the SEC's failure to fine the Company. Gross Decl. ¶¶ 153, 157.

- If Lead Plaintiff prevailed on the accounting claims in this case, it would have been due to its independent investigation that located several former employees who stated that Charter was improperly capitalizing customer service representative salaries and third party acquisition costs. Gross Decl. ¶¶ 141, 154.

---

[19] *See, e.g.*, *Goldberg v. Household Bank, F.S.B.* 890 F.2d 965, 967 (7th Cir. 1989) (restatements of earnings are common, the aftermath of negligence at most, unless the investor knows something casting it in a more sinister light); *In re Rural Cellular Corp. Sec. Litig.*, No. 02-Civ-4893, 2004 U.S. Dist. LEXIS 10577, 2004 WL 1278725 (D. Minn. June 6, 2004).

18

- In any event, regardless of its ability to prove that Charter recklessly inflated it cash flow and subscriber growth rates, Lead Plaintiff had to demonstrate that such inflation contributed to the losses sustained by Class members. **The restatement and government actions provided no benefit on these "loss causation" matters**. Indeed, Lead Plaintiff had to overcome the fact that Charter stock rose when it wrote off all the customers that were the subject of the Indictment's over count scheme. It took Lead Counsel's ingenuity to persuade defendants that they were potentially exposed to damages in excess of \$0.70 per share decline in Charter stock that took place in connection with the July and August disclosures. Gross Decl. ¶¶ 197-98.

- Even if Lead Plaintiff proved loss causation, the likelihood of collecting any sizable judgment from Charter was highly problematic. Through shrewd negotiating, Lead Counsel structured a package that enabled Charter to provide the Class with significant compensation (including securities) representing upwards of 93% of the likely recovery, while enabling the Company to continue operating. Gross Decl. ¶ 196.

Under these circumstances, the risks undertaken and overcome, particularly relative to the spectacular recovery, support an award of 20%.

### E.     The Objectors' Focus on the Lodestar/Multiplier Is Misplaced

Though this litigation was concluded within 2½ years, it required the investment of over 13,600 hours of plaintiffs' counsel's time, with an aggregate lodestar of over \$5.2 million, none of which has been compensated to date. All plaintiffs' counsel in this action should be applauded for concluding the litigation within this time frame, and rewarded accordingly. *See Xcel*, 2005 U.S. Dist. LEXIS 6432, at *18, 2005 WL 840370 at *5 ("This is the type of complex litigation that easily could have dragged on for several more years."); *In re M.D.C. Holdings Sec. Litig.*, No. 89-0090, 1990 U.S. Dist LEXIS 15488, at *21, 1990 WL 454747 at *7 (S.D. Cal. Aug. 30, 1990) (In awarding 30% fee, court concluded: "Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlement — especially in complex class action cases — should be done."); *Di Giacomo*, 2001 U.S. Dist. LEXIS 25532, at *32-*33, 2001 WL 34633373 at *11; *In re Activision Sec. Litig.*, 723 F. Supp. 1372, 1378 (N.D. Cal. 1989).

19

For the very reason that the lodestar approach creates delays and undue burdens on judicial resources, courts in this Circuit and elsewhere have consistently embraced the primacy of the percentage of recovery approach for determining fees. Under the percentage approach, "'[t]he more the attorney succeeds in recovering money for the client, and the fewer legal hours expended to reach the result, the higher dollar amount of fees the lawyer earns.'" *Xcel*, 2005 U.S. *Dist.* LEXIS 6432, at *16, 2005 WL 840370 at *4 (citation omitted). Therefore, "'one of the primary advantages of the [percentage of recovery] method is that it is thought to equate the interests of class counsel with those of the class members and encourage class counsel to prosecute the case in an efficient manner.'" *Id.* (citation omitted).[20]

Nonetheless, several objectors fault Lead Counsel because the 20% fee requested would result in an award in excess of a "3" multiplier. This focus on the lodestar/multiplier is entirely misplaced, and would undermine the very policy reasons encouraging early settlements. Moreover, as recognized in *Xcel* (25% fee/ 4.7 multiplier): "In the Eighth Circuit, use of a percentage method of awarding attorney fees in a common-fund case is not only approved, but also 'well established.'" *Id.*, LEXIS, at *15, WL at *4 citing *Petrovic*, 200 F.3d at 1157. Indeed, in *Johnston*, 83 F.3d at 245, the Eighth Circuit approvingly cited the Third Circuit's Task Force Report (*Court Awarded Attorney Fees*, Report of the Third Circuit Task Force, 108 F.R.D.237 (1985)), which recommended use of the percentage method, while identifying the pitfalls of the lodestar approach. As stated in *Johnston*:

> The Task Force discussed some of the deficiencies of the lodestar process particularly as it applies to a fund case. First, calculation of the lodestar increases the workload of an already over-taxed judicial system. Second, the elements of the lodestar process are insufficiently objective and produce results that are far from

---

[20] Indeed, "the PSLRA incorporates the common fund percentage method." *Id.* LEXIS, *15 n.6, WL *4 fn.6, citing 15 U.S.C. § 78u-4(a)(6).

homogenous. Third, the lodestar process creates a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law. Fourth, the lodestar is subject to manipulation by judges who prefer to calibrate fees in terms of percentages of the settlement fund or the amounts recovered by the plaintiffs or of an overall dollar amount. Fifth, although designed to curb certain abuses, the lodestar approach has led to others. **Sixth, the lodestar creates a disincentive for the early settlement of cases. The report in this area added ". . . there appears to be a conscious, or perhaps, unconscious, desire to keep the litigation alive despite a reasonable prospect of settlement, to maximize the number of hours to be included in computing the lodestar."** Seventh, the lodestar does not provide the district court with enough flexibility to reward or deter lawyers so that desirable objectives, such as early settlement, will be fostered. Eighth, the lodestar process works to the particular disadvantage of the public interest bar. Ninth, despite the apparent simplicity of the lodestar formulation, considerable confusion and lack of predictability remain in its administration. *Court Awarded Attorney Fees*, 108 F.R.D. at 246-49.

83 F.3d at 245 n.8. (Emphasis Supplied).

The lodestar approach has also been faulted for its emphasis on the amount of effort invested

- rather than the effectiveness of that effort:

> Where success is a condition precedent to compensation, "hours of time expended" is a nebulous, highly variable standard, of limited significance. One thousand plodding hours may be far less productive than one imaginative, brilliant hour. A surgeon who skillfully performs an appendectomy in seven minutes is entitled to no smaller fee than one who takes an hour; many a patient would think he is entitled to more.

*Mashburn v. National Healthcare, Inc.*, 684 F. Supp. 679, 689 (M.D. Ala. 1988) (citation omitted).

Although courts will sometimes utilize the lodestar to "cross check" the reasonableness of

the percentage awarded, there is no *requirement* to do so in the Eighth Circuit. *See*, *Xcel*, 2005 U.S.

Dist. LEXIS 6432, at *39, 2005 WL 840370 at *12. In any event, "the lodestar cross-check does not

trump the court's primary reliance on the percentage of common fund method." *Id.* LEXIS, at *40,

WL at *12.

21

Significantly, in *Xcel* and *Rite Aid*, the courts awarded multipliers of 4.7 and 6.96 respectively, despite the identical argument by NYS Teachers that the multipliers were too high. Each court stressed that there is no mandate that multipliers "'fall within any pre-defined range, provided the district court justifies the award.'" *Xcel*, LEXIS, at \*34, WL at \*10, quoting *Rite Aid*, 396 F.3d at 306 (where the court cautioned against setting fees in a "formulaic way" 396 F.3d at 301). Indeed, the court in *Rite Aid* made clear that a fee award "need entail neither mathematical precision nor bean-counting." 396 F.3d at 306.

Here, fees of 20% of the settlement yield a 5.61 multiplier, which is within the range of multipliers awarded in comparable complex cases.

| Case | Multiplier |
| --- | --- |
| *Weiss v. Mercedes Benz of N. Am.*, 899 F. Supp. 1297 (D.N.J. 1985) | 9.3[21] |
| *Perrera v. Chiron Corp.*, Civ. No. 95-20725-SW (N.D. Cal. 1999) | 9.14[22] |
| *Cosgrove v. Sullivan*, 759 F. Supp. 166 (S.D.N.Y. 1991) | 8.84[23] |
| *In re Buspirone Antitrust Litig.*, No. 01-MD-1413, (S.D.N.Y. April 17, 2003) | 8.46[24] |
| *Newman v. Caribiner Int'l, Inc.*, No. 99 Civ. 2271 (S.D.N.Y. Oct. 19, 2001) | 7.7[25] |

---

[21]   ("Coffee Decl. at 22), Supp. Decl. Ex 13.

[22]   *Id.*

[23]   *Id.*

[24]   *Id.*

[25]   *Id.*

22

| | |
|---|---|
| *In re InfoSpace, Inc. Sec. Litig.*, <br> 330 F. Supp. 2d 1203 (W.D. Wash. 2004) | 7.5 |
| *In re RiteAid Corp.*, MDL Dkt. No. 1360, <br> Master File No. 99-1349 2005 U.S. Dist. LEXIS 4718, 2005 <br> WL6997461 (E.D.Pa. Mar. 24, 2005) | 6.96 |
| *In re 3Com Sec. Litig.*, <br> No. 97-21083 Order (N.D. Cel. Mar. 9, 2001) | 6.67[26] |
| *In re Triangle Indus. Shareholders Litig.*, <br> No. 10466, 1991 Del. Ch. LEXIS 203, 1991 <br> WL 275766 (Del. Ch. Dec. 19, 1991) | 6.6 [27] |
| *In re RJR Nabisco, Inc. Sec. Litig.*, <br> 1992 U.S. Dist. LEXIS 12702, 1992 WL 210138 <br> (S.D.N.Y. Aug. 24, 1992) | 6[28] |
| *Boston & Maine Corp. v. Sheehan,* <br> *Phinney, Bass & Green, P.A.*, <br> 778 F.2d 890, 894 (1st Cir. 1985) | 6 |
| *Roberts v. Texaco, Inc.*, <br> 979 F. Supp. 185 (S.D.N.Y. 1997) | 5.5[29] |
| *Lemmer v. Golden Books Family Entertainment, Inc.*, <br> No. 98 Civ. 5748 (S.D.N.Y. Oct. 12, 1999) | 5.3[30] |
| *Di Giacomo,* <br> 2001 U.S. Dist. LEXIS 25532 , <br> 2001 WL 34633473 | 5.3 |
| *In re Waste Management, Inc. Sec. Litig.*, <br> No. 99-2183 (S.D.Tex. Apr. 29, 2002) | 5.29[31] <br> (case settled for <br> $457 million) |

[26]   *Id.*

[27]   *Id.*

[28]   *Id.*

[29]   *Id.*

[30]   Coffee Decl. at 23, Supp. Decl. Ex. 13.

[31]   Cited in *Logan Study*, 169, Supp. Decl. Ex 2.

| *In re Beverly Hills Fire Litig.*, 639 F. Supp. 915, 924 (E.D. Ky. 1986) | $5^{32}$ |
| *Glendora Comm'ty Redevelopment Agency v. Demeter*, 155 Cal. App. 3d 465, 202 Cal. Rptr. 380, 398-99 (App. 2d Dist. 1984) | 12 |
| *Wilson v. Bank of Am. Nat'l Trust & Savings Ass'n*, No. 643872 (Cal. Sup. Ct. Aug. 16, 1982) | $10^{33}$ |

The award of the requested fees will offer fair and reasonable compensation to all plaintiffs'

counsel and will provide the necessary incentive to competent and reputable counsel to undertake

the risky and difficult task of representing the class in a complex securities fraud action.

## F.    The Objectors' Challenge to Time Incurred In Connection With Due Diligence Discovery Is Equally Unwarranted

Lead Counsel directed a significant due diligence discovery effort in connection with

execution of the MOU. This effort was an express condition of the Settlement. The due diligence

was conducted in an efficient and expedited manner, and was completed 12 weeks later despite the

fact that over one million pages of documents were reviewed and analyzed, and 10 interviews were

of defendants and key officers were conducted.

The purpose of this discovery program was two-fold. The first objective was to continue

building evidence against the non-settling defendants (Arthur Andersen, Scientific-Atlanta and

Motorola), to prosecute the claims or otherwise bring them to the bargaining table. This strategy

paid off with Andersen, which subsequently agreed to settle for $2.25 million (after it tried to block

---

[32]    Awarded to lead counsel.

[33]    *Cited in* Alba Conte and Herbert B. Newberg, *4 Newberg on Class Actions 4th Ed.* § 14:6 at 578 n.87 (West 2002).

24

this discovery effort). The Court dismissed claims against the remaining two defendants, not because of lack of evidence, but because of the split in the case-law regarding whether a party which engages in deliberate wrongdoing, but "makes" no statement to the market, can nonetheless be sued for securities law violations. That dismissal is now being appealed, with the additional evidence now part of the record.

The second objective was to confirm the assumptions Lead Plaintiff and its counsel made during the settlement negotiations regarding the evidence supporting, and undercutting, the claims at issue here. This was particularly important since the "release" demanded by defendants, which is typical in these cases, included a discharge of all claims that were or "could have been" asserted in the action, including known and "unknown" claims. Thus, in entering the MOU, Lead Plaintiff expressly reserved the right to:

> withdraw from the Settlement if the results of its due diligence demonstrate that there are material and significant claims that were previously unknown to Class Action Plaintiff, such that it would warrant reconsideration of the appropriateness of the Settlement.

MOU, Aug. 5, 2004 ¶ 2(j). Supp. Decl. ¶ 7. While Lead Plaintiff had conducted a thorough and ongoing investigation before and during the negotiations, in the absence of any formal discovery, such additional discovery was thus deemed appropriate and necessary. *See Reynolds v. Beneficial Nat. Bank*, 260 F. Supp. 680 (W.D. Ill. 2003) (absence of confirmatory discovery one reason for disapproval of settlement). Even the case cited by NYS Teachers (*Bristol-Myers*, 361 F. Supp. 2d at 235) acknowledged that "post-settlement confirmatory discovery can serve important purposes." *Id.*[34] If Lead Counsel had uncovered information that undercut the fairness of the settlement, they

---

[34] The court in *Bristol-Myers* did caution that such discovery can be excessive. However, as discussed in the Supp. Decl., Lead Plaintiff conducted an efficient and expedited due

25

had the right to walk away from it. This was not just a theoretical possibility. *See In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543 (D.N.J. 1992) *aff'd*, 7F.3d 357 (3d Cir. 1993)(class counsel abandoned settlement after due diligence discovery).

Thus, the time expended in connection with due diligence should not be discounted for any reason.

## G.    NYS Teachers' Other Objections to the Lodestar Are Misplaced

NYS Teachers additionally challenges the lodestar on two grounds. First, it attacks the time spent on discovery in this action, asserting that it evidences inefficient management of the due diligence program in particular, and the case in general. The attack is flawed for a number of reasons. First, it ignores that a portion of the discovery pre-dated the due diligence program. See Supp. Decl. ¶¶ 5, 6. Moreover, the due diligence component was efficiently staffed, solely by associates from a few firms (with the exception of partners who conducted the actual interviews). Moreover, the entire program was completed in 12 weeks after execution of the MOU, indicative of the efficiency of the effort. *Id.* 7-21. Thus, all the discovery related time should be fully compensated.

NYS Teachers also questions the inclusion of the time incurred by several firms in preparing their initial complaints and vying for lead plaintiff. None of these cases were dismissed. They were all consolidated in the amended complaint. They provided a significant breadth of plaintiffs, making clear that any effort to defeat class certification would have been futile. Several of the firms assisted the prosecution of the case by providing additional personnel to review and analyze documents for

---

diligence.

26

preparation of the Amended Complaint and for the due diligence program. Thus, their efforts throughout the lawsuit contributed to its successful resolution.

Moreover, NYS Teachers lumps together all the firms' time into these two categories, including that of Lead Counsel (327 hours), as well as two other firms whose work product contributed to the Amended Complaint; Glancy Binkow, which filed the first action (109 hours.); and Milberg Weiss (248 hours). Both firms conducted their own independent investigations (Milberg Weiss retained a private investigator), and shared the benefits of that investigation with Lead Plaintiff. Even if the Court were to disallow the time of all the other firms, the ultimate impact on the lodestar/multiplier would not be significant, and would not warrant reduction of the percentage award requested. The total hours as adjusted would be 12,108; the total lodestar would be approximately $4.7 million. The multiplier for a 20% award would increase to 6.2, which is still within the range of awards for cases discussed above at pp. 22-24.

Moreover, the focus on the quantity of time, rather than the quality of the results, is contrary to the public policy concerns underlying the preference for the percentage methodology; i.e., to encourage expeditious resolution of complex cases; to align the interests of counsel with that of the class; and to discourage attorneys from simply racking up time to enhance their own potential rewards.[35]

---

[35] NYS Teachers invokes several earlier decisions by courts whose approaches have been criticized elsewhere. *See In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943 (N.D. Ill. 2001) (Judge Shadur relied on an auction procedure to select lead counsel, a procedure "inconsistent with the statutory scheme embodied in the Reform Act [PSLRA]." *See Cendant*, 264 F.3d at 260 n.45); *In re HPL Techs., Inc.*, No. C-02-3510 VRW, 2005 U.S. Dist. LEXIS 7244, at *29, 2005 WL 941586 at *10 (N.D. Cal. Apr. 22, 2005) (Judge Walker, the originator of the auction procedure (*Cendant*, 264 F.3d at 260 n. 45), again demonstrated his extreme position concerning fees by suggesting that it would be a good practice if, at the "outset of the case," a lead counsel submits a "quantitative assessment of the probability of

27

## H.    The "Professional" Objections Should Be Rejected

In class action settlements of significant amounts, it has become *de rigeur* for a select few

attorneys (claiming to champion the interests of class members) to object to the fees being sought,

whatever the amount. One of these attorneys, John J. Pentz, Esq., appeared in this action on behalf

of Rory Valas, who purchased 400 shares of Charter. (Lead Plaintiff StoneRidge purchased

1,385,000 Charter shares).[36] The American Lawyer aptly described Mr. Pentz as a "holdup artist."[37]

Elsewhere, Mr. Pentz (who previously identified himself as "The Objectors Group"), was

characterized as a "repeat objector," with "a groundless objection". *In re Compact Disc Minimum*

*Advertised Price Antitrust Litig.*, MDL 1361, 2003 U.S. Dist. LEXIS 25788, at *6 n.3, 2003 WL

22417252 at *2 fn.3 (D. Me. Oct. 7, 2003).

Mr. Pentz has admitted that most of his compensation comes from payments by class counsel

in exchange for *dropping* objections.[38] An adversary "who faced off with Pentz in three different

cases, says he has always paid Pentz to drop objections without making changes to the settlement.

---

success and the likely effort entailed in obtaining various recoveries," against which a fee
request at the end of the case would be evaluated. That court's penchant for "departing"
from statutory scheme of the PSLRA to satisfy its own beliefs about fee arrangements is
well known. *See In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002) (reversing Judge Walker
refusal to appoint as lead plaintiff the investor with the largest financial loss in favor of a
small investor, who, in the court's opinion, had negotiated the lowest attorney fee
agreement; the Ninth Circuit concluded that "the district court has no authority to select for
the class what it considers to be the best possible lawyer or the lawyer offering the best
possible fee schedule").

[36] Supp. Decl. Ex. 18.

[37]*Lerer/Pentz Article*, Supp. Decl. Ex. 17.

[38] *Id.*

'It's like having to pay a tax.'"[39]  According to another article, in connection with settlement involving AT&T phone cards, "Pentz and 12 other objectors filed appeals in the case, but all of the objectors have dropped their appeals. Pentz said he was paid to dismiss his appeal, but the amount is confidential."[40]

The same can be said of Nicholas M. Fausto, Esq. *See In re Rent-Way Secs. Litig*, 305 F. Supp. 2d 491, 519-20 (W.D. Pa. 2003) (denying Mr. Fausto's request for a fee award for his objection); *Paypal Litig.*, 2004 U.S. Dist. LEXIS 22470, at *10, 2004 WL 2445244. In this case, he has filed an objection for Ann Mitchell, without bothering to submit basic transactional documentation required by the Notice concerning purchases and sales of Charter stock. For this reason alone, the Court should deny the objection.

Courts have looked disfavorably on such professional objectors. *See O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003) ("Federal courts are increasingly weary of professional objectors."); *Spark v. MBNA Corp.*, 289 F. Supp. 2d 510, 512-15 (D. Del. 2003)

---

[39] *Id.*

[40] Brian Brueggemann, *AT&T may give charities phone cards; Part of settlement in class-action suit*, BELLEVILLE NEWS-DEMOCRAT, Apr. 7, 2003, sec. A, p. 20. Supp. Decl. Ex. 14. Other cases where Pentz objected, include, *Morris v. Lifescan, Inc.* 54 Fed. Appx. 663 (9th Cir. 2003) (Not selected for pub. in the Fed. Rptr.) (affirming fee award of 33%); *Tenuto v. Transworld Sys., Inc.*, No. 99-4228, 2002 U.S. Dist. LEXIS 1764, at *6-*14, 2002 WL 188569 at *2-*3 (E.D. Pa. Feb. 2, 2002); *In re Paypal Litig.*, No. 02-1227-JF PVT, 2004 U.S. Dist. LEXIS 22470, 2004 WL 2445244 (N.D. Cal. Oct. 13, 2004) (awarding 30% in fees); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002) (22.5% fee award) *aff'd*, 391 F.3d 516 (3d Cir. 2004); *Benacquisto v. American Express Fin. Corp*, No. 00-1980 DSD/JMM, 2001 U.S. Dist. LEXIS 23914 (D. Minn. May 15, 2001) (requested fees awarded); *In re Rite Aid Corp. Sec. Litig.*, 269 F. Supp. 2d 603 (E.D. Pa. 2003), *vacated and remanded*, 396 F.3d 294 (3d Cir.2005), *aff'd on remand*, MDL Dkt. No. 1360, Master File No. 99-1349, 2005 U.S. Dist. LEXIS 4718, 2005 WL 697461 (E.D. Pa. Mar. 24, 2005), and David B. Caruso, *Judge sign off on KPMG settlement after settling legal fees*, ASSOCIATED PRESS, June 3, 2003 (Supp. Decl. Ex. 15).

(court denied Pentz's fee request because his objection did not result in any benefit to the class). *See also Rite Aid*, 269 F. Supp. 2d at 610 n.9 (criticizing "a professional gadfly" who had "become a twelfth-hour squeaky wheel" (*vacated on other grounds*, 396 F.3d 294)); *Shaw v. Toshiba America Info. Sys., Inc.*, 91 F. Supp. 2d 942, 973 (E.D. Tex. 2000) ("[S]ome of the objections were obviously canned objections filed by professional objectors who seek out class actions to simply extract a fee").

**I.    Ms. Lockshine's Objections to the Notice, Time of Payment of Fees and Amount of Payment to Lead Plaintiff Is Without Justification**

The Notice mailed to Class members more than adequately described the recovery obtained, the relevant proceeding, the attorneys' fees requested and the rights and obligations of Class members, and other information to enable a Class member to make an informed judgment as to whether to participate in the Settlement, object to it or the requested fees, or to opt out.  In compliance with the PSLRA, the Notice also specified the number of shares Lead Plaintiff's expert estimated were damaged and represented that the recovery per share if every class member submitted a proof of claim. *See* 15 U.S.C. § 78u-4(a)(7)(A).[41]

---

[41] The relevant section provides:

> (7)    Disclosure of settlement terms to class members.  Any proposed or finasettlement agreement that is published or otherwise disseminated to the class shall include each of the following statements, along with a cover page summarizing the information contained in such statements:
>
> (A)    Statement of plaintiff recovery. The amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis.
>
> (B)    Statement of potential outcome of case.
>
> (i)    Agreement on amount of damages. **If the settling parties agree** on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title [15 U.S.C. §§ 78a *et seq.*], a statement concerning the average amount of such potential damages per share.

The additional details that Ms. Lockshine insists should have been included in the Notice concerning total amount of damages, and percentage of damages recovered, are not required by the PSLRA, where, as here, there is a disagreement among the parties about the average amount of damage on a per share basis. *See* 15 U.S.C. § 78u-4(a)(7)(B). The PSLRA requires, and the Notice (¶ 3) describes, the reasons for the disagreement — *e.g.*, the appropriate economic model for determining damages, the amount, if any, of the artificial inflation, and non-fraud related market or other forces affecting the price of Charter stock. *See*, *Rent-Way*, 305 F. Supp. at 511 (Court rejected a similar objection, reasoning that the objector "demands a level of specificity not required by Rule 23(e), federal due process standards, or the PSLRA." (citation omitted)); *see also Petrovic*, 200 F.3d at 31.

Moreover, Ms. Lockshine is represented by counsel, who had access to papers Lead Plaintiff filed last month in support of settlement and fees. These papers detail the damage estimates of both defendants (100%) and Lead Plaintiff (upwards of 93% for claimants likely to file). Thus, the adequacy of the Notice and record supporting the Settlement is beyond doubt.

Ms. Lockshine's attack on the $26,625 compensatory award requested by Lead Plaintiff is also misplaced. (She erroneously assumes that request is for $30,000.) The Affidavit of Joseph Stocke shows that the Class clearly benefitted from the time Lead Plaintiff expended aiding the

---

> (ii)    **Disagreement on amount of damages.**
> If the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title [15 U.S.C. §§ 78a *et seq.*], a statement from each settling party concerning the issue or issues on which the parties disagree.

15 U.S.C. §§ (a)(7)(A)-(B)(i)-(ii), (boldface added).

31

pursuit of these claims. The request is modest relative to other awards. *See Xcel*, 2005 U.S. Dist. LEXIS 6432, at *43, 2005 WL 840370 at *13 ($100,000 to one lead plaintiff); *In re Dun & Bradstreet Credit Servs. Cust. Litig.* 130 F.R.D. 366, 376 (S.D. Ohio 1990) ($215,000 to four named plaintiffs).

## CONCLUSION

For all of the reasons stated above, Lead Plaintiff respectfully requests that the Court: (1) deny the objections, (2) approve the Settlement, and (3) award the requested (a) 20% in fees to plaintiffs' counsel, (b) $671,734.64 in expenses and (c) $26,625 Compensatory Award to Lead Plaintiff.

Dated: May 13, 2005

POMERANTZ HAUDEK BLOCK
GROSSMAN & GROSS LLP

Stanley M. Grossman
Marc. I. Gross
Shaheen Rushd
100 Park Avenue, 26th Floor
New York, New York 10017
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
E-mail: migross@pomlaw.com

Patrick V. Dahlstrom
Leigh R. Handelman (Bar No. 116606)
One North LaSalle Street, Suite 2225
Chicago, Illinois 60602
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: pdahlstrom@pomlaw.com
E-mail: lsmollar@pomlaw.com

*Lead Counsel For Lead Plaintiff StoneRidge
Investment Partners LLC and the Class*

32

**LAW OFFICES OF WOLFF
AND D'AGROSA**
Paul J. D'Agrosa (Bar No. 20852)
8019 Forsyth Street
Clayton, Missouri 63105
Telephone: (314) 725-8019
Facsimile: (314) 725-8443
E-mail: wolffdagrosa@birch.net

*Liaison Counsel for Lead Plaintiff and the
Class*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on May 19, 2005 he served a true copy of this Motion by first class mail on the counsel listed below:

Philip A. O'Connell, Jr.
SONNENSCHEIN NATH & ROSENTHAL LLP
155 Federal Street, 17th floor
Boston, MA 02110

John J. Pentz

3